**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISON**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION and STATE OF GEORGIA,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN D. PEYROUX, individually and as an owner and officer of REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC, also d/b/a Stem Cell Institute of America, LLC, PHYSICIANS BUSINESS SOLUTIONS, LLC, and SUPERIOR HEALTHCARE, LLC,<br><br>BRENT J. DETELICH, individually and as an officer of REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC, also d/b/a Stem Cell Institute of America, LLC,<br><br>REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC, a limited liability company, also d/b/a Stem Cell Institute of America, LLC,<br><br>PHYSICIANS BUSINESS SOLUTIONS, LLC, a limited liability company, and<br><br>SUPERIOR HEALTHCARE, LLC, a limited liability company,<br><br>Defendants. | : | **Case No. 1:21-cv-03329-AT** |

## TABLE OF CONTENTS


**I. INTRODUCTION** ........................................................ **1-2**

**II. STATEMENT OF MATERIAL FACTS**............................. **2-10**

**III. SEPARATE AND DISTINCT CAUSES OF ACTION UNDER FEDERAL LAW AND STATE LAW** ................................ **10-12**

**IV. ARGUMENT AND CITATION OF AUTHORITY**................. **12-24**

A. Standard for Summary Judgment ..................................... **12-13**

B. Violations for the FTC Act and Georgia's FBPA .................. **13-15**

C. Dissemination of False and Misleading Representations Using a Computer ....................................................... **15-16**

D. The Common Enterprise ............................................. **17-21**

E. Individual Liability .................................................. **21-24**

**V. MONETARY RELIEF** ................................................ **24-34**

A. Civil Penalties Under Section 397 .................................. **24-26**

1. O.C.G.A. § 10-1-397(b)(2)(B) ................................ **26-29**

2. O.C.G.A. § 10-1-397(b)(2)(D) ................................ **29-31**

B. Civil Penalties Under Section 851 .................................. **31-34**

**VI. CONCLUSION** ........................................................ **34**

# TABLE OF AUTHORITIES

**Cases**

*105 Floyd Rd., Inc., v. Crisp County*, 279 Ga. 345, 348 (2005) …………….. **31**

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642,646 (11th Cir. 1997)………………. **12**

*Amason v. Whitehead*, 186 Ga.App. 320, 322 (1988) ……………………….. **23**

*Anderson v. Atlanta Committee for the Olympic Games*, 273 GA. 113, 114(1)(a) (2000) ……………………………………………………………….. **29, 31, 33**

*Antoskow & Assoc. LLC v. Gregory*, 278 Ga.App. 468, 470 (2005) ………. **19**

*Bouton v. Ocean Properties, Ltd.*, No. 16-cv-80502, 2017 WL 4792488, at *29-30 (S.D. FL Oct. 23. 2017) …………………………………………………… **18, 22**

*Casey v. Carrollton Ford Co.*, 152 Ga.App. 105 (1979) ……………………. **23**

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) …………… **13**

*Cobra 4 Enterprises v. Powell-Newman*, 336 Ga. App. 609, 613(2) (2016) … **20**

*Daimler Chrysler Motors, LLC v. Clemente*, 294 Ga.App. 38, 46-47 (2008) ... **19**

*Derbyshire v. United Builder Supply, Inc.*, 194 Ga.App. 840, 844 (1990) …… **23**

*Dream Defenders, et al v. Governor of the State of Florida*, 57 F.4th 879, 890 (11th Cir. 2023) ………………………………………………………………… **26**

*Golden Atlanta Site Dev., Inc. v. Nahai*, 299 Ga.App. 646, 648 (2009) ……… **19**

*Johnson v. Curenton*, 127 Ga.App. 687, 688 (1972) ……………………… **2, 13**

*Johnson v. Frankell*, 520 U.S. 911, 916 (1997) ……………………………… **17**

*Keister v. Bell*, 29 F.4th 1239, 1258 (11th Cir. 2022) …………………………….. **25**

*Kennerly v. State*, 311 Ga. App. 190, 193 (2011) ……………………………….. **31**

*Kissun v. Humana, Inc.*, 267 Ga. 419, 419-20 (1997) …………………………… **20**

*Lewis v. Suttles Truck Leasing, Inc.*, 869 F.Supp. 947, 948
(S.D. Ga. Oct. 3, 1994) …………………………………………………… **11**

*Lowery v. Noodle Life, Inc.*, 363 Ga.App.1, 3 (2022) ………………………….. **20**

*Lowery v. State*, 347 Ga.App. 26, 32 (2018) …………………………………… **19**

*May v. Morgan County*, 343 Ga. App. 255, 258(6) (2017) …………………….. **26**

*Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534
(11th Cir. 1992) ………………………………………………………….. **13**

*New Georgia Project, Inc. v. Carr*, No. 1-22-cv-035333, 2022 WL 17667828,
at *14 (N.D. Ga. Dec. 14, 2022) …………………………………………… **26, 32**

*Raynor v. American States Ins. Co.*, 176 Ga.App. 564 (1985) ………………….. **23**

*Royal Capital Development, LLC v. Maryland Cas. Co.*, 659 F.3d 1050, 1054
(11th Cir. 2011) …………………………………………………… **12, 25, 32**

*In re Schlein,* 8 F.3d 745, 754 (11th Cir. 1993) ………………………………… **11**

*Service Merchandise, Inc. v. Jackson*, 221 Ga.App. 897, 898 (1996) ……… **2, 13**

*Standard Educators, Inc. v. FTC*, 475 F.2d 401, 408 (1975) ………………….. **3**

*State of GA ex rel. Doyle v. Frederick J. Hanna & Assoc.*, P.C., 287 Ga. 289, 293
(2010) …………………………………………………………………… **15, 16**

*Stewart Brothers v. Allen*, 189 Ga.App. 816 (1989) ............................... **23**

*Theni Guru Krishna Textile Mills (P), Ltd. v. The World's Global Source, LLC,* No. 1:16-cv-1482, 2018 WL 11336434. At *9 (N.D. Ga. March 6, 2018) ...... **22, 24**

*Trans-State v. Barber*, 170 Ga.App. 372, 374 (1984) ......................... **23**

**<u>Statutes</u>**

O.C.G.A. § 10-1-391

O.C.G.A. § 10-1-392

O.C.G.A. § 10-1-393

O.C.G.A. § 10-1-393.5

O.C.G.A. § 10-1-397

O.C.G.A. § 10-1-850

O.C.G.A. § 10-1-851

O.C.G.A. § 10-1-852

28 U.S.C. § 1367(a)

**DEFENDANTS' RESPONSE TO THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the Defendants (except Brent J. Detelich), by and through their undersigned counsel, and pursuant to L.R. 56, hereby file their Response to the Motion for Summary Judgment filed by the Plaintiffs, the Federal Trade Commission (hereafter, "FTC") and the State of Georgia (hereafter, the "State). As demonstrated below, there are disputed material issues of fact, and as a matter of law, the Plaintiffs are not entitled to summary judgment on their claims.

## I. INTRODUCTION

The Plaintiffs seek summary judgment in this case consistent with their modus operandi: overwhelm the Defendants and this Court with a jury trial's worth of exhibits, offer a highly selective and distorted presentation of the facts to the Court, and endeavor to convince the Court that a jury is not needed to weigh the veracity of testimony, contradictory evidence, or inferences from the facts. Indeed, if there is an attempt to mislead in this matter, it is to be found in the Plaintiffs' herculean efforts to keep this case away from a jury's review. The Plaintiffs omit, obfuscate, and distort key material facts, and the law applicable to those facts, including:

- There is no legislative mandate for the consistent interpretation of the FTC Act and the Georgia Fair Business Practices Act ("GFBPA");

- Georgia law does not extend federally conceived "common enterprise" doctrine and individual liability short-cuts to the GFBPA context; and
- As to monetary relief, significant unsettled questions of Georgia law exist.

## II. STATEMENT OF ADDITIONAL MATERIAL FACTS

The basis of any cause of action is "who did what to whom?" Here, it is difficult to know based upon the Plaintiffs' collective allegations. Indeed, the Plaintiffs strategically make broad and sweeping allegations (e.g., "Defendants' ads," "Defendants created") to poison the well without carefully delineating from the supporting evidence "who did what to whom."[1] Plaintiffs' artfully edited material facts, drawn from a massive evidentiary record, support exactly why a jury is needed for this case: "[The jury] weighs the contradictory evidence and inferences, judges the credibility of witnesses . . . and draws the ultimate conclusion as to facts . . . **frequently amongst the fact best proved is one which no witness mentioned in his testimony, such fact being an inference from other facts**." *Service Merchandise, Inc. v. Jackson*, 221 Ga.App. 897, 898 (1996) (quoting, *Johnson v. Curenton*, 127 Ga.App. 687, 688 (1972) (emphasis added).

**Peyroux:** Defendant Peyroux is a trained and licensed chiropractor, a small

[1] See, Doc. 73-1, pp. 10, 11, & 14

business owner, an entrepreneur, and a business coach.[2] He is a hard-nose capitalist who offers blunt and at times, inelegant, views on running a business.[3] Likewise, Peyroux holds a sincere, good faith belief in whole body wellness and alternative healing, and maintains that relief from discomfort and pain are not within the exclusive purview of America's medical-industrial complex.[4] For the past twenty-eight years, Peyroux has engaged in "starting-up" businesses.[5] As is the American way, some of Peyroux's businesses succeed and some fail.[6] Unlike businesses such as Coca-Cola or UPS in which one's role is confined to the narrows of a wordsmith-authored job description, Peyroux, a small business owner, necessarily wears many hats and is involved in most aspects of his small businesses.[7] Important to the proper application of Georgia law to the facts in this case, Peyroux did not commingle corporate assets with his own, misappropriate corporate assets for his own use, or conduct his private and corporate business on an interchangeable basis.[8] While

---

[2] Defendants' Ex. 1, Peyroux Decl. ¶ 2; Def. Ex. 22 (aka Pls.' Ex. 005), Peyroux IH 12:2-7, 14:15-25, 15:1-3, 26:9-13, 47:15-25; Def. Ex. 19 (aka Pls.' Ex. 004), SHC IH 13:5-7

[3] Def. Ex. 18 (aka Pls.' Ex. 016) Peyroux Dep. 115:7-25, 116:1-5

[4] Defendants' Ex. 1, Peyroux Declaration ¶ 8; Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 43:20-25, 44:1-2

[5] Def. Ex.22 (aka Pls.' Ex. 005), Peyroux IH12:2-7

[6] Def. Ex. 22 (aka Pls.' Ex. 005), IH Peyroux 38:13-25, 39:1-25, 40:1-8

[7] Def. Ex. 23 (aka Pls.' Ex. 011) Huey Dep. 62:12-16. Despite federal courts carving out a new niche, "*guilt by office*," for the FTC in federal caselaw, ***under Georgia law*** Peyroux's participation in the operation of businesses that he owns does not make him individually liable for the acts of the Corporate Defendants. *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 408 (1975) (Circuit Judge Wilkey for the dissent articulating grave concerns with the judicial establishment of a new niche in the law for "guilt by office" and "guilt by association" that saddles a defendant with a "heavy burden of exculpation," even absent inculpating evidence and that actually shifts the burden to defendant once Plaintiff's complaint "has rested on a wink or a leer"). See, Section IV (F), *infra.*

[8] Defendants' Ex. 1, Peyroux Declaration ¶ 6; Def. Ex. 22 (aka Pls.' Ex. 005) Peyroux IH 33:10-19, 100:12-19

Peyroux received financial compensation and/or profits from Defendants Regenerative Medicine Institute of America, LLC, also d/b/a Stem Cell Institute of America, LLC ("SCIA"), Physicians Business Solutions, LLC ("PBS") and Superior Healthcare, LLC ("SHC") (collectively, hereafter, "Corporate Defendants"), said compensation was taken after the Corporate Defendants paid their expenses.[9] Peyroux kept the Corporate Defendants separate in his mind. Indeed, the record evidence of his deposition demonstrates that Peyroux did not have difficulty recalling which Corporate Defendant did what or articulating the distinctions between each of the Corporate Defendants' core efforts.[10]

**Superior Healthcare, LLC:** Defendant SHC was organized under the laws of the State of Georgia on or about December 9, ***2005***.[11] Hardly a fly by night business or "predatory business model,"[12] SHC, a medically integrated outpatient clinic, cared for patients, treated a wide array of its patients' healthcare needs,[13] and maintained a stable corporate existence from its location at 2050 Cumming Highway, Suite 100, Canton, Georgia.[14] Indeed, it was not until approximately *2016*

[9] Defendants' Ex. 1, Peyroux Declaration¶ 9; Defendants' Ex. 2, M. Peyroux Declaration ¶6
[10] Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 43:1-25, 44:1-2, 100:4-8; Def. Ex. 21 (aka Pls.' Ex. 002) PBS IH 69:2-12
[11] Defendants' Ex. 11
[12] Doc. 73-1 p. 8
[13] Def. Ex. 18 (aka Pls.' Ex. 016) Peyroux Dep. 48:25, 49:1-8; Def. Ex. 24 (aka Pls.' Ex. 008) Bernard Dep. 89:5-17
[14] Def. Ex. 18 (aka Pls.' Ex. 016) Peyroux Dep. 50:9-15, 51:4-10

that SHC even began to offer some forms of regenerative medicine to patients.[15] Once SHC began offering regenerative medicine to patients, SHC became a client of Defendant SCIA.[16] Consequently, some promotional pieces for lectures that SHC hosted on the topic of stem cell therapy also included the name, SCIA.[17] Contrary to Plaintiffs' sweeping assertion, SHC was not "the training center for PBS and SCIA."[18] In fact, Plaintiffs' own evidence establishes that some videos, like how to put on a knee brace, were shot at SHC's clinic for PBS's benefit, and Peyroux *envisioned* holding seminars in "this big [gym] facility building" but "it didn't last or work."[19]

SHC did not share its clinic space or primary telephone number.[20] Hardly a bombshell, due to space constraints a couple of SHC's ministerial employees operated from a different location.[21] Specifically, the "HR and marketing director" were one in the same person, Jenn Huey, and as Peyroux's right hand she "roved wherever she was needed."[22] SHC shared a bookkeeper, Melinda *Peyroux*, with

[15] Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 34:6-17, 35:21-25, 36:1-25, 37:1-12, 46:17-25, 47:1-25, 48:1
[16] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 57:7-18; Def. Ex. 19 (aka Pls,' Ex. 004), SHC IH 78:24-25, 79:1-6
[17] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 157:4-14; Def. Ex. 19 (aka Pls.' Ex. 004), SHC IH 134:14-25, 135:1-12
[18] Doc. 73-1 p. 26
[19] Def. Ex. 19 (aka Pls.' Ex. 004), SHC IH 69:14-23, 150:2-9.
[20] Def. Ex. 2, M. Peyroux Decl. ¶ 10; Def. Ex. 1, Peyroux Decl. ¶ 4; Def. Ex. 19 (aka Pls.' Ex. 016), Peyroux Dep. 51:4-15
[21] Doc. 73-1 p. 24; Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 51:4-15
[22] Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 52:1-8, 55:7-25, 66:2-11

other Peyroux owned businesses.[23] There was no "entire call center staff."[24] From 2005 until 2019, SHC maintained a unique federal tax identification number, unique bank accounts, paid its own employees, paid its own debts and expenses, bore its own profits and losses, and filed its own tax returns.[25] As a result of escalating rent, overhead, and other market factors, SHC filed for bankruptcy protection on October 22, 2019, and shut down its operations after fourteen years.[26]

***Physicians Business Solutions, LLC:*** Contrary to Plaintiffs' "factual" assertion, PBS was not "*created* to deploy [Defendant] SHC's deceptive advertising system across the country," nor were "marketing materials . . . [at] the heart of PBS's consulting programs."[27] In reality, PBS was created under the laws of the State of Georgia on or about January 1, ***2009***, later reorganized under the laws of the State of Nevada, and remains an active company today.[28] PBS is a consulting business. In sum, PBS consults, on a contract basis,[29] with existing healthcare practices regarding a medical integration model.[30] One aspect of PBS's consulting model involves

[23] Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 51:16-25
[24] Def. Ex. 19 (aka Pls.' Ex. 004) SHC IH 57:11-17
[25] Def. Ex. 12, 13, 14; Def. Ex. 19 (aka Pls.' Ex. 004), SHC IH 155:5-14.
[26] Def. Ex. 18 (aka Pls.' Ex. 016) Peyroux Dep. 67:20-25, 68:1-11; Def. Ex. 19 (aka Pls.' Ex. 004), SHC IH 160:3-25, 161:1-2; Doc. 1, Plaintiff's Compliant, ¶ 15
[27] Doc. 73-1, pp. 8, 26
[28] Def. Ex. 21 (aka Pls.' Ex. 2), PBS IH 70:17-25, 71:1-15
[29] Def. Ex. 21 (aka Pls.' Ex. 2), PBS IH 51:14-25, 52:1-8
[30] Def. Ex. 21 (aka Pls.' Ex. 2), PBS IH 40:15-25, 41:1-25, 42:1-25

hosting, planning, and producing client seminars.[31] During these seminars, PBS's healthcare practitioner clients (often chiropractors) are introduced to various means and methods by which the client's practice might expand the services offered to its patients (e.g., medical weight loss, hormone replacement therapy, erectile dysfunction, and regenerative medicine) thereby, enhancing profitability.[32] While PBS and SCIA occasionally held seminars that overlapped as to date and general location, the record demonstrates the seminars were not joint seminars; rather, they were distinct in terms of the clients eligible to attend, timing, speakers, content, and even specific room locations.[33] At best, Plaintiffs' artful restatement, "it made sense to have SCIA events at PBS seminars because PBS already paid for the event," mischaracterizes Peyroux's in-depth testimony on this topic and his business decision making process.[34]

PBS uniquely contracts with each of its clients, and the contracts are distinguishable from other Corporate Defendants in terms of the cost of services and duration.[35] In 2015, PBS leased an office located at 151 W. Main Street, Suite 204,

[31] Def. Ex. 21 (aka Pls.' Ex. 2), PBS IH 40:15-25, 41:1-25

[32] Def. Ex. 21 (aka Pls.' Ex. 2), PBS IH 40:15-25, 41:1-25

[33] Def. Ex. 18 (aka Pls. Ex. 016), Peyroux Dep. 130:8-25, 131:1-25, 132:1-25, 133:1-13, Def. Ex. 21 (aka Pls.' Ex. 2), PBS IH 50:25, 51:1-7; Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 192:13-25, 193:1-24

[34] Doc. 73-1, p. 26. See, Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 130:8-25, 131:1-25, 132:1-25, 133:1-13.

[35] Def. Ex. 21 (aka Pls.' Ex. 002), PBS IH 51:14-25, 52:1-25

Canton, Georgia and operated therefrom.[36] Thereafter, when Defendant SCIA "started up" as a new business, rather than enter into its own commercial lease, SCIA rented a limited workspace area from PBS and remitted payments to PBS for the same.[37] From 2009 to the present date, PBS maintains a unique federal tax identification number, unique bank accounts, pays its employees from PBS bank accounts, pays its own debts and expenses, bears its own profits and losses, and files its own tax returns.[38]

***Regenerative Medicine Institute of America, LLC (also d/b/a SCIA):*** SCIA was organized under the laws of the state of Nevada on September 23, 2015. SCIA, the brainchild of Defendant Detelich, was a consulting and coaching business exclusively providing its' services on the subject of stem cell therapy and regenerative medicine, a distinction from the other Corporate Defendants.[39] On a contract basis, SCIA consulted with existing healthcare practices regarding the addition of regenerative medicine to the array of services offered to their patients.[40] One aspect of SCIA's consultancy involved client seminars.[41] During these

[36] Def. Ex. 21 (aka Pls.' Ex. 002) PBS IH 11:15-17, 13:17-22
[37] Defendants' Ex. 2, M. Peyroux Decl. ¶ 9; Defendants' Ex. 9, 10
[38] Defendants' Ex. 3, 4, 5
[39] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 35:19-25, 36:1-8; Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 42:32-35
[40] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 35:5-25, 36:1-8, 197:16-25, 198:1-25
[41] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 38:18-25, 39:1-25, 154:4-25, 155:1-8, 192:13-25, 193:1-17; Def. Ex. 18 (aka Pls.' Ex.016), Peyroux Dep. 69:20-25, 70:1-25, 71:1-3

seminars, SCIA clients were coached, typically by Detelich, on various topics including public speaking skills, lecture techniques, and advertising sequencing.[42] SCIA uniquely contracted with each of its clients and received its compensation either based upon a percentage of a client clinic's stem cell treatment sales or at a flat rate.[43] From its origin, a vast majority of SCIA's core operations, including the recruitment of new clients (a.k.a. "sales"), were handled remotely by Defendant Detelich, whether from his residence in Florida (824 Island Way), a Delta airplane or at hotels.[44] Only a few times a year did Detelich use a desk located at 151 W. Main Street, Suite 204, Canton, Georgia.[45] However, SCIA did have its' "own space" at this location for which it paid PBS rent.[46] From 2015 to 2019, SCIA maintained a unique federal tax identification number, unique bank accounts, paid its employees from SCIA bank accounts, paid its own debts and expenses, bore its own profits and losses, and filed its own tax returns.[47] However, SCIA ceased its business operations and filed for bankruptcy on August 30, 2019.[48]

***Corporate Entities Finances:*** Plaintiffs boldly declare, without any

[42] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 38:18-25, 39:1-25, 40:1-25, 41:1-2
[43] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 42:17-25, 43:9-25, 44:1-4; Def. Ex. 21 (aka Pls.' Ex. 002), PBS IH 52:9-25
[44] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 24:24-25, 25:1-25, 26:1-25, 27:1-25; Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 109:3-18
[45] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 26:11-18
[46] Def. Ex. 20 (aka Pls.' Ex. 003), SCIA IH 28:16-22
[47] Defendants' Ex. 6, 7, 8, 9, 10
[48] Doc. 1, Plaintiff's Complaint, ¶ 14

supporting citation, the "Corporate Defendants also commingled funds."[49] "Commingling" commonly refers to a fiduciary's mixing of funds belonging to one party with funds belonging to another party (e.g., improper mixing of personal funds with corporate funds).[50] Here, the Plaintiffs offer no evidence of such. Instead, Plaintiffs strain at less than fastidious timekeeping and mischaracterize Peyroux's decision making, as a business owner, concerning the salary of his personal assistant, Jenn Huey, to make its case for nefarious Corporate "commingling."[51] Further, it is a false statement that "[b]usiness expenses were also paid interchangeably."[52] Indeed, Plaintiffs' cited evidence establishes that if one Corporate Defendant paid an expense on behalf of another Corporate Defendant, a check for *reimbursement* thereof was issued.[53] In this context, reimbursement is an act of separation and segregation; not commingling.

**III. Separate and Distinct Causes of Action under Federal Law and State Law**

---

[49] Doc. 73-1, p. 25
[50] "Commingling" Definition, https://www.law.cornell.edu/wex/commingling#:~:text=Primary%20tabs,funds%20belonging%20to%20a%20client (last visited May 3, 2023)
[51] Doc. 73-1, p. 25; Def. Ex. 21 (aka Pls.' Ex. 002), PBS IH 24:9-18; Def. Ex. 18 (aka Pls.' Ex. 016), Peyroux Dep. 52:1-8, 55:20-25, 66:2-11 & 21-25
[52] Doc. 73-1, p. 25.
[53] Defendants' Exhibits 15, 16, 17. Plaintiffs' Ex. 555, 553, 445, 446, 447, 444, 443, 450, 449, 448, 454, 455, 456, 550, 453, 551

The Plaintiffs bury the lead - that being that this case involves separate and distinct matters of both federal law and the State (Georgia) law. Indeed, the Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment (hereinafter, "Memorandum") mingles, merges, and omits law in such a way as to obfuscate this fact. While the federal and the State law claims arise from the same transactions and occurrences, Georgia isn't hitching a ride with the FTC. Indeed, one may best think of this case as two cars - Georgia driving one and the FTC driving the other- that travel different roads to the same courthouse.

The Plaintiffs cite little Georgia case law in support of their arguments in the combined Memorandum. Instead, they rely almost exclusively upon federal court interpretations of federal statutes. Yet, in order to determine the meaning of a *state statute*, federal courts must look to the decisions of the state's courts. See, *In re Schlein,* 8 F.3d 745, 754 (11th Cir. 1993) (holding "[i]t is axiomatic that: the highest court of the state is the final arbiter of what is state law). See also, *Lewis v. Suttles Truck Leasing, Inc.*, 869 F.Supp. 947, 948 (S.D. Ga. Oct. 3, 1994) (holding that the proper interpretation of an issue of state law is a question of state law; thus, federal courts are required to construe the law as the supreme court of the state would).

Moreover, where, as here, the case involves a dispute over proper interpretation or unsettled questions of Georgia law, a federal court should certify

the question to the Georgia Supreme Court rather than speculate as to how Georgia courts would resolve the issue. See, *Royal Capital Development, LLC v. Maryland Cas. Co.*, 659 F.3d 1050, 1054 (11th Cir. 2011) (holding that certification was appropriate where Georgia law was unsettled on the narrow but important question of whether the precedent established by the *Mabry* rule extends to standard insurance contracts for buildings).

To distract from these important rules of interpretation, the Plaintiffs gloss over actual statutory text in favor of *artful* summary[54] and misapply, misconstrue, and outright misrepresent the applicable law.[55] Accordingly, the Defendants in their responses herein direct the Court's attention to areas of distinction between the application of federal law and the application of Georgia law to the facts in this case.

## IV. Argument and Citation of Authority

### *A. Standard for Summary Judgment*

While repeating the summary judgment standard is largely unnecessary, where, as here, the Plaintiffs craftily edit the standard, some restatement is required. In deciding whether the movant has met its burden to foreclose a trial by jury, the Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Allen v. Tyson Foods, Inc.*, 121

[54] Doc. 73-1, p. 16

[55] Doc. 73-1 pp. 22, 27

F.3d 642,646 (11th Cir. 1997). "If reasonable minds could differ on the **inferences arising** from undisputed facts, then a court should **deny** summary judgment." Id. (quoting *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (emphasis added). Once the movant satisfies its burden under Rule 56(c)[56], the burden shifts to the nonmovant to demonstrate there is a material issue of fact that precludes summary judgment. Id. (quoting *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in their favor." Id.

### *B. Violations of the FTC Act and Georgia's FBPA*

Plaintiffs flippantly offer that "[t]he [G]FBPA which protects consumers and legitimate business enterprises against unfair and deceptive practices within Georgia, is interpreted and construed consistently with the FTC Act," thereby, strongly implying that the federal and State law are mirror images.[57] In support,

[56] While the Federal Rules of Civil Procedure apply to the procedural aspects of this case, Counts IV and V of the Complaint are based ***solely*** upon the substantive laws of Georgia. For this reason, although non-binding authority, it is noteworthy that under Georgia law the granting of summary judgment "is a very, very grave matter" for by such act, "the case it taken away from the jury and the court substitutes its own judgment for the combined judgment of the jury." *Service Merchandise, Inc. v. Jackson*, 221 Ga.App. 897, 898 (1996) (quoting, *Johnson v. Curenton*, 127 Ga.App. 687, 688 (1972). "It is the jury, not the court, which is the factfinding body. [The jury] weighs the contradictory evidence and inferences, judges the credibility of witnesses . . . and draws the ultimate conclusion as to facts . . . frequently amongst the fact best proved is one which no witness mentioned in his testimony, such fact being an inference from other facts . . . [f]rom this perspective, it is preferable **not** to have a single trial judge stand in the shoes of . . . a jury." *Service Merchandise, Inc.* at 898.

[57] Doc. 73-1, p. 16

Plaintiffs drop a footnote to O.C.G.A. § 10-1-391(a) & (b).[58] Importantly, Plaintiffs gloss over the actual statutory text. Section 10-1-391(b) states, "[i]t is the intent of the General Assembly that this part [GFBPA] be interpreted and construed consistently with interpretations ***given by the*** Federal Trade Commission ***in the*** federal courts pursuant to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a)(1)), as from time to time amended." O.C.G.A. § 10-1-391(b).

To "interpret" is the "art of process of discovering and expounding the intended signification of the language used in a statute.[59] "Construe" means "to arrange or marshal the words of an instrument."[60] While "consistent with" means "furthers and does not contradict objectives, goals, and policies in a relevant document."[61] It is clear that "interpret," "construe," and "consistent with" concern the significance of the acts' language ***given by the FTC***. Section 10-1-391(b) neither

[58] Plaintiffs likewise cite to *Zeeman v. Black, Standish v. Hub Motor, Co., and Ga. ex rel. Carr v. Elite Integrated Med., LLC*. These cases are distinguishable in obvious ways. First, none of the cited cases involve alleged violations of ***both federal and state law***. Thus, none of Plaintiffs' cited authority illuminates how a federal court pursuant to supplemental jurisdiction, 28 U.S.C. § 1367(a), properly divides the task of applying federal law and state law to distinct federal and state counts within a single complaint. *Zeeman* is a private right of action case under the GFBPA in which the court referred to the consistent interpretation of the FTC Act and GFBPA for the premise that the "basic purpose" of both laws is to "protect the public." *Standish* does not even mention the FTC Act; rather the case focused on the separate and distinct nature of plaintiff's truth in lending claim (that she settled) and her private right of action under GFBPA. *Elite* stands for proposition that the same meaning should apply for a "misleading representation" under the FTC Act and GFBPA.

[59] Interpretation: Definition and Legal Meaning, https://thelawdictionary.org/interpretation/ (last visited April 14, 2023)

[60] Construe: Definition and Legal Meaning, https://thelawdictionary.org/construe/ (last visited April 14, 2023)

[61] *Consistent With Definition*, https://www.lawinsider.com/dictionary/consistent-with#:~:text=Consistent%20with%20means%20to%20be,or%20requirement%20of%20the%20Plan (last visited April 14, 2023)

expresses nor implies that *Georgia* defers to the interpretations of its' State statute as ***given by*** the federal courts. Indeed, "OCGA § 10-1-391(b) does not constitute a 'legislative mandate' for consistent interpretation of the [G]FBPA and the Federal Trade Commission Act (FTCA) . . . consistent construction of these federal and state laws must take into account the differences between the statutory schemes . . . Congress obviously acts in a different governmental context than does the General Assembly." *State of GA ex rel. Doyle v. Frederick J. Hanna & Assoc.*, P.C., 287 Ga. 289, 293 (2010). With these principles in mind, Plaintiffs omission of interpretations of the GFBPA *given by* Georgia's State courts is fatal to Plaintiff's Motion for Summary Judgment on Count IV.

***C. Dissemination of False and Misleading Representations Using a Computer***

The Plaintiffs state, rather loosely, that "[t]he [G]FBPA makes using a computer or computer network to engage in deceptive conduct a separate unlawful act" and "SHC's sustained use of the internet, social media platforms and email to disseminate the deceptive representations to consumers is thus a separate violation of the [G]FBPA." In support of this contention, Plaintiffs drop a footnote to

O.C.G.A. § 10-1-393.5(b)(2) and direct the Court to a one-sided factual narrative and a prayer for monetary relief best described as wholesale conjecture.[62]

Yet again, Plaintiffs disguise the actual statutory text of Section 10-1-393.5(b)(2) in favor of a slippery summary thereof.

Section 10-1-393.5(b)(2) reads:

> "Without otherwise limiting the definition of unfair and deceptive acts or practices under this part, it shall be unlawful for any person who is engaged in telemarketing, any person who is engaged in any activity involving or using a computer or computer network, or any person who is engaged in home repair or home improvement work to: (2) Engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon a person, organization or entity." O.C.G.A. § 10-1-393.5(b)(2)

Those acts, practices or courses of business that operate as a *fraud or deceit* upon a person is a question of fact for a jury. Additionally, whether SHC's activities involving a computer fall within these necessary, yet undefined, parameters is a question of fact for a jury. Plaintiffs fail to offer any *Georgia* caselaw that elucidates what acts, practices or course of business operate as a *fraud or deceit* upon a person. Further, nothing, express or implied, in the GFPBA's statutory language indicates that Georgia submits to an interpretation of the GFBPA ***given by*** the federal courts.[63]

---

[62] See, Doc. 73-1, p. 22 FN 68 & 69

[63] "OCGA § 10-1-391(b) does **not** constitute a 'legislative mandate' for consistent interpretation of the [G]FBPA and the Federal Trade Commission Act (FTCA) . . . Congress obviously acts in a different governmental context than does the General Assembly." *State of GA ex rel. Doyle v. Frederick J. Hanna & Assoc.*, P.C., 287 Ga. 289, 293 (2010).

***D. The Common Enterprise***

As applicable to *all* Counts,[64] Plaintiff FTC, yet again commandeering the proverbial driver's seat, asserts, *"**[u]nder the FTC Act,*** a corporate entity can be responsible for the actions of other corporations in a business venture when the structure, organization, and pattern of business reveal a common enterprise or maze of integrated business entities."[65] Plaintiffs assert that Georgia must follow the federal construction of "common enterprise liability" in both the FTC Act[66] and GFBPA[67] contexts. However, even if both statutes contained identical language, which they do not, the interpretation of a Georgia statute by the Georgia Supreme Court would be binding upon federal courts. No federal court has any authority to place a construction on a state statute, whether applicable to procedural or substantive rules, different from the one rendered by the highest court of the State. See, *Johnson v. Frankell*, 520 U.S. 911, 916 (1997).

As a threshold matter, this "common enterprise" doctrine cited by the Plaintiffs is not "under the FTC Act." Rather, as business organizations are established and regulated by the laws of the various states, in the absence of a federal

---

[64] Counts I, II, III are allegations of violations of federal law brought by Plaintiff FTC. Counts IV and V are allegations of violations of Georgia law brought Plaintiff the State.
[65] Doc. 73-1, pp.22-23
[66] FTC Counts I, II and II
[67] State of Georgia Counts IV and V

statute for piercing the corporate veil, a new legal doctrine, known as "common enterprise," was born. Indeed, this "all for one, one for all" doctrine and related factor test are a whole cloth creation of the federal courts via caselaw and powerfully side-step many aspects of the general laws of joint and several liability.[68]

In relation to the facts of this case, *Bouton* is instructive. In *Bouton*, a Florida district court examined a case in which the plaintiff sought to hold a defendant, OPL, jointly and severally liable with the other defendants because they operated as a common or unitary enterprise. However, the plaintiff failed to direct the court to any case law that supported the existence of a common or unitary enterprise theory under *Florida corporate law* that would apply to the case facts. As defendant, OPL, pointed out *Florida law* had only applied the common or unitary enterprise theory of liability in the context of taxation schemes. The court in examining Florida corporate law on veil piercing concluded that the plaintiff had not pled the appropriate veil piercing theory of liability in its complaint and consequently, the theory of liability could not survive summary judgment. See, *Bouton v. Ocean Properties, Ltd.*, No. 16-cv-80502, 2017 WL 4792488, at *29-30 (S.D. Fl Oct. 23. 2017).

---

[68] Historically, the "common enterprise" doctrine in the context of a violation of the FTC Act first arose in the Second Circuit case, *Delaware Watch Company v. Federal Trade Commission*, 332 F.2d 745 (2d Cir. 1964).

Similarly, here, the Plaintiffs have not pled the appropriate veil piercing theory of liability under *Georgia* law in their Complaint; thus, the theory of liability cannot survive summary judgment.[69] Like in *Bouton*, the Plaintiffs do **not** direct this Court to any Georgia case law supporting the existence of a common or unitary theory of liability that would apply to facts of this case. Indeed, in Georgia, "common enterprise" has been prescribed **only** as part of a factor test for determining the existence of a partnership, in defining when an investment contract is a security, in the criminal law context, and as part of a discussion concerning when an agency relationship may arise. *Antoskow & Assoc. LLC v. Gregory*, 278 Ga.App. 468, 470 (2005), *Golden Atlanta Site Dev., Inc. v. Nahai*, 299 Ga.App. 646, 648 (2009), *Lowery v. State*, 347 Ga.App. 26, 32 (2018), and *Daimler Chrysler Motors, LLC v. Clemente*, 294 Ga.App. 38, 46-47 (2008).[70] Absent some clear indication from Georgia's highest court that it wishes to expand the application of the federally

---

[69] *See*, Doc. 1 Plaintiffs' Complaint ¶ 17 and ¶¶ 47-53

[70] While O.C.G.A. § 10-1-391(b) states, "[i]t is the intent of the General Assembly that this part [Fair Business Practice Act] be interpreted and construed consistently with interpretations ***given by*** *the* Federal Trade Commission in the federal courts pursuant to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a)(1)), as from time to time amended," had Georgia's General Assembly intended to adopt the "common enterprise" doctrine, as created by and in the federal district courts, in the GFBPA context or forego the application of Georgia's theories of alter ego, agency, and joint venture for piercing the corporate veil in the GFBPA context, it could have done so. Georgia's General Assembly has **not** done so.

conceived "common enterprise" doctrine to the arena of GFBPA liability, this Court should decline to do so.

Even if the Plaintiffs had properly pled the appropriate veil piercing theory of liability under *Georgia law,* which they did not, the record facts do not support piercing the corporate veils of the Corporate Defendants. In Georgia, a plaintiff may rely on three intertwined theories in an attempt to pierce the corporate veil: (1) alter ego; (2) agency; and (3) joint venture. *Kissun v. Humana, Inc.*, 267 Ga. 419, 419-20 (1997). "Under the alter ego doctrine, equitable principles are used to disregard the separate and distinct legal existence possessed by a corporation where it is established that the corporation served as a mere alter ego business or business conduit of another." *Lowery v. Noodle Life, Inc.*, 363 Ga.App.1, 3 (2022). "The Plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records, or control." Id. at 3-4. However, to pierce the veil, "there **must be** some evidence of abuse of the corporate form, and sole ownership of a corporation is not a factor." Id. (quoting *Cobra 4 Enterprises v. Powell-Newman*, 336 Ga. App. 609, 613(2) (2016) (emphasis added).

There is no evidence of Corporate Defendants' abuse of the corporate form. The Corporate Defendants were uniquely and properly organized under various state

laws; each at a different time and for a different purpose.[71] Each of the Corporate Defendants maintained separate records, including, but not limited to, banking, payroll, profit and loss, tax returns, occupancy license, and corporate organizational renewals.[72] Plaintiffs' own evidence demonstrates the Corporate Defendants reimbursed one another for expenses paid on another's behalf.[73] In so doing, the Corporate Defendants, actually separated and divided corporate funds, rather than commingle them. Importantly, under Georgia law, Defendant Peyroux's sole ownership of the Corporate Defendants is **not** factor in evidence of abuse.

***E. Individual Liability***

As to *all* Counts, the Plaintiffs wrongly assert that "[i]ndividuals are liable for FTC Act **and [G]FBPA violations**, if they participated directly in the deceptive practices or acts or had authority to control them."[74] Further, Plaintiffs assert that one's mere "status" as a "corporate officer of a small, closely-held-corporation" gives rise to a "presumption of ability to control the corporation."[75]

[71] See, Section II, Statement of Additional Material Facts, *supra.*
[72] Defendants' Exhibits 3 – 14; Defendants' Ex. 2, M. Peyroux Decl. ¶¶ 2 – 8.
[73] Defendants' Ex. 2, M. Peyroux Decl. ¶ 8; Defendants' Ex. 15, 16, 17. Plaintiffs' Ex. 443, 444, 446, 446, 447, 448, 449, 450, 453, 454, 455, 550, 551, 553, 555.
[74] Doc. 73-1 p. 27
[75] Doc. 73-1, p. 27

Again, the only caselaw Plaintiffs cite in support of this short-cut to individual liability are FTC cases that involve violations of federal law only.[76] In fact, these individual liability rules and short-cuts are a judicial construct of the federal courts via FTC caselaw to create an avenue by which the FTC can pierce the corporate veil and hold individuals liable for a corporation's misdeeds. It bears repeating such an powerful weapon side-steps many aspects of state laws of individual liability.

As with "common enterprise," the Plaintiffs have **not** pled the appropriate corporate veil piercing theory for individual liability under *Georgia* law in their Complaint; thus, the theory of Peyroux's individual liability for the Corporate Defendants' misdeeds cannot survive summary judgment.[77] Like in *Bouton*, the Plaintiffs do **not** direct this Court to any *Georgia* case law supporting piercing the corporate veil to hold an individual liable for a corporation's acts applicable to the facts of this case. Absent some clear indication from Georgia's highest court that it wishes to significantly expand the scope of individual liability for a *corporation's acts* in the GFBPA context, this Court should decline to do so.[78]

[76] Doc. 73-1, p. 27 FN 96, 97, 98, 99, 100, and 101
[77] *See*, Doc. 1 Plaintiffs' Complaint ¶¶ 9, 19, 29,
[78] In fact, "the Eleventh Circuit has stated: under Georgia corporate law, individual shareholders and officers of a corporation are shielded by the corporate veil, in the absence of **fraud or abuse of the corporate form**." *Theni Guru Krishna Textile Mills (P), Ltd. v. The World's Global Source, LLC*, No. 1:16-cv-1482, 2018 WL 11336434, at *9 (N.D. Ga. March 6, 2018) (quoting *Moore v. Barge*, 210 Ga. App. 552, 554 (1993) (emphasis added).

Even if the Plaintiffs had properly pled the appropriate veil piercing theory for individual liability under *Georgia* law*,* which they did not, the record facts do not support piercing the Corporate Defendants' veils to hold Peyroux individually liable. Under Georgia law, a corporation and its officers and shareholders are separate, even if one person owns all of its shares and controls its actions. See, *Raynor v. American States Ins. Co.*, 176 Ga.App. 564 (1985). The corporation is not bound by the acts of the owner as an individual, *Casey v. Carrollton Ford Co.*, 152 Ga.App. 105 (1979), and the mere operation of a corporate business does not render one personally liable for corporate acts. *Trans-State v. Barber*, 170 Ga.App. 372, 374 (1984). The law intervenes when the separate personalities of the corporation and its owner no longer exist. *Derbyshire v. United Builder Supply, Inc.*, 194 Ga.App. 840, 844 (1990). "To activate this cut-through, there **must be abuse** of the corporate form. Id. (emphasis added). "Abuse of the corporate form occurs when the owner of the corporation conducts his private and corporate business on an interchangeable or joint basis." *Stewart Brothers v. Allen*, 189 Ga.App. 816 (1989). Importantly, neither sole ownership of a corporation by one person nor the fact that the sole owner uses and controls it to promote his ends are factors to find abuse of corporate form. *Amason v. Whitehead*, 186 Ga.App. 320, 322. The standard is

difficult to meet and courts must exercise great caution absent an evidentiary showing of abuse. *Theni Guru Krishna Textile Mills (P), Ltd.* at 10.

Corporations necessarily act through persons. Despite this truism, the Plaintiffs unleash a laundry list of facts[79] relative to Peyroux's mere operation of the businesses as evidence of individual liability for the Corporate Defendants' alleged misdeeds. Yet, it is undisputed that Peyroux acted exclusively as a corporate officer of the Corporate Defendants; not in his individual capacity. See, Doc. 73-1, pp. 28-30. Importantly, relative to Plaintiffs' facts, Peyroux's sole ownership of the Corporate Defendants is **not** a factor in finding abuse of corporate form. *Amason* at 332. Plaintiffs offer no record evidence establishing that Peyroux used the Corporate Defendants' funds for his personal expenses or blurred the lines to treat all the companies as one unit.[80]

## V. Monetary Relief

### *A. Civil Penalties Under Section 397*

[79] Plaintiffs' examples of Peyroux operating his businesses include, he "kind of do[es] everything at the company [PBS]" like "negotiating and countersigning contracts" and" "mak[ing] financial and hiring decisions." Peyroux made the decision to "close SHC and file for bankruptcy." Moreover, when Defendant Detelich departed, Peyroux "took over day-to-day management" of a struggling business he solely owned, SCIA. Doc. 73-1, pp. 28,29.

[80] See, Section II, Statement of Additional Material Facts, *supra*.

Pursuant to O.C.G.A. § 10-1-397(b)(2), the State[81] seeks monetary relief in the form of "per violation" penalties and restitution.[82] Importantly, the Plaintiffs concede that this case involves significant, unsettled questions of Georgia law, including, but not limited to: (i) no specified method for calculating the number of violations; (ii) no factors for determining the size of the per violation penalty; and (iii) no definition of the remedy of restitution.[83] Rather than a federal court speculate as to how the Georgia Courts would resolve these issues, "[w]here there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary Erie 'guesses' and to offer the state court the opportunity to interpret or change existing law." *Royal Capital Development, LLC* at 1054. Because *all parties* concede that significant, unsettled questions of Georgia law exist in this matter, all open questions concerning Section 397's "per violation" penalties and restitution should be certified to the State Supreme Court for resolution.

[81] Plaintiff FTC does **not** have the requisite statutory power to seek monetary relief in this case. The U.S. Supreme Court unanimously held that § 13(b) of the FTC Act does **not** give the FTC the power to seek equitable monetary relief. See, *AMG Capital Management LLC v. Federal Trade Commission*, 141 S. Ct. 1341, 1347 (2021) (holding that that § 13(b)'s "permanent injunction" language does not authorize the FTC to directly obtain court-ordered monetary relief because an "injunction" is plainly not the same as an award of equitable monetary relief).
[82] Doc. 73-1, pp. 35 & 40
[83] Doc. 73-1, pp. 35, 37, and 40

Moreover, "when a statute imposes a fine or penalty, strict construction is required in favor of the person penalized." *New Georgia Project, Inc. v. Carr*, No. 1-22-cv-035333, 2022 WL 17667828, at *14 (N.D. Ga. Dec. 14, 2022). Section 10-1-397(b)(2) of the GFBPA is unconstitutionally vague as applied to the facts in this case.[84] "Unconstitutionally vague laws fail to provide 'fair warning' of what the law requires, and they encourage arbitrary and discriminatory enforcement by giving government officials the sole ability to interpret the scope of the law." *Dream Defenders, et al v. Governor of the State of Florida*, 57 F.4th 879, 890 (11th Cir. 2023) (quoting *Keister v. Bell*, 29 F.4th 1239, 1258 (11th Cir. 2022).

In *May v. Morgan County*, the court held that:

> "When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would… applying these principles if the statutory text is clear and unambiguous, we attribute to the statute its plain meaning and our search for statutory meaning it at its end. *May v. Morgan County*, 343 Ga. App. 255, 258(6) (2017).

**<u>1. O.C.G.A. § 10-1-397(b)(2)(B)</u>**

Section 397(b)(2) of Georgia's FBPA provides that:

[84] "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." *Hall v. The State*, 268 Ga. 89, 91 (1997).

> ". . . upon a showing by the Attorney General in any superior court of competent jurisdiction that a person has violated or is about to violate this part, a rule promulgated under this part, or an order of the Attorney General, the court may enter or grant any or all of the following relief: (A) A temporary restraining order or temporary or permanent injunction; (B) **A civil penalty of up to a maximum of $5,000 per violation of this part;** (C) A declaratory judgment; (D) Restitution to any person or persons adversely affected by a defendant's actions in violation of this part . . . or (F) other relief as the court deems just and equitable." O.C.G.A. § 10-1-397(b)(2)

Here, the plain and ordinary meaning of a statute that reads, "a civil penalty of up to a maximum of $5,000," is that the penalty amount associated with violating "this part" (GFBPA) exists on a range. O.C.G.A. § 10-1-397(b)(2)(B). While the maximum civil penalty is authoritatively established at $5,000, the minimum penalty is not prescribed at all. Consequently, there is an element of vagueness and indefiniteness implicit in the determination of the amount of civil penalty the court may grant. Nothing in the statutory text establishes which factor(s) or test(s) will be used to determine the size of the civil penalty.[85]

The statute states that a court may grant a wide-ranging civil penalty on a "*per violation of this part* [GFBPA]" basis. O.C.G.A. § 10-1-397(b)(2)(B). Thus, the plain and ordinary meaning is that *each* violation may be subject to civil penalty. Where, as here, a statute prescribes a "per violation" penalty, both a definition of

[85] Compare and contrast with O.C.G.A. § 10-1-852 in which factors to consider in imposing additional civil penalty are legislatively prescribed.

what constitutes a "violation" (e.g., a postcard, an Instagram post) and a method for calculating the number of "violations" (e.g., number of postcards mailed, number of Instagram views) are necessary. Although the statute contains a general expression of prohibited conduct ("unfair or deceptive acts or practices in the conduct of consumer transactions . . . are declared unlawful") followed by a laundry list of precise unlawful practices, it does not plainly articulate what constitutes a "violation" of the GFBPA. See, O.C.G.A. § 10-1-393. Thus, where "violation" is used in § 10-1-397, unconstitutional vagueness and indefiniteness results.

Indeed, the Plaintiffs' own Memorandum explains the problematic nature with their demand for per violation civil penalties. The Plaintiffs concede that (i) "[t]he FBPA **does not specify** a method for calculating the number of violations;" (ii) "[t]he FBPA **does not set** out factors for determining the size of the per violation penalty," and (iii) "this [civil penalty] provision has **not** otherwise been judicially construed ***in Georgia***."[86] Instead of citing to controlling caselaw,[87] the Plaintiffs offer conjecture and speculation (e.g., number of days website visible, number of seminars held).[88] Importantly, it is impossible for *the Defendants* to know what method and/or factors will be used to (i) define or delineate a "violation" of GFBPA,

---

[86] Doc. 73-1, pp. 28 & 30
[87] Doc. 73-1, p. 35 FN 142, p. 36 FN 143, 144, &145, and p. 37 FN 152
[88] Doc. 73-1, pp. 36-38

(ii) calculate the number of "violations," and (iii) determine the size of the per "violation" penalty under O.C.G.A. § 10-1-397(b)(2)(B). Indeed, "[t]o withstand an attack of vagueness or indefiniteness, a civil [law] must provide fair notice to those to whom the [law] is directed and its provisions must enable them to determine the legislative intent." *Anderson v. Atlanta Committee for the Olympic Games*, 273 GA. 113 (114(1)(a) (2000). For the foregoing reasons, O.C.G.A. § 10-1-397(b)(2)(B) is unconstitutionally vague and indefinite as applied to the facts in this case.

**<u>2. O.C.G.A. § 10-1-397(b)(2)(D)</u>**

Section 397(b)(2) of Georgia's FBPA provides that:

> ". . . upon a showing by the Attorney General in any superior court of competent jurisdiction that a person has violated or is about to violate this part, a rule promulgated under this part, or an order of the Attorney General, the court may enter or grant any or all of the following relief . . . (D) **Restitution to any person or persons adversely affected by a defendant's actions in violation of this part . . . "** O.C.G.A. § 10-1-397(b)(2) (emphasis added).

Here, the plain and ordinary meaning of a statute that reads, "[r]estitution to any person or persons **adversely affected** by a defendant's actions in violation of this part (GFBPA)," is that being "adversely affected" by a defendant's actions is a prerequisite to restitution. O.C.G.A. § 10-1-397(b)(2)(D). An ordinary reading of the statute clearly establishes that the remedy of "restitution" is not available "to [just]

any person or persons." Consequently, there is an element of vagueness and indefiniteness implicit in the determination of which persons are "adversely affected" and thus, entitled to statutory restitution. Yet, nothing in the statutory text, establishes which factor(s) or test(s) will be used to determine what constitutes being "adversely affected" by the Defendants violations of the GFBPA.

Indeed, the Plaintiffs' own Memorandum explains the problematic nature with its demand for restitution. The Plaintiffs concede that "[t]he remedy of restitution is not defined in Section 397(b)(2)(D)."[89] Instead of citing to controlling authority,[90] the Plaintiffs' posit that *all consumers* ("[h]ere, 485") who purchased stem cell therapy from SHC are categorically "*persons adversely affected*" by SHC's actions in violation of GFBPA.[91] Significantly, Defendant Peyroux does not know what method and/or factors will be used to determine which persons out of a total group ("[h]ere, 485") were "adversely affected" by SHC's actions in violation of GFBPA and thus, entitled to statutory restitution. "To withstand an attack of vagueness or indefiniteness, a civil [law] must provide fair notice to those to whom

---

[89] Doc. 73-1, p. 40

[90] Plaintiffs misrepresent *Quattrocchi v. State* as "confirm[ing] that in a **government enforcement action**, restitution is something akin to the refund of the purchase price." *Quattrocchi v. State*, 357 Ga.App. 224, 228 n.2 (2020). In fact, Footnote 2 reads, "[d]amages available to a **private individual** for actual injury suffered means relief other than the refund of the purchase price *and* restitution." *Quattrocchi* is best understood as drawing a distinction between the remedies available to the government and remedies available to private individuals under the parallel enforcement scheme of the GFBPA.

[91] Doc. 73-1, p. 41

the [law] is directed and its provisions must enable them to determine the legislative intent." *Anderson* at 114 (1)(a). For the foregoing reasons, O.C.G.A. § 10-1-397(b)(2)(D) is unconstitutionally vague as applied to the facts in this case.

In summary, while the Plaintiffs encourage this Court to ignore the conspicuous issues of statutory vagueness and indefiniteness in O.C.G.A. §10-1-397(b)(2)(B) and (D) and proceed with the wholesale creation of applicable factors, rules, and tests, such an approach is ill-advised. This is particularly true, where, as here, doing so concerns a case of first impression of Georgia law.

> "It is well-settled that the court is charged with the duty of interpreting statutes, **not enacting them** . . . It is a fundamental principle that the legislature, and not the courts, is empowered by the Constitution to decide public policy, and to implement that policy by enacting laws." *Kennerly v. State*, 311 Ga. App. 190, 193 (2011) (emphasis added).

In Georgia, legislation "must be definite and certain to be valid, and when it is so vague and indefinite that persons of common intelligence must necessarily guess as its meaning and differ as to its application it violates the first essential element of due process law." *105 Floyd Rd., Inc., v. Crisp County*, 279 Ga. 345, 348 (2005). Because Sections 10-1-397(b)(2)(B) and (D) are unconstitutionally vague and indefinite as applied to the facts in this case, the Court should not grant summary judgment on the issues of the State's per violation penalties and restitution claims.

**B. Civil Penalties Under Section 851**

While Plaintiffs do not concede the unsettled questions of Georgia law under Section 851, nonetheless, the exist. Indeed, there is an open question as to that which constitutes a "violation" of the GFPBA. Rather than a federal court speculate as to how the Georgia Courts would resolve this issue, "[w]here there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary Erie 'guesses' and to offer the state court the opportunity to interpret or change existing law." *Royal Capital Development, LLC* at 1054.

"When a statute imposes a fine or penalty, strict construction is required in favor of the person penalized." *New Georgia Project, Inc.* at *14. Yet, Section 851 is unconstitutionally vague and indefinite as applied to the facts in this case. It provides:

> "When any person who is found to have conducted business in violation of Article 15, 17, or 21 of this chapter is found to have committed said **violation** against elder or disabled persons, in addition to any civil penalty otherwise set forth or imposed, the court may impose an additional civil penalty not to exceed $10,000 for each **violation**." O.C.G.A. §10-1-851

Here, the statute expressly states that a court may grant a civil penalty on an "each violation" basis; thus, a definition of what constitutes a "violation" is necessarily required. Because Georgia's lawmakers do not provide this definition,

the Plaintiffs advance a self-interested interpretation.[92] Defendants must guess.[93] Notably, Georgia lawmakers defined an "intentional violation," but not a "violation." See, O.C.G.A. § 10-1-392. Consequently, where the term, "violation" is used in Section 10-1-851, unconstitutional vagueness and indefiniteness results.

In addition, Plaintiffs' material facts belie that SHC's "marketing content and strategy was geared toward the elderly."[94] In fact, a reasonable alternate inference from the evidence is that SHC's marketing content and strategy were geared toward those living with pain and discomfort: "[w]e've been able to help people of all ages and all walks of life recover from all sorts of injuries, arthritis, and chronic joint pain."[95] Defendant's call scripts pose questions about a potential seminar attendee's pain, not their age.[96] Advertisements and testimonials focused on living with *reduced* pain such as Ronda whose pain level went from an 8 to a 3 after injections.[97] SHC leveraged internet based and social media platforms to gain new patients.[98] While admittedly it is somewhat distasteful to glimpse the inner workings of

---

[92] According to the Plaintiffs a "violation" should be the number of online campaigns plus the number of brochure downloads plus the number of seminars conducted, plus the elderly consumer purchases. Doc. 73-1 p 40.

[93] "To withstand an attack of vagueness or indefiniteness, a civil [law] **must** provide fair notice to those to whom the [law] is directed and its provisions **must** enable them to determine the legislative intent." Anderson v. Atlanta Committee for the Olympic Games, 273 GA. 113 (114(1)(a) (2000).

[94] Doc. 73-1, p. 38

[95] Plaintiffs' Exhibit 557

[96] Plaintiffs' Ex. 61, p. 10: "Where is it that you are experiencing pain?" and p. 12: "Can you let me know where it is that you are experiencing pain or what is your health concern."

[97] Plaintiff's Ex. 071

[98] Def. Ex. 19 (aka Pls.' Ex. 004), SHC IH, 101:21-25, 102:1-3, 103:15-22, 105:22-25, 106:1-11

promotion, it is not malfeasance to reschedule a seminar for improved attendance or to allow for a quiet seminar space. In fact, such steps are among the basics of both sound marketing and the conservation of corporate resources.

Further, by omitting the relevant statutory definition of "major life activities," Plaintiffs unfairly spin a wholly unsupported allegation, that "SHC's advertising also focused on consumers who were 'disabled' under the FBPA," as a fact.[99] Section 10-1-850 plainly states that a "disabled person" is one "who has a physical or mental impairment which substantially limits one or more of such person's *major life activities*." O.C.G.A. § 10-1-850 (1). Plaintiffs fail to mention, much less cite, the relevant statutory definition of "major life activities," which is embedded in and necessary to a complete understanding of a "disabled person."[100] A plain and ordinary reading of Section 10-1-850 (1) establishes that in order to qualify as a "disabled person," under the law, one must suffer from a physical or mental impairment **and** that impairment substantially limits one or more major life activities. In fact, *both conditions must be true*. Plaintiffs present no such evidence.

## CONCLUSION

[99] Doc. 73-1, p. 39.

[100] "Major life activities include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." O.C.G.A. § 10-1-850 (3).

For the foregoing reasons, Defendants respectfully request that the Plaintiffs' Motion for Summary Judgment be denied and that the State of Georgia's request for monetary relief be denied.

Respectfully submitted,

John W. Oxendine
Georgia Bar No. 558155
Email: jwolaw@gmail.com

/s/ Ivy A. Oxendine
Ivy A. Oxendine
Georgia Bar No. 952891
Email: ivyoxendine71@gmail.com

**Oxendine Law Group, P.C**

4370 Peachtree Road, N.E.
First Floor
Atlanta, Georgia 30319
Telephone: (404) 734-5738
Facsimile: (404) 521-4834
*Attorneys for Steven Peyroux, Regenerative Medicine Institute of America, LLC, Physicians Business Solutions, LLC and Superior Healthcare, LLC*

**<u>CERTIFICATE OF COMPLIANCE</u>**
**and**
**<u>CERTIFICATE OF SERVICE</u>**

In compliance with N.D. Ga. R. 7.1D, I certify that the foregoing RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT has been prepared in conformity with N.D. Ga. R. 5.1. This memorandum was prepared with Times New Roman (14 point) type, with a top margin of one and one-half (1.5) inches and a left margin of one (1) inch.

I also hereby certify that I have this day served the foregoing upon opposing counsel via the Court's electronic filing system which will cause a copy of the same to be delivered electronically to all counsel of record.

This 4th day of May 2023.

**Oxendine Law Group, P.C.**

/s/ <u>John W. Oxendine</u>
John W. Oxendine
Georgia Bar No. 558155