**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION and STATE OF GEORGIA,<br><br>Plaintiffs<br><br>vs.<br><br>STEVEN D. PEYROUX, individually and as an owner and officer of REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC also d/b/a Stem Cell Institute of America, LLC, PHYSICIANS BUSINESS SOLUTIONS, LLC, and SUPERIOR HEALTHCARE, LLC,<br><br>BRENT J. DETELICH, individually and as an officer of REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC, also d/b/a Stem Cell Institute of America, LLC,<br><br>REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC, a limited liability company, also d/b/a Stem Cell Institute of America, LLC,<br><br>PHYSICIANS BUSINESS SOLUTIONS, LLC, a limited liability company, and<br><br>SUPERIOR HEALTHCARE, LLC, a limited liability company,<br><br>Defendants, | **Case No.: 1:21-cv-03329-AT** |

**RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff FTC seeks to recover in Count I of the Complaint for False and Unsubstantiated Efficacy claims, and that Defendants, including Defendant Detelich, have engaged in a deceptive act or practice, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52. (Doc. 001, p. 33).

In Count II Plaintiff FTC alleges Defendant Detelich has falsely represented that Defendant PBS offered a medicine compliance training program that was approved by the U.S. Federal Trade Commission and by the U.S. Food and Drug Administration, and that such conduct violates Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52. (Doc.001, p. 34).

In Count III, Plaintiff FTC alleges that Defendants have provided their clients with the means and instrumentalities for the commission of deceptive acts and practices, and that this constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (Doc. 001, p. 35). In Count IV, Plaintiff State of Georgia alleges Defendants made false or misleading representations that constitute a deceptive act or practice in violation of O.C.G.A. §§ 10-1-393(a) and 393(b)(5). (Doc. 001, p. 35 - 36). In Count V, Plaintiff State of Georgia alleges Defendants disseminated false or misleading

representations through the use of a computer or computer network, and targeted elderly and disabled consumers, in violation of O.C.G.A. § 10-1-393.5(b). (Doc. 001, p. 36 - 37).

In their prayer for relief, both Plaintiff State of Georgia seeks injunctive relief. In addition, Plaintiff State of Georgia seeks civil penalties against Defendants in the amount of $5,000.00 per violation of the FBPA, and, pursuant to O.C.G.A. § 10-1-851, civil penalties in the amount of $10,000.00 for each violation of the FBPA committed against elderly and disabled consumers. (DOC. 001, P. 38 - 39.

## II. STATEMENT OF FACTS

Brent Detelich is a trained chiropractor, although he is no longer licensed as a chiropractor in any state. (Detelich Response to SOMF ¶¶ 244 and 247). Mr. Detelich has not received any formal training in stem cell therapy or regenerative medicine. (Detelich Response to SOMF ¶ 248).

Steven Peyroux owned 100% of SCIA. (Detelich Response to SOMF ¶ 138). Mr. Detelich was an officer of Stem Cell Institute of America (SCIA) and was actively involved in its affairs, until Steven Peyroux, the owner of SCIA, took over in January of 2018. (Detelich Response to SOMF ¶¶ 250, 252). Mr. Detelich was an independent contractor of SCIA. (Detelich Response to SOMF ¶ 253). SCIA consulted with existing healthcare practices on a contract basis regarding the

addition of regenerative medicine to the array of services offered to their patients. (73-6 Ex 3 Detelich 30(b)(6) 35:5-25, 36:1-8, 197:16-25, 198:1-25). One aspect of SCIA was client seminars, during which SCIA clients were coached, typically by Detelich, on various topics including public speaking skills, lecture techniques, and advertising sequencing. (73-6 Ex 3 Detelich 30(b)(6) 38:18-25, 39:1-25, 40:1-25, 41:1-2, 154:4-25, 155:1-8, 192:13-25, 193:1-17). Mr. Detelich performed most of his services for SCIA remotely, whether from his residence in Florida, while traveling or at hotels. Mr. Detelich used SCIA's business location infrequently. (73-6 Ex 3 Detelich 30(b)(6) 24:24-25, 25:1-25, 26:1-25, 27:1-25). Even though PBS and SCIA were housed in the same location, SCIA actually paid rent to PBS for its space. (Ex 2 73-5 PBS 30(b)(6) 28:16-22.

SCIA also made marketing materials available to clients. These materials were provided to SCIA clients by placing them in the Smart Vault system, so the clients could access the materials online. SCIA had legal counsel perform a compliance review of the materials that were placed in the Smart Vault system. In addition, SCIA clients were instructed to also check all materials for legal compliance. (Detelich SOMF ¶ 12; Detelich Declaration ¶ 9).

Mr. Detelich believed the information shared with SCIA clients regarding possible results from stem cell treatment to be true and credible. These results were consistent with positive results his father received when he underwent stem

cell treatment in Europe. (Detelich Declaration ¶ 8). Mr. Detelich had personally observed the success his father had achieved through stem cell treatment. In the course of his father obtaining stem cell treatment, Mr. Detelich did a significant amount of research regarding stem cell treatment, and the articles he read showed very positive results. (Detelich SOMF ¶11; 98-5, Detelich Depo. 38:3 - 41:4).

Mr. Detelich also was aware that many patients experienced positive results with stem cell treatment. (Ex. 516). Dr. Lou Ciliberti appeared in a SCIA video in which he discussed at length the positive outcomes he had experienced in his own medical practice through the use of stem cell treatment. (Ex. 516). There is no evidence to show that the statements in the video (Ex. 516) are false or misleading. (Detelich SOMF ¶14; Detelich Declaration ¶11).

Mr. Detelich reasonably relied on the patient testimonials and the statements of medical professionals such as Dr. Ciliberti when providing information about the use of stem cell treatment. (Detelich SOMF ¶15; Detelich Declaration ¶ 11; Ex. 516). There is no evidence the patient testimonials utilized by SHC or SCIA were not true or legitimate testimonials. (Detelich SOMF ¶16; Ex. 115; Ex. 350; Ex. 364 at 4; Ex. 600; Ex. 602; Ex. 626; Ex. 194; Ex. 015, Gass Dep. 19:2– 9; Ex. 364 at 2; Ex. 168 at 2).

The marketing that SCIA created, including marketing created for SHC, did not target certain individuals because of their age. Rather, the marketing was

targeted to reach individuals who were experiencing pain and symptoms that Mr. Detelich believed could be helped through regenerative therapy. (Detelich SOMF ¶ 13; Detelich Declaration ¶ 10)

Steven Peyroux owns 100% of PBS, and he is and always has been PBS's Chief Executive Officer. (Detelich Response to SOMF ¶¶ 156, 157). Mr. Detelich and employees of PBS understood Steven Peyroux to have control over PBS. (Detelich Response to SOMF ¶160). Steven Peyroux determined what services PBS offers to its clients, he had final say over PBS's financial decisions, and he identified vendors to recommend to PBS clients. (Detelich Response to SOMF ¶¶ 162, 163, 170). Steven Peyroux organized PBS seminars and conferences. Steven Peyroux created agendas for PBS seminars and training programs, deciding what topics would be covered and who would be speaking. (Response to SOMF ¶¶ 171, 172). Mr. Peyroux ran PBS 100 %. (Ex. 73-10 Detelich Depo. 78:4 - 14). PBS was a consulting business. PBS consulted, on a contract basis, with existing chiropractic practices regarding a medical integration model. (110-21 PBS 30(b)(6) 51:14-25, 52:1-8; 73-5 PBS 30(b)(6) 40:15-25, 41:1-25).

Defendant Superior Healthcare, LLC (SHC) was wholly owned by Defendant Steven Peyroux. (Detelich Response to SOMF ¶ 184). Mr. Peyroux was actively involved in directing SHC, and he handled SHC's day-to-day operations. (Detelich Response to SOMF ¶¶ 183, 187). Brent Detelich was never

an employee of nor an independent contractor with SHC, or Superior Healthcare. He had no ownership interest in SHC, and he did not share in the profits from SHC. (Detelich SOMF ¶9; Detelich Declaration ¶ 6).

Mr. Detelich was aware that Melinda Peyroux, the wife of Steve Peyroux, did the accounting work for Mr. Peyroux's companies, including SCIA, PBS and SCH. (Detelich SOMF ¶¶ 1,2; Detelich Depo.98-5 142:21 - 143:3; Detelich Declaration ¶2). Through discovery, Mr. Detelich became aware that some individuals worked for PBS and SCIA and possibly SHC, but they didn't keep track of the time they worked for each entity. Mr. Detelich was not aware this was happening at the time. Rather, he understood individuals were supposed to be keeping track of their time. Mr. Detelich also knew Melinda Peyroux to be handing all accounting matters, and he believed the proper accounting would be done and that the individuals would be keeping track of their time and effort spent. (Detelich SOMF ¶5; Detelich Declaration, ¶ 3). Mr. Detelich understood Melinda Peyroux would track expenses such that each company for which she did the accounting paid for the services it received. (Detelich SOMF ¶6; Detelich Declaration, ¶ 4).

Mr. Detelich is no longer employed by PBA or SCIA. He is no longer engaged in marketing stem cell or regenerative medicine products or therapies, and he have no intention of engaging in the marketing of these products or therapies in

the future. (Detelich Declaration, ¶12; Detelich SOMF ¶ 18).

## III. ARGUMENT AND CITATION OF AUTHORITY

Rule 56(a) of the Federal Rules of Civil Procedure states, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." While the party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, the moving party is not required to negate his opponent's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Rather, the moving party discharges her burden merely by "'showing'—that is, pointing out to the district court-that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Id. at 325 (emphasis added). "[I]n deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." Allen v. Tyson Foods, 121 F.3d 642, 646, (11th Cir. 1997). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." Id. at 323. The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). Summary judgment is only to be entered where "the nonmoving party has failed to make a sufficient showing on an

essential element of his case with respect to which he has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. at 323. "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole . . .. 'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tyson Foods, 121 F.3d at 646 (citations omitted).

## A. The FTC's Claims

Plaintiff FTC and Plaintiff State of Georgia have presented the FTC Act claims (Counts I, II and III) and the Georgia Fair Business Practices Claims (Counts IV and V) as if they are coextensive. They are not. The FTC is limited to injunctive relief. "Congress in §5(l) and §19 gave district courts the authority to impose limited monetary penalties and to award monetary relief in cases where the Commission has issued cease and desist orders. AMG Capital Mgmt., LLC v. FTC, 141 S. Ct. 1341, 1348-49 (2021). See also, FTC v. On Point Capital Partners Ltd. Liab. Co., 17 F.4th 1066, 1071 (11th Cir. 2021) ("the Supreme Court held in AMG Capital Management that 15 U.S.C. § 53(b) does not permit an award of 'equitable monetary relief such as restitution or disgorgement'"). In this case, however, the FTC did not go through the administrative process that culminated in cease and desist orders directed to any of the defendants. Accordingly, the FTC is limited to injunctive relief, and it is not entitled to seek monetary penalties or restitution. AMG Capital Mgmt., LLC v. FTC, 141 S. Ct. 1341, 1352 (2021).

An act or practice is deceptive under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), if (1) there is a representation, omission, or practice, (2) the representation, omission, or practice is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. FTC v. On Point Cap. Partners, LLC, 17 F.4th 1066, 1079 (11th Cir. 2021).

The first step the court must take to analyze whether the defendants violated the FTC Act is to determine whether the advertisements made the claims asserted by the FTC in the complaint. QT, Inc., 448 F. Supp. 2d at 957. The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, is fundamentally a question of fact. See, e.g., id. at 957-58 (citing National Bakers Services, Inc., v. FTC, 329 F.2d 365, 367 (7th Cir. 1964)). This *question of fact* may be resolved by the terms of the advertisement itself or by evidence of what consumers interpreted the advertisement to convey. FTC v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008). If an advertisement implies a claim, the court should receive evidence regarding consumer perceptions of the ad to determine the meaning of an ad. Nat'l Urological Grp., 645 F. Supp. 2d at 1189.

In On Point Capital, the Eleventh Circuit noted the district court had sufficient evidence to find the websites at issue were misleading in a material way. On Point Capital, 17 F.4th at 1080. In On Point Capital, however, the district court

had evidence of *hundreds of consumer complaints*, as well as evidence of regular charge backs. Id. That evidence is lacking in this case. The Plaintiff FTC and Plaintiff State of Georgia introduced evidence of a total of *four* consumer complaints. (SOMF ¶¶ 402, 405; Ex. 141 73-16, Bae Decl. ¶¶ 21, 22, 23 and 24). Just as evidence of a significant number of consumer complaints can be evidence of materiality, On Point Capital, 17 F.4th at 1080, the lack of a significant number of consumer complaints is evidence the ads or statements were not misleading or material. There is an issue of fact whether materials for which Mr. Detelich can be held responsible are misleading.

## B. The FTC Is Not Entitled to Injunctive Relief

Even assuming the FTC has established violations, in order for the FTC to obtain injunctive relief, there must be a risk that harm will recur in the future. United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953). ("The purpose of an injunction is to prevent future violations.") The FTC "must have reason to believe that the violation is ongoing or likely to recur as a prerequisite to seeking a permanent injunction." Nat'l Urological, 645 F. Supp. 2d at 1209. The danger of a recurrent violation must be "more than a mere possibility." Id. In determining whether the likelihood of a recurring violation is "more than a mere possibility", it is appropriate for this Court to consider whether a defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered

from defendants' unlawful conduct, and defendants' recognition of their own culpability and the sincerity of their assurances against future violations. FTC v. Citigroup Inc., 239 F. Supp. 2d 1302, 1306 (N.D. Ga. 2001) (cited with approval in Nat'l Urological, 645 F. Supp. 2d at 1209).

Mr. Detelich has stated under oath that he is no longer employed by PBA or SCIA. Moreover, he is no longer engaged in marketing stem cell or regenerative medicine products or therapies, and he have no intention of engaging in the marketing of these products or therapies in the future. (Detelich SOMF ¶ 18; Detelich Declaration, ¶12). There are no facts to support the conclusion that he has is likely to commit violations in the future. At a minimum, there are issue of fact regarding his likelihood to commit violations in the future. Even if the Court determines that some type of injunctive relief could be appropriate, there are fatual issues regarding the scope and any duration of such injunctive relief.

## C. The State's FBPA Claims

The FBPA, which protects consumers and legitimate business enterprises against unfair or deceptive practices within Georgia, is interpreted and construed consistently with the FTC Act. O.C.G.A. § 10-1-391(a), (b). See also Zeeman v. Black, 156 Ga. App. 82 (1980); Standish v. Hub Motor Co., 149 Ga. App. 365 (1979); Ga. ex rel. Carr v. Elite Integrated Med., LLC, 533 F. Supp.3d 1303, 1312 (N.D. Ga. 2021) (applying FTC Act standard in determining whether a

representation is deceptive under FBPA).

O.C.G.A. § 10-1-397(b)(2) provides:

> (2) Without regard as to whether the Attorney General has issued any orders under this Code section, *upon a showing by the Attorney General in any superior court of competent jurisdiction* that a person has violated or is about to violate this part, a rule promulgated under this part, or an order of the Attorney General, the court may enter or grant any or all of the following relief:
>
> (A) A temporary restraining order or temporary or permanent injunction;
> (B) A civil penalty of *up to a maximum of $5,000.00* per violation of this part;
> (C) A declaratory judgment;
> (D) Restitution to any person or persons adversely affected by a defendant's actions in violation of this part;
> (E) The appointment of a receiver, auditor, or conservator for the defendant or the defendant's assets; or
> (F) Other relief as the court deems just and equitable.

O.C.G.A. § 10-1-397(b)(2) (emphasis added).

## D. The State's Claims for Civil Penalties Fail

Plaintiff State of Georgia notes that Section 10-1-397(b)(2)(B) states a court can award a civil penalty of up to $5,000.00 per violation, and it rightfully admits the FBPA does not specify a method for calculating the number of violations. (73-1, p. 35). The State also admits the "FBPA does not set out factors for determining the size of the per violation penalty under Section 397 and this provision has not otherwise been judicially construed in Georgia. (73-1, p. 37). There is no guidance from the Georgia courts of what a court should consider in exercising its discretion in determining whether a civil penalty should even be imposed, up to the

maximum of $5,000 per violation, and there is no guidance from Georgia courts for determining the number of violations. Regardless, the State asks this court to make those novel determinations of Georgia law.

If the FBPA is to be construed consistently with the FTC Act, then in order to establish a violation the State must show (1) there is a representation, omission, or practice, (2) the representation, omission, or practice is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. On Point Capital, 17 F.4th at 1071. In On Point Capital, the Court interpreted the hundreds of consumer complaints as evidence of materiality. As argued previously, in this case, there is evidence of just four consumer complaints. (SOMF ¶¶ 402, 405; Ex. 141 73-16, Bae Decl. ¶¶ 21, 22, 23 and 24). Just as evidence of a significant number of consumer complaints can be evidence of materiality, On Point Capital, 17 F.4th at 1080, the lack of a significant number of consumer complaints is evidence the ads or statements were not misleading or material. In short, there is an issue of fact regarding the materiality of the representations made.

Regardless how one decides to count the number of violations for the purpose of assessing a per violation civil penalty, given the genuine issues of material fact regarding the materiality of representations, there is a concurrent issue of fact regarding the number of violations. There is a violation only if the

representation was material. <u>On Point Capital</u>, 17 F.4th at 1071. As argued in addressing the State's request for restitution, the State contends a total of 435 consumers were victims. (73-1, p. 34, citing SOMF ¶ 350; Ex. 141, Bae Decl. ¶16). But all the State has shown is that 435 consumers made purchases. The state has not shown how many of those purchases were the result of ads or promotions for which Defendant Detelich can be held responsible. If there is an issue of fact regarding the number of victims, there similarly is an issue of fact regarding the number of violations.

Although O.C.G.A. § 10-1-397(b)(2) gives no guidance regarding how a court is to determine the number of violations, or how a court is to exercise its discretion in determining if any civil penalty is to be assessed, the statute does give guidance as to *which* court should be making those determinations. Section 10-1-397(b)(2) states unequivocally states it is the superior court that is to make the determination as to numbers of violations and what if any civil penalty should be assessed.

> "Without regard as to whether the Attorney General has issued any orders under this Code section, upon a showing by the Attorney General in *any superior court* of competent jurisdiction that a person has violated or is about to violate this part, a rule promulgated under this part, or an order of the Attorney General, the court may enter or grant any or all of the following relief . . .."

O.C.G.A. § 10-1-397(b)(2).

By its express language, the statute limits the ability of the Attorney General

to obtain an order for civil penalties or restitution when before a "superior court." This limitation should be construed in favor of Mr. Detelich. "[W]hen a statute imposes a fine or penalty, strict construction is required in favor of the person penalized." New Georgia Project, Inc. v. Carr, No. 1-22-cv-035333, 2022 WL 17667828, at *14 (N.D. Ga. Dec. 14, 2022). "[A] statute draws its meaning … from its text." Zaldivar v. Prickett, 297 Ga. 589, 591 (2015) (citation and punctuation omitted). "[W] must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." Deal v. Coleman, 294 Ga. 170, 172-173 (2013) (citations and punctuation omitted). "[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." Id. at 173 (citation and punctuation omitted).

The natural and reasonable way to read "superior court" is that it means a superior court in the state of Georgia. To the extent a court must for the first time determine how the number of violations are determined and how a court exercises its discretion of whether and in what amount a civil monetary penalty should be imposed, that should first be done be a superior court in Georgia. In the absence of any guidance regarding the application of Section 10-1-397(b)(2), there is an issue of fact regarding what if any civil penalty is appropriate.

The complexity of the novel issues raised in the State's claim for civil penalties is only increased in its claim for penalties pursuant to O.C.G.A. § 10-1-851. Section 851 provides:

> "When any person who is found to have conducted business in violation of Article 15, 17, or 21 of this chapter is found to have committed said violation against elder or disabled persons, in addition to any civil penalty otherwise set forth or imposed, the court may impose an additional civil penalty not to exceed $10,000 for each violation."

O.C.G.A. §10-1-851. The State must first prove that Defendant Detelich intentionally targeted elder or disabled person in order for additional civil penalties to become available. O.C.G.A. § 10-1-395.5(d).

It is clear that civil penalties pursuant to O.C.G.A. § 10-1-851 cannot be imposed against Mr. Detelich without him first being found liable O.C.G.A. § 10-1-397. For the reasons stated, summary judgment is not appropriate for the State's claim for Section 397 damages. Accordingly, summary judgment is inappropriate for its claim for Section 851 damages.

Just as with Section 397, Section 851 presents a novel issue of Georgia law, as it does not define what constitutes a violation. In the absence of any guidance from the Georgia legislature or the Georgia courts, the State advocates that a violation should be the number of online campaigns, plus the number of brochure downloads, plus the number of seminars conducted, plus the elderly consumer purchases. (Doc. 73-1 p 40.). There is no evidence of the correlation between the

number of consumer purchases, and the online campaigns, brochure downloads or seminars. Although there is evidence of consumer purchases, there is an issue of fact of how many consumer purchases were the result of the marketing at issues. There is no evidence of what representations should be considered "material" such that they could constitute a violation (a term which is undefined in Georgia law).

Significantly, genuine issues of material fact exist whether ad campaigns, even assuming a violation under Section 397, were targeted towards elder or disabled persons. O.C.G.A. § 10-1-850(1) defines "disabled person" as " a person who has a physical or mental impairment which substantially limits one or more of such person's major life activities." There is no evidence to support targeting who meet the definition of "disabled person" set forth in O.C.G.A.§ 10-1-851(1).

The State also argues that Defendant Detelich targeted "elder persons", which is defined as "a person who is 60 years of age or older." O.C.G.A. § 10-1-850(b)(2). An equally plausible reading of the marketing materials at issue is that promotional materials were intended to reach those dealing with pain, regardless of age. (See, e.g., Plaintiff's Ex. 557). At a minimum, there is an issue of fact whether elder or disabled persons were targeted. Accordingly, the State is not entitled to summary judgment as to its claims for Section 851 civil penalties.

The State also argues that upon a showing by the Attorney General that a person has violated the FBPA, the Court may grant a permanent injunction and

other relief the Court deems just and equitable. O.C.G.A. § 10-1-397(b)(2)(A), (F). (Doc. 73-1, p. 33). As argued above, regarding the State's effort to recover civil penalties, the State has the authority to seek injunctive relief in a superior court in the State of Georgia. As argued in response to the FTC's request for injunctive relief, there is no factual basis for concluding injunctive relief is necessary.

Just as the Supreme Court in AMG parsed the FTC Act to determine that congress only gave district courts the authority to impose limited monetary penalties and to award monetary relief in cases where the Commission has issued cease and desist orders. AMG Capital, 141 S. Ct. at 1348-49, this Court should parse the Georgia FBPA and hold that a superior court in Georgia must determine whether or not civil penalties and injunctive relief can be ordered pursuant to O.C.G.A. § 10-1-397(b)(2).

## E. The State is Not Entitled to Restitution

The State of Georgia is seeking restitution from Defendants. Because the FTC may no longer seek restitution after the AMG decision, Plaintiff State of Georgia is seeking restitution pursuant to the FBPA.

The FBPA provides for the recovery by the State, under certain circumstances[1], of "[r]estitution to any person or persons adversely affected by a

[1] As argued, *supra*, Defendant submits the State of Georgia is not authorized to bring this action for monetary relief in federal court pursuant to O.C.G.A. § 10-1-392(b)(2)("upon a showing by the Attorney General in any *superior court* of competent jurisdiction that a person

defendant's actions in violation of this part." O.C.G.A. § 10-1-397(b)(2)(D). The State admits that the statute does not define restitution, but it submits the Georgia Court of Appeals has confirmed that in a government enforcement action, "restitution is something akin to the refund of the purchase price." (Doc. 73-1, p. 34 n.9). The State's reliance on Quattrocchi v. State of Ga., 357 Ga. App. 224, 227 n.2 for this proposition is misplaced. Quattrocchi was not decided in the context of a State enforcement action, and it specifically did not define how restitution was to be calculated. Instead, the import of Quattrocchi is that a private litigant could not seek restitution. Quattrocchi, 357 Ga. App. at 227 n.2 (quoting Edel v. Southtowne Motors of Newnan II, 338 Ga. App. 376, 379 (2) (2016)).

Even assuming it is appropriate for the Court to reach the issue of restitution, there is a factual issue regarding the amount of restitution. Plaintiff State of Georgia asserts that "435 consumers fell victim to SHC's deceptive representations making purchases in an aggregate gross amount of $3,350,416." (73-1, p. 34, citing SOMF ¶ 350; Ex. 141, Bae Decl. ¶16). All that State has shown, however, is that 435 consumers made purchases. The state has not shown how many of those purchases were the result of ads or promotions for which Defendant Detelich can be held responsible. In the context of a federal criminal case discussing the

---

has violated or is about to violate this part, a rule promulgated under this part, or an order of the Attorney General, the court may enter or grant any or all of the following relief . . . .").

requirements of the Mandatory Victims Restitution Act, a federal court has held an award of restitution based on an arbitrary calculation based on speculation and guess work is impermissible. United States v. Sommerville, No. 3:16cr001/MCR, 2016 U.S. Dist. LEXIS 157432, at *15 (N.D. Fla. Nov. 14, 2016). The State is seeking restitution based simply on speculation and guess work.

### F. This Court Should Dismiss the State's Claims Pursuant to 28 U.S.C. § 1367

"Federal courts are courts of limited jurisdiction" and only possess "that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Federal courts may exercise supplemental jurisdiction over state law claims "in any civil action of which the district courts have original jurisdiction." Id. at § 1367(a). "District courts may decline to exercise supplemental jurisdiction over a claim" if "(1) the claim raises a novel or complex issue of State law," or "(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." Id.at § 1367(c)(1) and (2). [S]tate courts, not federal courts, should be the final arbiters of state law." Ingram v. Sch. Bd. Of Miami-Dade Cnty., 167 F. App'x 107, 108 (11th Cir. 2006) (quoting Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997)).

The FTC and the State admit the State's claims raise novel issues of state law regarding civil penalties and restitution. It is appropriate for this court to decline

jurisdiction over claim would have required the district court to decide a novel question of state law that was by no means clear cut. Ga. Outdoor Network, Inc. v. Marion Cty., 652 F. Supp. 2d 1355, 1372 (M.D. Ga. 2009) ("Given the importance of the questions of Georgia law at issue in this case and the lack of controlling authority offered by the parties, the Court concludes that Plaintiffs' claims under Georgia law will be more appropriately adjudicated by a Georgia court."). The Eleventh Circuit has held that needless decisions of novel questions of state law are to be avoided. Grant v. Cty. of Seminole, 817 F.2d 731, 732 (11th Cir. 1987). The Grant Court cited with approval the decision in Financial General Bankshares, Inc. v. Metzger, 680 F.2d 768 (D.C. Cir. 1982), in which the D.C. Court of Appeals held the district court abused discretion by exercising pendent jurisdiction over novel and unsettled questions of District of Columbia law.

Not only does this case raise novel issues of State law, but those novel issues also predominate this case, in which the State is seeking millions of dollars in civil penalties. For these reasons, this Court should decline to exercise jurisdiction over the State's claims for civil penalties, restitution and injunctive relief.

## G. In The Alternative This Court Should Certify Questions To The State Supreme Court

Federal courts may certify questions of law to the Georgia Supreme Court for an answer on "determinative" state law issues in the cases before them. O.C.G.A. § 15-2-9(a). Under Eleventh Circuit precedent, certification is

appropriate when there is "substantial" or "significant" doubt—not just any doubt, as Daikin claims—regarding the status of state law. Peoples Gas Sys. v. Posen Constr., Inc., 931 F.3d 1337, 1340 (11th Cir. 2019). The Eleventh Circuit in Royal Cap. Dev., LLC v. Md. Cas. Co., 659 F.3d 1050, 1054-55 (11th Cir. 2011), set for several factors to be considered by a court when exercising its discretion to certify a question to the State Supreme Court.

> The most important are the closeness of the question and the existence of sufficient sources of state law to allow a principled rather than conjectural conclusion. But also to be considered is the degree to which considerations of comity are relevant. And we must also take into account practical limitations of the certification process.

Id. at 1055 (quotation marks and alterations omitted). In Royal, the Eleventh Circuit stated that, although certification is an exercise of the court's discretion, "[w]here there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary Erie 'guesses' and to offer the state court the opportunity to interpret or change existing law." Royal Capital Dev, 659 F.3d at 1054 (quoting Colonial Props., Inc. v. Vogue Cleaners, Inc., 77 F.3d 384, 387 (11th Cir. 1996)).

This Court should certify the following questions to the Supreme Court of Georgia:

1. How are the number of violations calculated pursuant to O.C.G.A. § 10-2-397(b)(2)(B);
2. What factors are to be considered pursuant to O.C.G.A. § 10-2-397(b)(2)(B) in determining whether to assess a civil penalty and if so in what amount; and
3. How is restitution determined pursuant to O.C.G.A. § 10-2-397(b)(2)(B).

## IV. CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment. Further, this Court should dismiss the State's claims for civil monetary penalties, restitution and injunctive relief, because those claims predominate and raise novel issues of state law upon which no guidance exists from the Georgia courts. In the alternative, this Court should certify questions to the Georgia Supreme Court regarding the State's claims for civil penalties and restitution.

This May 12, 2023.

**/s Charles E. Cox, Jr.**
Ga. Bar No. 192305
**Charles E. Cox, Jr., LLC**
484 1st Street, Suite 1
Post Office Box 67
Macon, Georgia 31202-0067
Telephone: (478) 757-2990
Facsimile: (478) 757-2991
E-mail: Charles@cecoxjr.com

## CERTIFICATE OF SERVICE

I, Charles E. Cox, Jr., hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, who will send notification and a copy of such to all counsel of record.

I also certify that I have mailed by United States Postal Service the document and a copy of the Notice of Electronic Filing to the following nonCM/ECF participants:

I further certify pursuant to L.R. 7.1D that the above-titled document complies with L.R. 5.1B and was prepared using a 14 point Times New Roman font.

This May 12, 2023.

**/s Charles E. Cox, Jr.**
Ga. Bar No. 192305
**Charles E. Cox, Jr., LLC**
484 1st Street, Suite 1
Post Office Box 67
Macon, Georgia 31202-0067
Telephone: (478) 757-2990
Facsimile: (478) 757-2991
E-mail: Charles@cecoxjr.com