IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION and STATE OF GEORGIA, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| STEVEN D. PEYROUX, individually and as an owner and officer of REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC, also d/b/a Stem Cell Institute of America, LLC, PHYSICIANS BUSINESS SOLUTIONS, LLC, and SUPERIOR HEALTHCARE, LLC, | : | |
| | : | |
| BRENT J. DETELICH, individually and as an officer of REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC, also d/b/a Stem Cell Institute of America, LLC, | : | CIVIL ACTION NO. 1:21-cv-3329-AT |
| | : | |
| REGENERATIVE MEDICINE INSTITUTE OF AMERICA, LLC, a limited liability company, also d/b/a Stem Cell Institute of America, LLC, | : | |
| | : | |
| PHYSICIANS BUSINESS SOLUTIONS, LLC, a limited liability company, and | : | |
| | : | |
| SUPERIOR HEALTHCARE, LLC, a limited liability company, | : | |
| | : | |
| Defendants. | : | |

## <u>OPINION AND ORDER</u>

In this case, the Federal Trade Commission ("FTC") and the State of Georgia allege that Defendants — acting together as a part of a common enterprise — engaged in unfair and deceptive acts in violation of the Federal Trade Commission Act ("FTC Act") and the Georgia Fair Business Practice Act ("GFBPA"). In particular, Plaintiffs allege that Defendants created and published false and misleading advertisements about the efficacy and approval of stem cell therapy injection treatments for a host of medical conditions (osteoarthritis, neuropathy, joint pain, and more), and embarked on a comprehensive marketing campaign to distribute those ads to the public and to other medical clinics across the county. Now before the Court is Plaintiffs' Motion for Summary Judgment [Doc. 73] on all five claims. As detailed in this Order, Plaintiffs have put forth ample record evidence in support of their claims. After review of the entire summary judgment record, the Court finds that there are no disputes of genuine issues of material fact and that the record and controlling law dictate that Plaintiffs' Motion [Doc. 73] be **GRANTED** in full as to liability.

# Table of Contents

I.   BACKGROUND ............................................................... 4

  A. The Parties ............................................................... 4

  B. Plaintiffs' Allegations that Stem Cell Advertisements Were Deceptive.... 9

     1.  Direct Ads to Consumers ............................... 9

     2.  Ads Provided to Clinics ................................ 15

  C. Other Aspects of the Marketing Campaigns ............................ 19

  D. Procedural History of this Case ..................................... 24

II.  LEGAL STANDARD ........................................................ 26

III.  DISCUSSION ............................................................. 28

  A. The FTC Act Claims (Counts I-III) ...................................... 28

     1.  The Corporate Defendants Engaged in a Common Enterprise ... 29

     2.  The Corporate Defendants Are Liable as to the FTC Act Claims (Counts I–III) ...................................................... 34

        a.  Standard for Liability Under Sections 5 and 12 of the FTC Act ...................................................... 35

        b.  Count I: False or Unsubstantiated Efficacy Claims ............... 38

        c.  Count II: False FDA/FTC Approval Claim ............................ 43

        d.  Count III: Provision of Means and Instrumentalities Claim . 44

     3.  The Individual Defendants Are Liable as to Counts I-III ............ 46

  B. The GFBPA Claims (Counts IV and V) ................................. 50

  C. Requested Relief ...................................................... 60

     1.  Injunctive Relief ....................................... 60

     2.  Monetary Relief Under the GFBPA ............................. 63

        a.  Civil Penalties Can be Obtained in a Federal Court ............... 68

        b.  The GFBPA's Civil Penalty Provision is Not Unconstitutionally Vague ...................................................... 68

        c.  The UDPTEA is Not Unconstitutionally Vague ..................... 76

        d.  The Court Declines to Certify Questions to the Georgia Supreme Court ...................................................... 77

IV.  CONCLUSION ............................................................. 81

## I.     BACKGROUND[1]

### A.     The Parties

Plaintiffs are the Federal Trade Commission ("FTC") and the State of Georgia. The FTC enforces the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce — including false advertising for drugs or services. 15 U.S.C. §§ 45(a) and 52. The State of Georgia, through its Attorney General, enforces the GFBPA, which also prohibits unfair or deceptive acts or practices in or affecting commerce. O.C.G.A. §§ 10-1-390—10-1-408.

This case involves a complex web of interrelated Defendants. There are five named Defendants: three LLC corporate Defendants and two individual Defendants. The three corporate Defendants are: (1) Superior Healthcare, LLC ("Superior"); (2) Physicians Business Solutions, LLC ("Physicians Business"); and (3) Regenerative Medicine Institute of America, LLC d/b/a Stem Cell Institute of America LLC ("SCIA") (collectively, the "Corporate Defendants"). The two individual Defendants are (4) Steven Peyroux and (5) Brent Detelich. The three Corporate Defendants and Mr. Peyroux ("the Peyroux Defendants") are

---

[1] This factual description does not constitute actual findings of fact. The Court derives the facts below from the evidence in the record and views these facts in the light most favorable to Defendants, the non-moving parties. The Court notes from the outset that, in filing their response to the Plaintiffs' Statement of Material Facts, the Peyroux Defendants dispute certain facts but *never* cite to contrary evidence. (*See generally* Peyroux Defs. Resp. to SOMF, Doc. 109.) Consistent with Local Rule 56.1(B)(2)(a)(2), the Court deems Plaintiffs' facts admitted unless Defendants (i) directly refute the movant's fact with specific citations to evidence, (ii) state a valid admissibility objection, or (iii) point out that the citation does not support the movant's fact. Most of the Peyroux Defendants objections fall in this third category, so, as to these facts, the Court has reviewed Plaintiffs' cited evidence to determine whether the evidence supports the stated fact.

represented by one set of counsel, and Mr. Detelich is represented by separate counsel. A breakdown is provided below.

| Corporate Defendants | Individual Defendants |
|---|---|
| • Superior<br>• Physicians Business<br>• SCIA | • Peyroux<br>• Detelich (separate counsel) |

The Court begins with descriptions of the Corporate Defendants.

From 2005 to 2019, **Superior** operated a clinic in Canton, Georgia that provided health-related services and products to consumers, including: chiropractic services, medical weight loss services, and — at issue here — stem cell therapy. Superior offered stem cell therapy from 2015 to 2019. (Plaintiffs' Reply to Peyroux Defendants in Support of Statement of Material Facts ("PSOMF-Peyroux"), Doc. 115-1 ¶¶ 1–2, 341.) Stem cell therapy involves the injection of shots with products containing cells or growth factors derived from birth tissue, including amniotic tissue or fluid, placenta, Wharton's jelly, umbilical cord blood, adipose tissue, and bone marrow. (*Id.* ¶¶ 343, 344.)  Besides offering stem cell therapy at *its* clinic, Superior also provided stem cell therapy through satellite clinic locations. (Defs. Rog. Resp., Doc. 79-19 at ROG 6.) Superior paid rent to these satellite clinics and paid doctors and medical staff flat fees to inject patients with stem cell therapy. (*Id.*) From 2017 to 2019, at least 485 consumers purchased stem cell therapy injections from Superior (at its clinic and/or the satellite

locations) at an aggregate cost of $3,350,416. (Declaration of FTC Investigator Dawn Bae, Doc. 78-16 ¶ 16.) Of these customers, 335 were age 60 or older. (*Id.*)[2]

The next Corporate Defendant is **Physicians Business.** Physicians Business is a consulting company that advises chiropractors and healthcare clinics (like Superior) on how to increase revenue by offering additional services to patients — one such service is stem cell therapy. (PSOMF-Peyroux, Doc. 115-1 ¶¶ 550, 553, 555.) In advising healthcare clinics on how to add stem cell therapy to their practices, Physicians Business provided resources — marketing manuals, flyers, lectures, sample emails ads, and PowerPoints — and a procedure to launch advertising campaigns.[3] (*Id.* ¶¶ 553, 561, 564, 566, 567.) Physicians Business also provided coaching to clinics on how to deliver PowerPoint presentations to potential patients. (*Id.* ¶ 577.) And, as a part of its consulting, Physicians Business offered medical training for clinics, ordered supplies for the stem cell injections, and provided other sales training, for example, on how to track patients and potential patient responses to marketing campaigns. (*Id.* ¶¶ 561, 568.) Physicians Business offered various consulting programs to client clinics; these programs charged monthly or annual fees. (*See, e.g.*, PBS 1-Year Consulting Agreement, Doc.

---

[2] Defendant Peyroux testified that Superior typically charged around $5,000 "per joint," but that the cost fluctuated depending on the specific product; for example, "Wharton's jelly was more expensive than an amnio product." (Peyroux 30(b)(6) for Superior Dep., Doc. 73-7 p. 87.) Peyroux himself set the original prices at the clinic.

[3] At some point, Physicians Business also created a training platform called "PBS University" that provided client clinics with training videos and other materials containing information on stem cell therapy. (*Id.* ¶¶ 579–81.)

75-18) (charging clinic in Decatur, Alabama $13,500 per year, with $2,500 initial payment and $1,000 subsequent monthly payments).

The third corporate Defendant is The Stem Cell Institute of America (**"SCIA"**). Like Physicians Business, SCIA offered consulting services to chiropractors and other healthcare clinics — but SCIA's consulting business focused *only* on stem cell therapy. (Plaintiffs' Reply to Detelich in Support of Statement of Material Facts ("PSOMF-Detelich"), Doc. 117-1 ¶ 435.) SCIA provided its client clinics with materials such as public-facing lectures and PowerPoints (*id.* ¶ 442), advertising campaigns to promote those lectures (through social media ads, newspaper ads, and more) (*id.* ¶ 445), and an online document sharing system ("Smart Vault"). Smart Vault included information on stem cell products, advertisements for stem cell therapy, medical exam materials, patient surveys, contracts related to the provision of stem cell therapy, and more. (*Id.* ¶¶ 447–48.) SCIA also coached clients on how to deliver lectures to potential patients and provided sample handout materials to give consumers at these lectures. (*Id.* ¶¶ 449, 462.) SCIA provided client clinics with sample TV, video, and radio ads. (*Id.* ¶¶ 486, 489.) Besides providing client clinics with marketing campaigns, SCIA advertised stem cell therapy directly to consumers through lectures, postcards, emails, its website, YouTube, a documentary, and more. (*Id.* ¶¶ 512, 513, 515, 517, 520, 527.)

SCIA at first charged each client clinic a $400 fee per stem cell treatment injection administered by the clinic. (*Id.* ¶ 439.) At some point, however, SCIA

began offering clients "exclusivity membership" through which the clinic paid SCIA a flat fee and SCIA agreed not to accept competing client clinics within a set radius. (*Id.* ¶ 440) (*See also* Sample SCIA contract, Doc. 47-12) (offering exclusivity package of, e.g., $1,500 per month for a 2.5 mile exclusivity radius or $4,500 per month for a 15 mile exclusivity radius).

Besides the three Corporate Defendants, there are two named individual Defendants: Steven Peyroux and Brent Detelich.

**Peyroux**, a licensed chiropractor (PSOMF-Peyroux, Doc. 115-1 ¶ 134), was the 100% owner of all three Corporate Defendants: Superior, Physicians Business, and SCIA. (*Id.* ¶¶ 138, 156, 184.) Peyroux was the Executive Director and a corporate officer of Superior. (*Id.* ¶¶ 185–86.) Peyroux is the CEO and a corporate officer of Physicians Business. (*Id.* ¶¶ 157–58.) Peyroux was a co-founder and corporate officer of SCIA. (*Id.* ¶¶ 136, 139.)

**Detelich** was licensed as a chiropractor, but his license was revoked after he was convicted in federal court of several felonies and because he committed unprofessional conduct. (PSOMF-Detelich, Doc. 117-1 ¶ 245.)[4] Detelich was a co-founder, officer, and director of SCIA and served as SCIA's president until Peyroux took over this role in January 2018. (*Id.* ¶¶ 249–52.) As to Physicians Business, Detelich was directly involved in developing, marketing, and delivering consulting services about stem cell therapy. (*Id.* ¶ 304.) Detelich was also directly involved with Superior's marketing of its stem cell therapy treatments (though Detelich

---

[4] No further information about Mr. Detelich's felonies was provided.

claims that he was involved only because Superior was a client clinic of SCIA). (*Id.* ¶¶ 314–27.)

In 2019, Superior and SCIA filed for bankruptcy. (*Id.* ¶¶ 3, 8.) The bankruptcies closed in August and November 2021. (*Id.*)[5] Physicians Business remains operational. Peyroux and Detelich currently hold interests in several other healthcare companies. (PSOMF-Peyroux, Doc. 115-1 ¶¶ 217, 218, 219, 229, 230, 234, 238, 241; PSOMF-Detelich, Doc. 117-1 ¶¶ 332, 334.)

### B. Plaintiffs' Allegations that Stem Cell Advertisements Were Deceptive

#### 1. Direct Ads to Consumers

Plaintiffs allege that the Corporate Defendants published advertisements that were deceptive because the ads misrepresented the efficacy of stem cell therapy treatment.

Superior (the clinic), advertised stem cell therapy treatments directly and advertised for stem cell therapy lecture events (also known as "lunch and learns" or "seminars"). At these lecture events, stem cell therapy was further advertised. (PSOMF-Peyroux, Doc. 115-1 ¶ 360.) In so advertising, Superior used postcards, social media, TV commercials, websites, YouTube channels, email blasts, and print media. (*Id.* ¶ 362.) For example, on its website, Superior stated, among other things, "OUR . . . STEM CELL TREATMENTS CAN PROVIDE REMARKABLE

---

[5] The automatic stay provision of the bankruptcy code, 11 U.S.C. § 362(a), does not apply here. This is an action to enforce Plaintiffs' police and regulatory power as governmental units and therefore falls within an exception to the automatic stay provision. *See* 11 U.S.C. § 362(b)(4).

IMPROVEMENT WHEN OTHER TRADITIONAL MEDICAL PROCESSES HAVE FAILED OR HAD LIMITED EFFICACY." (*See* Superior Website, Docs. 96-24, 126-2 at ECF 21) (also noting "stem cells can be used to treat nearly any type of condition caused by injury or degeneration"). Superior's website also advertised for "educational seminars," by offering attendees a chance to learn about this "cutting edge therapy" that could provide relief in "as little as one treatment":

> DISCOVER HOW TO REPAIR JOINT DAMAGE AND LIVE PAIN FREE WITHOUT PAINFUL SURGERY OR HARMFUL DRUGS
> LEARN HOW THIS CUTTING EDGE THERAPY CAN GIVE YOU LASTING PAIN RELIEF IN AS LITTLE AS ONE TREATMENT TO HELP YOU STAY ACTIVE AND HEALTHY!

(*See* Superior Website II, Docs. 96-23, 126-2 at ECF 12) (also noting that stem cell therapy can treat COPD, Parkinson's Disease, Multiple Sclerosis, Congestive Heart Failure, and more). Superior also advertised for SCIA's stem cell therapy seminars but included its own name and logo in the bottom left corner:



(Stop the Pain Newspaper Ad, Doc. 75-11.)[6] The ad states that these treatments "can effectively reduce and even eliminate your pain without surgery or additive medications." (*Id*.) The same ad was sent out via postcards. (*See* Stop the Pain Postcard, Doc. 75-23) (advertising educational seminar to "hear about the latest medical breakthroughs in pain relief" for conditions like knee pain, low back pain, neuropathy, joint pain, osteoarthritis, and more, and touting an "80% Success rate!").

Superior also advertised seminars on Facebook, stating that attendees can learn how stem cell therapy "can be used to regenerate joints and restore mobility to damaged knees," as follows:



(Superior Facebook Ad, Doc. 75-12) (also noting that the lecture would be presented by "*Dr.* Steven Peyroux" and would show "how thousands of patients are living pain-free lives with help from the research, treatments and therapies of stem cell science") (emphasis added).

---

[6] This ad is attached to an email sent from Physicians Business to Superior's marketing department, and cc'ing Defendant Peyroux.

Superior also used TV ads. (*See* Superior TV Ad Video, Doc. 78-6, Pls. Ex. 131, filed manually) ("It only takes one stem cell treatment to reduce or eliminate your knee pain without prescription medications and without surgery. In fact, many patients start experiencing relief from their pain immediately after the treatment."); (*See also* Superior TV Ad II, Doc. 95-24, Pls. Ex. 574, filed manually) (advertising stem cell therapy as treatment for neuropathy).

At the lectures themselves, speakers (such as Mr. Peyroux) presented PowerPoints that touted a "Medical Breakthrough Recognized The World Over!" (Superior PowerPoint, Doc. 93-6 at ECF 3.) At the end, the PowerPoints offered discounts for signing up for stem cell injections immediately:

**ONE INJECTION** - As a gift for coming, when you sign up today, **you will receive 10% off** your first injection.

**TWO INJECTIONS** - If you need two injections **we're happy to give you 20% off.**

**These are HUGE SAVINGS and we are happy to give them to you!**

Many Patients need assistance with financing or a monthly payment option. **If approved for treatment our team has you covered with payment plans.**

(*Id*. at ECF 65.)

Like Superior, SCIA (the consulting company that focused only on stem cell therapy) advertised directly to consumers. (PSOMF-Peyroux, Doc. 115-1 ¶ 511; PSOMF-Detelich, Doc. 117-1 ¶ 511.) SCIA also advertised through postcards:



(SCIA Postcard Ad, Doc. 77-18.) On its website, SCIA advertised both its stem cell therapy and its lectures, noting, e.g., that customers could "eliminate knee pain" and that regenerative medicine "has revolutionized treatment options for those suffering from chronic neck pain":



 (SCIA website, Doc. 76-6.) SCIA also advertised directly to customers on YouTube. (*See, e.g.*, Pls. Ex. 612, filed manually, at 1:16–1:20) (stating that stem cell therapies are "clinically proven to be extremely effective in promoting healing"); (Pls. Ex. 623, filed manually) ("[O]ur clinic is proud to offer one of the most cutting edge, non-invasive, and non-surgical treatments for joint and arthritis pain"). SCIA also advertised directly through blog posts:

## Say Goodbye to Joint Pain – Regenerative Cellular Medicine to The Rescue

april 24, 2018  •  stemcellinstituteofamerica

Joint pain can leave you incapacitated, as it hinders your mobility. This can cause severe depression if it is not addressed on time. So, if you have joint pain of any kind, do not neglect it. There are 3 primary types of joint pain:



(http://americastem.com/)

1. Cervical pain that occurs from the degeneration of the cervical cartilages,

2. Chronic pain that occurs from reduced immunity (DJD), and

3. Cervical arthritis that occurs from inflammation of the tendons and ligaments.

Till recently, surgery was the only means of treating joint pain. Now, there are non-surgical alternatives and pain-free ways to treat joint pain. Regenerative medicine has gained popularity as a non-surgical treatment option because of its ability to restore structure and function of damaged tissues. Regenerative stem cell therapy repairs the injured and degenerated tissues and stimulates new growth of cells. You can learn about these advanced regenerative options at Stem Cell Institute of America (https://twitter.com/SCIAtweets).

Regenerative medicine is a promising revolution in the treatment of joint pain. It significantly reduces pain, slows the progression of the disease, restores joint function and increases mobility of the patient. The effects of this therapy can be greatly amplified by combining it with physiotherapy. If you want to know how regenerative medicine can help you live a better quality of life, contact Stem Cell Institute of America (https://www.pinterest.com/infostemcellinst/) for a free informational seminar today!

(SCIA Blog Post, Doc. 88-5.)

SCIA also created a documentary called The Healing Miracle that used other interviews and patient testimonials to advertise stem cell therapy. (*See* Healing Miracle Transcript, Doc. 97-4.)

Like Superior and SCIA, Physicians Business operated a website that included advertisements for stem cell therapy, such as:

Revolutionary platelet-rich plasma (PRP) and amniotic regenerative cell therapy procedures can treat all the damages and underlying conditions that cause pain. Practitioners can inject these cells into the target area, and they then act as an immunologically privileged material to rebuild and strengthen the damaged tissue causing back pain.

(Physicians Business Website, Doc. 80-23.)

## 2.  Ads Provided to Clinics

Beyond advertising directly to consumers, SCIA and Physicians Business — as consultants — provided ads to client clinics for those clinics to use when advertising stem cell treatments and lectures. (PSOMF-Peyroux, Doc. 115-1 ¶ 600; PSOMF-Detelich, Doc. 117-1 ¶ 447.)

SCIA included a SCIA Manual in its marketing packages. (PSOMF-Detelich, Doc. 117-1 ¶ 447.) This SCIA Manual included sample ads that are similar to the ones shown above. (See SCIA Manual, Doc. 78-2 at ECF 68–86.) For example, postcard ads included similar statements that stem cell therapy could "reduce and even eliminate" pain:

(*Id*. at ECF 72.) One sample magazine/newspaper ad touted the stem cell therapy as "FDA-approved," as shown below:



(*Id.* at ECF 82.) SCIA also provided client clinics sample e-blast emails to send to

potential customers/patients:

Dear Patient,

You or someone you know may have been recommended or even undergone harmful and painful steroid injections or surgery for a hip, knee, shoulder, back or neck condition.
Did you know there is a pain free medical breakthrough that can eliminate the need for steroids, pain medications and surgery for virtually any joint in the body?

 Well there is! And........

_____ in partnership with the *Stem Cell Institute of America* is ready to tell you how. Today you can schedule a free 30 minute consultation to learn all about the amazing benefits of stem cells. **This new revolutionary service now available to all of our past patients, family and friends is being called the most significant medical breakthrough in the 21st-century!**

Call *The Stem Cell Institute of America* today at **800-391-6040** to schedule your free appointment in our office and to have all your questions answered

(SCIA Sample Email for Clinics, Doc. 96-18.) Other sample email templates advertised for upcoming lectures given by "*Dr*. Steven Peyroux, *Chief Medical Officer* of Superior Healthcare" where "**FDA – approved 'Regenerative Injection Therapy'** for arthritic and/or degenerative conditions" would be discussed:

**When:** Tuesday, Mar. 8, 2016 at 6:30pm
**Where:** Northside Hospital Cherokee Conference Center at 1130 Bluffs Parkway in Canton
**Who:** Dr. Steve Peyroux, Chief Medical Officer of Superior Healthcare, will present these exciting new medical breakthroughs that are allowing chronic joint pain sufferers to return to a pain free life in a matter of weeks.
**What You'll Get:** Discover how you can finally become pain free from your arthritis, degenerative joint disease, tendonitis, bursitis, and more without expensive and painful surgery or prescription drugs.
**How To Participate:** Seating is limited to the first 30 callers! Please call us at **678-266 0298** to reserve a seat.
Developed in conjunction with the Stem Cell Institute of America, Superior Healthcare is now offering painless, *FDA - approved* "Regenerative Injection Therapy" for arthritic and/or

(SCIA Sample Email for Clinics II, Doc. 76-23) Other newspaper/print ads similarly represented that the stem cell therapy offered by the client clinic, along with SCIA, was FDA approved:



(*See, e.g.*, Wellness Institute of Illinois Print Ad, Doc. 75-24) (highlights added).

One video ad stated that, as an alternative to surgery or mediation, the particular clinic (in conjunction with SCIA) "offers a breakthrough treatment available now: a simple injection of an all-natural substance that your body already produces that has been *clinically shown* to regenerate damaged cartilage and connective tissue." (Gil Center Video Ad, Pls. Ex. 202, filed manually.)

Like SCIA, Physicians Business provided client clinics with sample ads. For example, Physicians Business provided clinics with a template (to be filled in by the clinic) for emails to be sent out that advertised stem cell therapy and lectures:

18

> is now offering Regenerative Medicine Services. The science and results of Regenerative and Stem Cell Therapy have already changed healthcare forever and we are excited to bring them to you.
>
> Until recently, treatment options for people with chronic pain were limited to steroid injections (short term relief) and surgery (high risk and long recovery periods). Now, safe and effective treatments for knee, shoulder, hip, elbow, back and neck pain are available without harmful side effects and minimal pain.

(*See, e.g.*, PBS Email Template, Doc. 97-16.) Physicians Business also provided clients with sample PowerPoints for seminars. (*See* Email Conveying PowerPoint, Doc. 77-11; PowerPoint Template, Doc. 77-12.)[7]

### C.    Other Aspects of the Marketing Campaigns

Besides providing sample ads, SCIA provided client clinics with other resources such as PowerPoint presentations; patient service agreements; informed consent forms; medical intake forms; access to a centralized call center with trained personnel to respond to patient questions; training for the client's clinical staff on how to deliver "successful lectures" as well as the appropriate methods to administer regenerative medicine services; and more. (SCIA Consulting Agreement, Doc. 75-22 at ECF 7, 9–10.) Under this umbrella of services, SCIA provided client clinics with materials and training on "handling objections" (i.e., where a consumer was hesitant or unwilling to purchase stem cell therapy treatment). One slideshow on this issue includes the following training:

---

[7] Physicians Business derived this PowerPoint template from a SCIA template. (See PSOMF-Peyroux, Doc. 115-1 ¶ 571) (the Peyroux Defendants do not dispute this fact).

## Tips for handling

1. Empathize
2. Take responsibility for the patient getting well, it's more important than any excuse
3. Always handle with truth
4. Don't exaggerate, use real expectations
5. These only work if you are sincere

## Spouse

"I need to talk to my spouse."

## Spouse Handle

"I agree you should. However, I know that if you go home and tell your spouse about it they'll say no, because they weren't at the seminar and they weren't here today to fully understand your condition and the therapy.

I'd like you to bring them in and we will go over it together so I can answer any questions or concerns they have."

. . .



(Handling Objections Slideshow, Doc. 76-4.)  SCIA provided many other trainings and materials related to sales strategies. (*See, e.g.*, Sales and Marketing PowerPoint, Doc. 74-7) (with specific slides for training of "case managers" whose "purpose" was to "ensure the public and patients are sufficiently enlightened to purchase stem cell therapy" and to "sell stem cells in high volume and collect the money needed to expand and further the purpose of the clinic"). SCIA also recommended particular stem cell products to client clinics. (PSOMF-Detelich, Doc. 117-1 ¶ 502.)

Like SCIA, Physicians Business also provided client clinics with various resources besides template ads, including management consultation on how to hire needed clinical staff; plans for internal and external marketing systems; case

management (including sales, financing, scheduling, and follow-up); medical forms and documentation templates; guidance on regenerative medicine products; and more. (Physicians Business Contract, Doc. 75-18.) Physicians Business also coached client clinics on how to deliver stem cell therapy lectures and PowerPoint presentations. (*See, e.g.*, Pls. Exs. 466, 471) (recordings of Peyroux coaching on how to present PowerPoint at lectures). In one training video, Peyroux and another employee explain and role-play how to respond to a customer's objection that she needs more information and more data by stating:

> There are certainly some research and things like that that I can provide to you that are published studies in well-known journal articles. However, the question you really should be asking me is . . . how many people and what results have you seen in people with similar knee conditions to me. . . .

> Over the past few years that we've done this, we have treated hundreds of patients with knee conditions with amazing results. So the level of degeneration you have in your knee makes you a really good candidate for this procedure. And I feel very confident in telling you that this is going to be a positive outcome for you as far as improving your range of motion, quality of life, and decreasing pain.

(Objection Training Video, Pls. Ex. 470, filed manually.)

Physicians Business also hosted seminars at the client clinics themselves that were directed to the clinics and/or the public. Such seminars could include sessions titled "Cash Services that Bring in New Patients by the 'Truckload'" and "Miracles of Stem Cells and Your Office," (Garden State Seminar Ad, Doc. 75-20 at ECF 9), or "How to resolve a knee condition with certainty in just 1-2 treatments – The secret to getting $5,000-$10,000 case fees paid in cash for these conditions"

(Apex Seminar Agenda, Doc. 90-5). At one Physicians Business Seminar in 2021, the agenda included talks by *Dr.* Brent [Detelich]" and "*Dr.* Steve [Peyroux]" about these topics, among others: "Learn the only *FDA approved* regen[erative] med[icine] systems that get results!" (emphases added); "How to *stay compliant with FDA and FTC for treatments and marketing*"; "Best systems to ensure 5 to 10 K per case"; "Cellular Hope Institute – Your private personal advanced Regen[erative] Med[icine] treatment Hospital in Cancun, Mexico . . . . Learn our ultra smooth process of preferring patients to the cancun[sic] center [and] Legal documents so that you can receive 20% of all funds collected without any risk." (Marietta Seminar Agenda, Doc. 77-25.)   Physicians Business also offered Facebook Live events about stem cell therapy and exosomes.[8] (*See* PBS Facebook Live, Doc. 92-15.)  In advertising for virtual sales trainings, Physicians Business represented that its regenerative medicine programs were both "FDA approved" and "approved by the FTC & FDA," as follows:

---

[8] Exosomes "are not cells, they are extracellular vesicles secreted by cells." (Expert Report of Dr. Phillip Morrison ("Morrison Report"), Doc. 78-22 ¶ 47.) Defendants, as alleged, recommended products that were claimed to contain exosomes produced in culture "by mesenchymal cells propagated from placentas or umbilical cords." (*Id.*)



(FDA Approved Facebook Ad, Doc. 87-3.) Like SCIA, Physicians Business also recommended particular stem cell products to clients. (PSOMF-Peyroux, Doc. 115-1 ¶ 632.) Together, SCIA and Physicians Business held joint conferences that included trainings on stem cell therapy and marketing stem cell therapy. (PSOMF-Detelich, Doc. 117-1 ¶ 508; *see, e.g.*, October 28–29, 2016 SCIA and PBS Seminar Agenda, Doc. 93-25.)

In total, Plaintiffs assert that the Defendants collectively generated $18,403,116.14 in gross income from 2015 to 2022. (MSJ, Doc. 73-1 at 31.)

### D.   Procedural History of this Case

The FTC began investigating Defendants' advertising practices at some time before July 2018 (*see* PSOMF-Peyroux ¶ 211) and filed its Complaint in August 2021 (Doc. 1). The Complaint asserts five claims, against all Defendants collectively:

- **Count I:** False or Unsubstantiated Efficacy Representations in violation of the FTC Act;

- **Count II:** False Representations About FTC/FDA Approval in violation of the FTC Act;

- **Count III**: Providing Means and Instrumentalities for Others to Commit Deceptive Acts in violation of the FTC Act;

- **Count IV:** False or Unsubstantiated Efficacy Representations in violation of the Georgia Fair Business Practices Act ("GFBPA");

- **Count V:** Unlawful Use of a Computer in Disseminating False or Misleading Representations in violation of the GFBPA.

(*See generally* Compl.) As relief, Plaintiffs FTC and the State of Georgia seek a permanent injunction and the State seeks monetary relief in the form of civil penalties and restitution available under the GFBPA.[9] (*Id.*) No motion to dismiss was filed here. In March of 2023, Plaintiffs moved for summary judgment [Doc. 73]. Defendants Superior, Physicians Business, SCIA, and Peyroux ("the Peyroux Defendants") responded. (Doc. 110.) Defendant Detelich, who has separate counsel, filed a separate response brief. (Doc. 112.) Plaintiffs filed separate replies to Defendants' responses. (Docs. 115, 117.)

Notably, in their response briefs, Defendants generally do not raise any *factual* disputes or challenge the voluminous evidence offered by the Plaintiffs in support of their claims.[10] Instead, Defendants advance *legal* arguments concerning interpretation and application of the relevant doctrines and statutes. With that note, the Court turns to the appropriate standard of review.

---

[9] Monetary relief is no longer available under Section 13(b) of the FTC Act. *See AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1347 (2021).

[10] Similarly, Defendants do not challenge the majority of the facts cited in Plaintiffs' SOMF. And, for the facts they do challenge, they do not provide any contrary evidence but rather challenge the Plaintiffs' facts "as unsupported by the record evidence," as the Court noted *supra* at n.1.

## II.    LEGAL STANDARD

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original). A fact is not "material" unless it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Id.* ("Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

Where the moving party bears the burden of proof at trial, as here, the moving party must show that "on all the essential elements of its case on which it bears the burden of proof, no reasonable [factfinder] could find for the nonmoving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). The FTC must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward

with *significant, probative evidence* demonstrating the existence of a genuine and material dispute of fact. *Id.*

The essential question is "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 250–51 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party."). In deciding this question, it is not the court's function to weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (11th Cir. 1994) (en banc). When reviewing the record evidence at the summary judgment stage, "the court must draw all reasonable inferences in favor of the nonmoving party." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).[11]

---

[11] District courts in this Circuit have on numerous occasions granted summary judgment to the FTC in assessing claims of deceptive and unfair acts under Section 5 of the FTC Act. A number of those decisions have been affirmed by the Eleventh Circuit. *See, e.g.*, *FTC v. USA Fin., LLC*, 415 F. App'x 970, 974 (11th Cir. 2011) (affirming district court's grant of summary judgment to FTC); *FTC v. Peoples Credit First, LLC*, 244 F. App'x 942 (11th Cir. 2007) (same); *FTC v. Lalonde*, 545 F. App'x 825, 841 (11th Cir. 2013) (same); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) (Pannell, J.), *aff'd*, 356 F. App'x 358 (11th Cir. 2009) (summarily affirming grant of summary judgment to FTC); *FTC v. Windward Mktg., Inc.*, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) (Hull, J.); *FTC v. Primary Grp. Inc.*, 2016 WL 4056206, at *10 (N.D. Ga. May 19, 2016) (Cohen, J.), *aff'd*, 713 F. App'x 805 (11th Cir. 2017); *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *51 (M.D. Fla. Sept. 16, 2011), *aff'd sub nom. FTC v. Krotzer*, 2013 WL 7860383 (11th Cir. May 3, 2013); *FTC v. Wolf*, 1996 WL 812940, at *5 (S.D. Fla. Jan. 31, 1996); *see also FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) (vacating district court's entry of judgment in favor of defendant and remanding for the entry of judgment in favor of the FTC and directing district court to fashion appropriate relief on remand); *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1364 (11th Cir. 1988) (affirming Commission's grant of summary judgment to FTC and issuing enforcement order).

### III.   DISCUSSION

Plaintiffs' request for summary judgment implicates a number of legal issues, which the Court addresses as follows. Broadly speaking, the Court focuses first on the FTC Act claims, second on the GFBPA claims, and third on the requested relief.

In assessing the FTC Act claims, the Court first evaluates whether the Corporate Defendants can be held legally responsible for each other's actions under the common enterprise doctrine. After finding that the common enterprise doctrine applies, the Court assesses the Corporate Defendants' common liability on Counts I–III. After finding that the Plaintiffs have proven that the Corporate Defendants are liable on Counts I–III, the Court assesses whether the individual Defendants can be held liable for the FTC Act claims as well. After finding that the FTC is entitled to summary judgment as to liability on Counts I–III as to all Defendants, the Court assesses whether the same standards for liability apply to the GFBPA claims as to the FTC Act claims. Finally, the Court addresses injunctive relief available under the FTC Act and GFBPA, and then monetary relief available under the GFBPA.

### A.   The FTC Act Claims (Counts I-III)

Before turning to the merits of each FTC Act claim, the Court evaluates whether the Corporate Defendants can be held responsible for each other's actions.

### 1.     The Corporate Defendants Engaged in a Common Enterprise

Under the FTC Act, "corporate entities can be responsible . . . for each other's actions through the common enterprise doctrine." *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1081 (11th Cir. 2021) (citing *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017)). Through this doctrine, one corporate entity can be held responsible for the actions of other corporations where "the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities." *Id.* (quoting *FTC v. Lanier L., LLC*, 715 F. App'x 970, 979–80 (11th Cir. 2017)). In determining whether a common enterprise exists, courts consider several factors, including whether the businesses (1) operated under common control, (2) shared office space and employees, (3) commingled funds, and (4) coordinated advertising." *Id.* (citing *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636 (6th Cir. 2014) (listing same basic factors)). While courts weigh all of these factors, "they are primarily tasked with evaluating the pattern and framework of the whole enterprise." *FTC v. Pointbreak Media, LLC*, 376 F.Supp.3d 1257, 1269 (S.D. Fla. 2019) (citing *FTC v. HES Merch. Servs. Co.*, 2014 WL 6863506, at *5 (M.D. Fla. Nov. 18, 2014), *aff'd*, 652 F. App'x 837 (11th Cir. 2016)).

Here, Plaintiffs argue that the three Corporate Defendants — Superior, Physicians Business, and SCIA — operated as a common enterprise and thus can be held liable for each other's acts. In response, the Peyroux Defendants mainly argue that this common enterprise doctrine should not apply *to the GFBPA claims*

and that the Court should instead apply the standard for piercing the corporate veil — an argument the Court will address in review of the GFBPA claims. Beyond that, however, the Peyroux Defendants make no legal argument in their brief that the Court should not apply the common enterprise doctrine to the FTC Act claims. (Peyroux Resp., Doc. 110 at 17–21.)  That said, the Peyroux Defendants do assert (in connection with their veil piercing argument) that the corporate Defendants did not wrongfully comingle funds and, in their response to Plaintiffs' SOMF, dispute some facts that speak to the application of this common enterprise doctrine. (*Id.*) Defendant Detelich presents no response to this common enterprise argument. Regardless of Defendants' partial concession on this issue (as to the FTC Act claims at least), the Court has an obligation to review the record to determine whether the Plaintiffs have established their claims on the merits.  *See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101–02 (11th Cir. 2004).

Upon conducting its review, the Court finds that *significant* unrebutted record evidence shows that the Corporate Defendants "made up a messy maze of interrelated business entities," sufficient to constitute a common enterprise, based on the relevant common enterprise factors. *See E.M.A. Nationwide*, 767 F.3d at 637.

As to the first factor, the Corporate Defendants operated under common control since all three were 100% owned by Defendant Peyroux and Peyroux was a

corporate officer of all three companies. (PSOMF-Peyroux, Doc. 115-1 ¶¶ 138–39, 156–58, 184–86.) (all undisputed).

Second, the three entities shared office space: the principal place of business for both SCIA and Physicians Business was 151 West Main Street in Canton, Georgia. (*Id.* ¶¶ 9, 10.) And Superior conducted operations out of this office as well. (*See* Deposition of Steven Peyroux as 30(b)(6) for Superior ("Peyroux 30(b)(6)-Superior Dep."), Doc. 73-7 p. 155 ("**All three of those companies, you know, were in one building**."); *see also* Deposition of Brent Detelich ("Detelich Dep."), Doc. 73-10 p. 243:3-9 (noting that Superior "administrative stuff" was handled at this office); *see also* Deposition of Steven Peyroux as 30(b)(6) for Physicians Business ("Peyroux 30(b)(6)-Physicians Business Dep."), Doc. 73-5 p. 11:15-12:16 (explaining that "[s]ome of the administrative staff for Superior" also operated out of the same building, along with Physicians Business and SCIA); Deposition of Amy Tully ("Tully Dep."), Doc. 73-9 p. 21:7-22:1 (testifying that she worked for Superior at the office on Main Street in Canton, and that it was a shared office suite for Superior, Physicians Business, and SCIA)).[12]

Additionally, the three entities shared employees. (*See* Tully Dep., Doc. 73-9 p. 16:8-18 (testifying that she worked as marketing director for both Superior and Physicians Business); Deposition of Julie Thorne ("Thorne Dep."), Doc. 73-16 p. 17:16-19:23 (testifying that she, as a nurse practitioner, worked for Superior

---

[12] There is an abundance of additional record evidence regarding shared office space. Defendants present no contrary evidence.

from 2011 to 2018 and for Physicians Business from 2011 to 2019); *see* Superior ROG responses, Doc. 79-14 ¶¶ 17–18 (listing 9 employees that worked for, and received compensation from, both Superior and Physicians Business in same calendar year and 2 employees that worked for both Superior and SCIA in same years)).[13]

The Corporate Defendants also coordinated their advertising. Many ads for stem cell therapy or lectures were co-branded. For example, one ad for a seminar by *SCIA* includes *Superior*'s logo:



---

[13] In their Statement of Material Facts, Plaintiffs detail the *many* employees who worked for (and were paid by) two or three of the Corporate Defendants at the same time, either as employees or independent contractors. Plaintiffs support these facts with *significant* record evidence — tax records, interrogatory responses, and deposition testimony. (*See* PSOMF-Peyroux, Doc. 115-1 ¶¶ 20–55) (asserting, e.g., that there were 19 individuals who were on the payroll of one company but were also an employee or independent contractor of one or more of the other corporate Defendants at the same time). The Peyroux Defendants dispute some facts as unsupported by the provided citation. However, the Court has reviewed the relevant cited evidence and finds that it *overwhelmingly* supports Plaintiffs' cited facts, which show that multiple individuals worked for two or three of the companies at the same time. The Peyroux Defendants provide no contrary record citations to dispute this evidence.

(Stop the Pain Ad, Doc. 75-11) (highlight added) (and, the email attaching ad was *sent by* a Physicians Business email address). Emails sent to clients of *Physicians Business* advertised trainings put on by *SCIA*. (*See, e.g.,* "Dear **PBS** Clients" Email, Doc. 83-11 ("**[SCIA]** is having a training on Friday, April 8, 2016 at 9:00 a.m. at the PBS training . . .") (emphasis added)). Training seminars were jointly advertised:

**PBS/SCIA** Training Seminar July 27-28, 2018

When
Friday, July 27, 2018 at 9:00 AM
EDT
-to-
Saturday, July 28, 2018 at 5:00
PM EDT

Get ready for our 2nd ever
Solutions for Healthcare Entrepreneurs
Conference!

(SCIA/PBS Conference Email Ad, Doc. 81-22) (highlight added). A schedule of Physicians Business and SCIA advertising and training events for 2018 demonstrates the coordinated advertising between the companies. (2018 SCIA/PBS Schedule of Events, Doc. 86-5) (listing, e.g., "SCIA & PBS Training" for a "Cruise [in] Miami, FL" from April 14-20.) While these are just some examples, Plaintiffs have proffered *many* other instances of coordinated and co-branded advertising in the record. Defendants have failed to produce or point to any evidence that contradicts this record.

Based on the above evidence — of common control, shared office space, shared employees, and coordinated advertising — Plaintiffs have established that the Corporate Defendants acted as a common enterprise sufficient to be held responsible for each other's acts for purposes of the FTC Act claims. *See On Point*, 17 F.4th at 1081; *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1184

(N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009) (finding existence of common enterprise where companies were controlled by the same parties, all used/shared advertising generated by the controlling individuals, and all worked together to share profitability, even though companies maintained separate banks and accounts and filed taxes separately).[14]

### 2.   The Corporate Defendants Are Liable as to the FTC Act Claims (Counts I–III)

Having determined that the Corporate Defendants can be held responsible for each other's actions, the Court now assesses Counts I-III as to those Defendants. To refresh, in Count I, Plaintiffs allege that Defendants made false or unsubstantiated efficacy claims about stem cell therapy. In Count II, Plaintiffs allege that Defendants made false claims of FDA and FTC approval of stem cell therapy programs. In Count III, Plaintiffs allege that Defendants supplied their client clinics with false/unsubstantiated ads and so provided clients with the means and instrumentalities to commit further deceptive acts and practices.

In response to the FTC's request for summary judgment on these claims, the Peyroux Defendants do not argue that the ads were not deceptive or false, or that they did not supply the means for client clinics to violate the act. Thus, these Defendants appear to concede liability on Counts I–III. Defendant Detelich,

---

[14] Under the common enterprise doctrine, Plaintiffs "need not 'prove any particular number of entity connections' or 'any specific connection.'" *FTC v. Pointbreak Media, LLC*, 376 F.Supp.3d 1257, 1269 (S.D. Fla. 2019) (quoting *FTC v. Kennedy*, 574 F.Supp.2d 714, 722 (S.D. Tex. 2008)). The Court therefore need not assess whether the entities comingled funds, since the remaining evidence overwhelmingly demonstrates the existence of a common enterprise, especially since Defendants have not argued that this doctrine does not apply to the FTC Act claims.

however, does present some argument that the ads were not misleading. Regardless of whether Defendants dispute liability on these claims, the Court has a duty to review the record to determine whether the moving party has established that there are no genuine issues of material fact and that it has proven its claims on the merits. *See One Piece of Real Property*, 363 F.3d at 1101–02.

### a. Standard for Liability Under Sections 5 and 12 of the FTC Act

Counts I and II are brought under Sections 5 and 12 of the FTC Act. Count III is brought under Section 5 of the Act only.

Section 5(a) of the FTC Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Section 12 of the FTC Act specifically addresses the dissemination of false advertisements likely to induce "the purchase of food, drug, devices, services, or cosmetics." 15 U.S.C. § 52. For purposes of Section 12, "false advertisement" means an advertisement that is "misleading in a material respect." *Id*. § 55. In determining whether an ad is "misleading in a material respect," courts should consider "not only representations made or suggested" but also "the extent to which the advertisement *fails to reveal facts* material in the light of such representations." *Id*. (emphasis added). A violation of Section 12 necessarily constitutes a violation of Section 5(a). *Id*. § 52(b) (stating that dissemination of any false ad under this section constitutes an unfair or deceptive act within the meaning of Section 5(a)).

To establish liability under Sections 5 *and/or* 12 based on a particular representation, the FTC "must show that (1) there was a representation; (2) the

representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material." *FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1188–89 (discussing both Sections 5 and 12).

In assessing the particular representation at issue under the first element, the Court must determine what claims the ad makes. "When assessing the meaning and representations conveyed by an advertisement, a court must look to the advertisement's overall, 'net impression' rather than the literal truth or falsity of the words of the advertisement." *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008). If an advertisement either (1) expressly states or (2) clearly and conspicuously implies a claim, "the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim." *Id.* (internal citations omitted).  Yet if an ad "faintly implies a claim," the court may require extrinsic evidence of consumer perception to determine the net impression of the ad. *Id.*

On the second element — whether a representation was likely to mislead customers acting reasonably — the FTC may pursue a "falsity theory," a "reasonable basis theory," *or both* (as Plaintiffs do here). *Id.* at 1190. If the FTC proceeds under a falsity theory, it must "demonstrate either that the express or implied message conveyed by the ad is false." *Id.* If the FTC proceeds under a reasonable basis theory, it must demonstrate that "the advertiser lacked a reasonable basis—or adequate substantiation—for asserting that the message was true." *Id.* "In the case of health-related claims or claims concerning the efficacy or

safety of dietary supplements" or other health-related products, "this reasonable basis must, at minimum, consist of *competent and reliable scientific evidence.*" *Id.* (internal citation omitted) (emphasis added).

On this second element (likelihood of deception), the FTC need not prove that customers were actually deceived; *instead*, the FTC must only establish that the representation had a "tendency to deceive" customers. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993).[15] And the FTC need not show that the defendants *intended* to deceive consumers, as intent is not an element of the claim. *See USA Fin.*, 415 F. App'x at 974, n.2 (explaining that "a defendant cannot avoid liability under section 5 of the [FTC Act] by showing that he acted in good faith because the statute does not require an intent to deceive").[16] And in evaluating whether an advertisement had a tendency to deceive, "deception is evaluated from the perspective of . . . a reasonable consumer in the audience targeted by the advertisement." *Wash. Data*, 856 F. Supp. 2d at 1272 ("The standard for 'deception' has been the 'average' or 'ordinary' person in the audience addressed by the ad, taking into account that many who may be misled are unsophisticated and unwary.") (citation omitted). Finally, there is no "extravagance defense" — that

---

[15] *See also Thompson Med. Co., Inc. v. FTC*, 791 F.2d 189, 193 (D.C. Cir. 1986); *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1273–74 (M.D. Fla. 2016) ("Moreover, a 'tendency to deceive' is all that is required, such that proof of actual consumer deception is unnecessary."); *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1273 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013).

[16] *See also Primary Grp. Inc.*, 2016 WL 4056206, at *10 (N.D. Ga. May 19, 2016) (Cohen, J.) (explaining that purpose of Section 5 is to protect the consuming public, thus, intent to deceive is not an element of a Section 5 violation) (citing *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005**));** *FTC v. Cap. Choice Consumer Credit, Inc.*, 2004 WL 5149998, at *33 (S.D. Fla. Feb. 20, 2004), *aff'd*, 157 F. App'x 248 (11th Cir. 2005).

is, defendants cannot escape liability by claiming that advertisements were so unreasonable that they could not be believed. *Tashman*, 318 F.3d at 1277 (11th Cir. 2003) ("*Caveat emptor* is simply not the law").

As to the third element, materiality, "[a] representation or omission is material if it is the kind usually relied on by a reasonably prudent person." *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190 ("A claim is considered material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.") (citation omitted). Express or clearly implied messages "used to induce the purchase of a particular product or service are presumptively material." *Id.*; *see also On Point*, 17 F.4th at 1080 (11th Cir. 2021) (finding that misrepresentations were material since they either induced consumers to make purchases or to surrender sensitive personal information). On this front, courts have found that ads that "significantly involve health" or safety are presumptively material. *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1190. (citing *QT, Inc.*, 448 F. Supp.2d at 960, 965–66).

### b. Count I: False or Unsubstantiated Efficacy Claims

Here, Plaintiffs assert that Corporate Defendants made false, misleading, and/or unsubstantiated claims that stem cell therapy (1) cures, treats, or mitigates various orthopedic conditions (including osteoarthritis, arthritis, neuropathy, plantar fasciitis, joint pain, and more) and (2) is comparable or superior to surgery, steroid injections, and painkillers in curing, treating, or mitigating those same conditions.

Under the test for liability outlined above, the Court first determines the net impression of the ads. *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1189. One emblematic ad in the record is provided below:



(Stop the Pain Ad, Doc. 75-11.) This ad, and the many others like it, clearly and conspicuously imply the message that stem cell therapy can effectively treat or mitigate (or "*eliminate*") the listed conditions (knee pain, back pain, neuropathy, etc.), and also that this therapy is a better alternative to surgery ("Get Relief without costly and painful surgery!"). The record contains a plethora of other ads — newspaper, magazine, postcard, website, email, radio, and TV — that make the same or highly similar claims. (*See, e.g.*, You Can Benefit Postcard Ad, Doc. 75-23; Email Blast Ad, Doc. 97-16 (stating and implying that stem cell therapy is superior to steroid injections and surgery); Live Pain Free Website Ad, Doc. 77-15 ("Learn

How This Cutting Edge Therapy Can Give You Lasting Pain Relief In As Little As One Treatment Without Costly and Painful Surgery"); Superior Infomercial TV Ad, Pls. Ex. 627 ("in most cases, it only takes one treatment to reduce or eliminate your pain"); *see also* Blog Post, Doc. 80-23; Magazine Ad, Doc. 75-24; Email Blast SCIA, Doc. 96-18; SCIA TV Ad, Pls. Ex. 623; SCIA YouTube Show, Pls. Ex. 516.)) In short, the "net impression" of these ads is clearly that stem cell therapy can cure, treat, or mitigate the listed conditions, and is superior to surgery, steroid injections, or pain relievers.

At the second step, the Court assesses whether these ads were likely to mislead. On Count I, Plaintiffs largely pursue a reasonable basis theory. *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1189 (noting that, under the reasonable basis theory, the FTC must demonstrate that "the advertiser lacked a reasonable basis— or adequate substantiation—for asserting that the message was true," and explaining that adequate substantiation means, "at minimum competent and reliable scientific evidence."). In support of their reasonable basis theory, Plaintiffs rely on the testimony of their expert, Dr. Sean Morrison.

Dr. Morrison is an expert in stem cell biology and regenerative medicine with considerable experience evaluating and interpreting results from the clinical testing of regenerative medicine products.[17] For this case, Dr. Morrison reviewed

---

[17] Dr. Morrison is, among other things, an investigator of the Howard Hughes Medical Institute and a professor of Pediatrics at University of Texas Southwestern Medical Center. He has a PhD in immunology from Stanford and a postdoctoral fellowship in neurobiology from CalTech. From 1999-2011, he was the Director of the University of Michigan's Center for Stem Cell Biology. His

the various stem cell products administered by Defendants, documents about the products produced by Defendants (or the companies from which Defendants sourced the products), and also performed more independent searches for published clinical studies evaluating each of the products. (Morrison Report, Doc. 78-22 ¶¶ 11–15.) Based on his experience and expertise in the field, as well as his review of relevant materials, Dr. Morrison concluded that:

> **there is *no* competent and reliable  scientific evidence that stem cell therapy: 1) cures, treats, or mitigates orthopedic conditions**, including osteoarthritis, arthritis, neuropathy, plantar fasciitis, joint pain, and pain resulting from injuries or aging; **or 2) is comparable or superior to surgery, steroid injections, and painkillers in curing, treating, or mitigating orthopedic conditions** including osteoarthritis, arthritis, neuropathy, plantar fasciitis, joint pain, and pain resulting from injuries or aging.

(*Id.* ¶ 19) (emphases added). He also concluded, among other things, that Defendants provided no competent and reliable scientific evidence that the stem cell, growth factor, or exosome products Defendants administered to patients and/or recommended to client clinics would be, or has proven to be, effective for treatment of any orthopedic condition in controlled clinical trials. (*Id.* ¶ 20.) As such, he determined that Defendants made "scientifically incorrect statements related to stem cells, growth factors/cytokines, exosomes, and regenerative

---

lab at UT continues to study the cellular and molecular mechanisms that regulate stem cell function and tissue regeneration. He has published more than 140 articles in peer-reviewed scientific journals and has served on the editorial boards of nine scientific journals, including *Cell Stem Cell*, the *Journal of Experimental Medicine*, and *Stem Cell Reports*. He has received numerous accolades for his research related to stem cells and regenerative medicine, including being elected President of the International Society for Stem Cell Research in 2015 and has testified before Congress on the topic of stem cell research. He also serves on scientific advisory boards for various universities' stem cell research centers. (*See* Morrison Report, Doc. 78-22 ¶¶ 1-7.)

medicine." (*Id.*) In briefing, Defendants do not challenge Dr. Morrison's opinions, offer any contrary evidence, or rely on any clinical studies. As a result, the undisputed record demonstrates that Defendants present no "competent and reliable scientific evidence," and therefore fail to present "adequate substantiation," for the health-based claims made in their ads. *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1189. Plaintiffs have therefore shown that the unsubstantiated ads were likely to mislead customers acting reasonably under the circumstances. *Id.*

As to the third element — materiality — the Court concludes that the representations were used to induce the purchase of the injections (at approximately $5,000 a shot). *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190. The ads also involved health-related products. *Id.* (citing *QT, Inc.*, 448 F. Supp.2d at 960, 965–66) ("claims that significantly involve health, safety . . . [are] presumptively material"); *FTC v. Romeo*, 658 F. Supp. 3d 1129, 1142 (M.D. Fla. Feb. 27, 2023) (same). Therefore, the materiality element is satisfied.

Considering all of this evidence, Plaintiffs have shown that Corporate Defendants' stem cell treatment ads made representations that were likely to mislead customers and were material. Summary judgment is thus **GRANTED** to the FTC on Count I.

### c. Count II: False FDA/FTC Approval Claim

In assessing Count II, the Court considers the same elements to determine whether Defendants made false and misleading representations that the offered treatments and programs were FDA and FTC approved.

The Court must first determine the net impression of the ads. One example is an ad from Physicians Business, posted on Facebook:



(FDA Approved Facebook Ad, Doc. 87-3.) An email blast sent to customers advertising a SCIA/Superior lecture stated that "Superior Healthcare is now offering painless, FDA approved 'Regenerative Injection Therapy' for arthritic and/or degenerative conditions." (SCIA Sample Email for Clinics II, Doc. 76-23.) Magazine ads made similar claims. (Wellness Institute of Illinois Newspaper Ad, Doc. 75-24 (noting that the clinic, along with SCIA, was "now offering painless, FDA approved stem cell injections for arthritic and/or degenerative conditions.") Based on this evidence, the net impression of the ads is clearly that the stem cell injection procedures and programs are approved by the FDA.

As to the second element, Plaintiffs proceed on a falsity theory. Plaintiffs present a letter and affidavit from the FDA stating it has never reviewed or approved the Physicians Business regenerative medicine compliance training or treatment program. (FDA letter, Doc. 87-6; *see also* FTC Declaration, Doc. 78-15 (noting that the FTC also does not approve compliance programs related to regenerative medicine)). Defendants do not dispute this element or present any evidence that the FDA or FTC in fact approved their treatment or compliance training programs.

As to materiality, the representations concern health and were explicitly stated to induce customers to purchase the stem cell therapy shots. Therefore, the FDA approval representations were material. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190.

The FTC has thus established its claim on false statements about FDA/FTC approval. Summary judgment is **GRANTED** to the FTC on Count II.

### d. Count III: Provision of Means and Instrumentalities Claim

Section 5(a) of the FTC Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Long ago, the Supreme Court held that a person who "furnishes another with the means of consummating a fraud" is in violation of the FTC Act. *See FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494 (1922). *See also Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963) ("Those who put into the hands of others the means by which they may mislead the public are themselves guilty of a violation of Section 5 of the [FTC]

Act."); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010); *FTC v. LabMD, Inc.*, 2012 WL 13104826, at *3 (N.D. Ga. Nov. 26, 2012).

Here, the FTC has presented ample evidence that the Corporate Defendants "put into the hands" of their client clinics the "means by which" those clinics could "mislead the public." *Waltham Watch,* 318 F.2d at 32. The most significant example is the SCIA Manual (Doc. 78-2) which includes sample postcard, newspaper, magazine ads; sample patient forms; sample sales agreements; information about stem cell products and how to administer them; and more. Corporate Defendants also conducted trainings with sample presentations and coaching on how to deliver lectures to the public. (*See, e.g*., Pls. Exs. 466, 471, filed manually.) The ads and presentations Defendants provided to client clinics include the same false and misleading representations that form the bases of Counts I and II. Defendants do not address Count III in their briefs, present any argument, or raise factual disputes. Based on the undisputed record evidence, the Corporate Defendants furnished client clinics with the means and instrumentalities to violate the act by providing them with false and misleading ads that had a tendency to deceive the public and were material. Summary judgment is therefore **GRANTED** in the FTC's favor as to Count III. *See FTC v. SPM Thermo-Shield, Inc.*, 2022 WL 833644, at *4 (M.D. Fla. Mar. 21, 2022) (granting summary judgment to FTC on means and instrumentalities claim); *FTC v. Cyberspy Software, LLC*, 2008 WL 5157718, at *2 (M.D. Fla. Nov. 25, 2008) (finding substantial likelihood that the FTC would establish that Defendants provided others with the means and

instrumentalities to engage in deceptive and unfair acts in violation of the FTC Act, and granting preliminary injunction).[18]

### 3.   The Individual Defendants Are Liable as to Counts I-III

Having determined that the Corporate Defendants are liable on Counts I-III, the Court next considers whether individual Defendants Peyroux and Detelich can be held liable for the Corporate Defendants' acts.

An individual is liable for a corporation's violations of the FTC Act if the FTC demonstrates that (1) "the individual either 'participated directly in the practice or acts or had the authority to control them,'" and (2) "the individual had 'some knowledge of the practices.'" *On Point*, 17 F.4th at 1083 (11th Cir. 2021) (quoting *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996)); *see* 15 U.S.C. § 53(b).

On the first prong, Plaintiffs must show either direct participation <u>or</u> authority to control. *Id.* Authority to control "may be established by active involvement in business affairs and the making of corporate policy." *IAB Mktg.*, 746 F.3d at 1233 (11th Cir. 2014) (internal quotation marks omitted). Where a defendant is a corporate officer of a small, closely-held corporation, "the individual's status gives rise to a presumption of ability to control the corporation." *Nat'l Urological Grp.*, F. Supp. 2d at 1207.

---

[18] *See also FTC v. Noland*, 2021 WL 4127292, at *26 (D. Ariz. Sept. 9, 2021) (same), *reconsideration denied*, 2021 WL 4950348 (D. Ariz. Oct. 25, 2021), *motion to certify appeal denied,* 2021 WL 5138280 (D. Ariz. Nov. 4, 2021), *motion for relief from judgment denied,* 2022 WL 901386 (D. Ariz. Mar. 28, 2022).

On the second prong, an individual's knowledge of practices that violate the FTC Act may be established by demonstrating that the individual had "'actual knowledge of the [unlawful] conduct, was recklessly indifferent to its [unlawfulness], or had an awareness of a high probability of [unlawfulness] and intentionally avoided learning of the truth.'" *FTC v. Primary Grp., Inc.*, 713 F. App'x 805, 807 (11th Cir. 2017) (quoting *FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014)). Furthermore, "[a]n individual's degree of participation in the business is probative of knowledge." *FTC v. Partners in Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016).

The Court first assesses whether Defendant Peyroux can be held individually liable. On the first prong, the evidence demonstrates that Defendant Peyroux directly participated in the unlawful acts and advertising *and also* had the authority to control the Corporate Defendants' acts. As to participation, Peyroux personally delivered stem cell lectures and thus delivered misleading representations to client clinics and the public. (*See, e.g.*, Full Stem Cell Lecture Video, Pls. Ex. 471 (presenting stem cell treatment as better alternative to surgery or other options, among many other representations); Nov. 2017 Seminar Agenda, Doc. 93-24 (listing "*Dr.* Peyroux" as designated speaker from 9:00 a.m. to 3:00 p.m. on topic of "How to sell $10,000 Regenerative Medicine Care Plan – Logistics, Training & Selling")). Next, numerous employees involved in marketing testified that Peyroux himself created or directed the creation of advertising materials. (*See, e.g.*, Deposition of Elliot Bernard ("Bernard Dep."), Doc. 73-11 p. 43–44 (stating

that Peyroux and Detelich created Physicians Business advertisements and that Peyroux and Detelich would direct him as to "what ads we would run . . . where we were advertising[,] magazines"); *id.* p. 235–236 (stating that Peyroux created the PowerPoint content for the stem cell lectures and the scripts for client clinics); Huey Dep., Doc. 73-14 p. 71 (stating that Peyroux would explain what type of marketing and ads he wanted at outset and then would approve the final product that was created)). Plaintiffs present emails proving Peyroux's direct involvement in the advertising decisions of the companies. (*See, e.g.*, Peyroux Email, Doc. 75-9 (confirming order of 40,000 inserts for StemCell trifold.)   On top of direct participation, Peyroux had authority to control the Corporate Defendants, as he fully owned all companies and was a corporate officer for each. *Nat'l Urological Grp.*, Doc. 645 F. Supp. 2d at 1207.

As to the second prong — knowledge — Peyroux was directly involved in the misrepresentations, as he approved the ads and provided the lectures to the public and client clinics. Without a doubt, he had actual knowledge of the misleading representations at issue.

Similar evidence supports a finding for liability against Defendant Detelich. On the first prong, Detelich was a corporate officer of SCIA, and thus a presumption arises that he had authority to control the company. *Nat'l Urological Grp.*, F. Supp. 2d at 1207. He also participated in the acts and advertising in question. At his deposition, Detelich explained that he would at times "handwrite an example" ad and have another individual create the ad based on his idea.

(Detelich Dep., Doc. 73-10 p. 96–97.) On occasions when clients would create their own advertisements, he asked the client to share the ad with him "so I could share it with other clients." (*Id*. p. 96.)  Detelich also testified that he would coach client clinics' employees on how to market the seminars and stem cell treatments to particular groups, like churches or clubs, and on how to deliver the seminars. (*Id*. pp. 95, 119–20.) He himself delivered seminars to the public on behalf of SCIA clients. (*Id*. p. 122 -23; *see also* Pls. Ex. 625, filed manually (video in which Detelich discusses "FDA-approved" treatment program)). Plaintiffs also introduce emails where Detelich approved ad content, or was involved in the creation of the ad content. (*See, e.g*., Detelich Email Approval, Doc. 84-3 (approving content of ad); Detelich Ad Building Email, Doc. 94-16 (in which Detelich emails ad to Peyroux touting "FDA approved" stem cell therapy treatment and says: "Here is a rough template that I can build from once you look at this and have ideas of what you want change[d] . . .")).

As to knowledge, based on Detelich's extensive participation in the businesses (and specifically the marketing and advertising aspects of the businesses), he no doubt had actual knowledge of the misleading advertising.

The examples provided above are a mere sliver of the voluminous evidence of direct participation by Peyroux and Detelich in the advertising scheme that the Corporate Defendants engaged in. The individual Defendants do not disclaim knowledge of the ads and, based on the plethora of evidence presented, they could not credibly do so. Under the relevant legal authority, the comprehensive record

supports a finding of individual liability against Defendants Peyroux and Detelich. Summary judgment is **GRANTED** in the FTC's favor and against the individuals on all FTC Act claims.

## B.     The GFBPA Claims (Counts IV and V)

Having determined that all Defendants are liable on the FTC Act claims (Counts I-III), the Court turns to assess the GFBPA claims (Counts IV and V).

The GFBPA outlaws "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." O.C.G.A. § 10-1-393(a). The GFBPA further provides a non-exclusive[19] list of examples of such unfair or deceptive acts and practices, including: "[r]epresenting that goods or services have sponsorship, *approval*, characteristics, ingredients, uses, *benefits*, or quantities that they do not have." *Id.* § 10-1-393(b)(5) (emphases added). The GFBPA also separately makes it unlawful for a person to use "a computer or computer network" to "[e]ngage in any act, practice, or course or business that operates . . .as a fraud or deceit upon a person." *Id.* § 10-1-393.5. Especially relevant here, the legislative intent and interpretation provision of the GFBPA makes clear that the Act should be interpreted broadly to end deceptive practices, *and* that the Act should be interpreted *as coterminous with the FTC Act*. The statute says:

> (a)     The purpose of this part shall be to protect consumers and legitimate business enterprises from unfair or deceptive

---

[19] The text of the GFBPA makes clear that the examples are non-exclusive by stating: "By way of illustration only and without limiting the scope of [the prohibition on unfair or deceptive acts in commerce], the following practices are declared unlawful." *Id.* § 10-1-393(b).

practices in the conduct of any trade or commerce in part or wholly in the state. It is the intent of the General Assembly that such practices be swiftly stopped, and **this part [the GFBPA] shall be liberally construed** and applied to promote its underlying purposes and policies.

**(b)   It is the intent of the General Assembly that [the GFBPA] be interpreted and construed consistently with interpretations given by the Federal Trade Commission in the federal courts pursuant to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a)(1)), as from time to time amended.**

O.C.G.A. § 10-1-391 (emphases added).

To refresh, in Count IV, the State of Georgia alleges that Defendants made false or misleading statements about the efficacy of stem cell therapy in violation of the GFBPA (and so Count IV mirrors Count I, which was brought under the FTC Act). In Count V, the State alleges that Defendants used a computer or computer network to disseminate false or misleading information in violation of the GFBPA, O.C.G.A. § 10-1-393.5.

Responding, the Peyroux Defendants argue that the GFBPA should not be interpreted consistently with the FTC Act. (Peyroux Resp., Doc. 110 at 13–15.) In particular, the Peyroux Defendants challenge the application of the common enterprise doctrine to the GFBPA claims. (*Id.* at 17–19) ("Absent some clear indication from Georgia's highest court that it wishes to expand the application of the federally conceived 'common enterprise' doctrine to the arena of GFBPA liability, this Court should decline to do so."). Similarly, the Peyroux Defendants challenge the application of the FTC Act's test for individual liability to the GFBPA

claims. (*Id.* at 21–23.) Instead, Defendants argue that the entities and individuals may only be jointly liable for each other's actions if Plaintiffs put forth evidence to support piercing the corporate veil under Georgia law. (*Id.*)

As noted above, the statutory text of the GFBPA states that the Act should be "interpreted and construed consistently" with "interpretations given by the [FTC] in the federal courts" under Section 5 of the FTC Act. *See* O.C.G.A. § 10-1-391. The Georgia Supreme Court has explained that, when it comes to the GFBPA, "the comparable federal law, the Federal Trade Commission Act, 15 U.S.C. Section 45, is *expressly made the appropriate standard* by which the purpose and intent of the Georgia Act is to be effectuated, implemented, and construed." *Zeeman v. Black*, 273 S.E.2d 910, 913 (Ga. 1980) (emphasis added). The Georgia Supreme Court reaffirmed this statement in a later case where it found that the GFBPA — like the FTC Act — applies to commercial aspects of the medical profession. *See Henderson v. Gandy*, 623 S.E.2d 465, 468–69 (Ga. 2005) ("Our ruling is further buttressed by our Legislature's stated intent that the [GFBPA] 'be interpreted and construed consistently with interpretations given by the Federal Trade Commission in the federal courts pursuant to Section 5'" of the FTC Act). *See also Agnew v. Great Atl. & Pacific Tea Co.*, 502 S.E.2d 735, 737 (Ga. Ct. App. 1998).

Although the Georgia Supreme Court and the Georgia Court of Appeals have reiterated the principle that the GFBPA should be interpreted consistently with the FTC Act, neither court has addressed the particular issues here: whether the common enterprise doctrine or standards for individual liability under the FTC Act

apply to GFBPA claims. That said, courts in other states have assessed this question and have applied these doctrines and standards to their state consumer protection laws.

For example, multiple federal district courts in Florida have held that "common enterprise liability presents a plausible means by which the State may state a claim against Defendants under FDUTPA [Florida Deceptive and Unfair Trade Practices Act]." *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 2019 WL 13203852, at *9–10 (S.D. Fla. Sept. 30, 2019). *See also Fed. Trade Comm'n v. Life Mgmt. Servs. of Orange Cty., LLC*, 350 F. Supp. 3d 1246, 1259–60 (M.D. Fla. 2018); *Office of Att'y Gen. Dep't of Legal Affairs v. Moving & Storage Acct. Inc.*, 2019 WL 2255575, at *9 (S.D. Fla. Mar. 22, 2019), *report and recommendation adopted sub nom. Office of Att'y Gen. v. Moving & Storage Acct. Inc.*, 2019 WL 3429123 (S.D. Fla. May 1, 2019). In support, these courts recognized that Florida's consumer protection statute (like Georgia's) instructs that it should be interpreted consistently with the FTC Act. *See* Fla. Stat. Section 501.204 ("It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to § 5(a)(1) of the Federal Trade Commission Act").

Similarly, a New Mexico district court has applied the FTC Act's common enterprise doctrine and the standard for individual liability to the New Mexico Unfair Practices Act. *See New Mexico ex rel. Balderas v. Real Est. L. Ctr., P.C.*, 430 F. Supp. 3d 761, 872 (D.N.M. 2019). There, the district court explained:

**As the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to -26 ("NMUPA"), directs New Mexico courts to look to the FTC for guidance** in interpreting the NMUPA, *see* N.M. Stat. Ann. § 57-12-4, as the MFCFPA is a specific form of NMUPA violation, *see* N.M. Stat. Ann. § 47-15-7(A), and as the Supreme Court of New Mexico has previously looked to federal statutes similar to New Mexico law, *see Featherstone v. Bureau of Revenue*, 1954-NMSC-080, ¶ 6, 58 N.M. 557, 273 P.2d 752, 753; *Lopez v. Singh*, 1949-NMSC-022, ¶ 7, 53 N.M. 245, 205 P.2d 492, 493, the Court predicts that the Supreme Court of New Mexico would also look to federal caselaw to interpret MFCFPA violations. **Liability for MFCFPA violations can, therefore, be shown through evidence of a common enterprise,** *see F.T.C. v. PayDay Fin. LLC*, 989 F. Supp. 2d at 808-09, **or through evidence that satisfies the FTCA test for individual liability**, *see F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d at 1203.

*Id.* (emphases added). As with Georgia's and Florida's consumer protection statutes, the New Mexico statute instructs that "[i]t is the intent of the legislature that in construing Section 3 of the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts." N.M. Stat. Ann. § 57-12-4.

Likewise, a New York district court has also applied the common enterprise doctrine in a case involving violations of New York's consumer protection laws brought by New York's attorney general. *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 361, 363–64 (S.D.N.Y. 2019).

Taken together, this authority shows that other jurisdictions around the country have applied the common enterprise doctrine and test for individual liability under the FTC Act to their state consumer protection laws. These decisions bolster Plaintiffs' statutory interpretation and support Plaintiffs' argument that the

Court should apply these doctrines to the GFBPA claims. The Georgia Supreme Court has looked to other states courts' interpretations of their own consumer protection laws for guidance when evaluating the contours of the GFBPA. *See Henderson*, 623 S.E.2d at 97–98 (discussing decisions from courts in other states evaluating whether state consumer protection laws apply to medical professionals and stating: "[w]e find the foregoing authority persuasive and we conclude that their reasoning is equally applicable to claims under the Georgia FBPA").

In arguing that the common enterprise doctrine and standards for individual liability under the FTC Act should not apply to the GFBPA claims, Defendants cite no portion of the statutory text that would limit the legislature's clear directive that the GFBPA be construed "consistently with interpretations given by the [FTC] in the federal courts." O.C.G.A. § 10-1-391. Nor do Defendants cite any case in which any court has declined to apply the common enterprise doctrine or standards for individual liability to state consumer protection claims under similar circumstances.

Instead, Defendants rely primarily on dicta in one Georgia Supreme Court case, *State ex rel. Doyle v. Frederick J. Hanna & Associates, P.C.*, 695 S.E.2d 612 (Ga. 2010). There, the Georgia Supreme Court assessed whether the GFBPA applies to the practice of law.[20] In a 4-3 decision, the *Doyle* Court, reasoned that,

---

[20] Specifically, the Administrator of the GFBPA issued an investigative demand to a law firm that collected debts on behalf of its clients. *Id.* at 613–14. While the *Doyle* decision in 2010 involved enforcement of the GFBPA by the Administrator of the GFBPA (an agency head within the Governor's Office), the Georgia General Assembly in 2015 reassigned the administration and

while business aspects of the legal profession might fall within the bounds of the GFBPA, the noncommercial aspects of lawyering are excepted from the GFBPA for public policy reasons. *Id*. at 614–15 (quoting and adopting the rationale of *Haynes v. Yale-New Haven Hosp*., 699 A.2d 964, 973 (Conn. 1997)). The *Doyle* Court relied in large part on the rationale that only the Georgia Supreme Court has the inherent power to govern the practice of law in Georgia. *Id*. at 615 ("[a]bsent a clear indication by the legislature, we will not conclude that the legislature intended to regulate attorney-client relationships through the [FBPA]") (quoting and adopting the rationale of *Cripe v. Leiter*, 703 N.E.2d 100, 105 (Ill. 1998)).

In providing its rationale, the *Doyle* Court acknowledged that attorneys engaging in debt collection would be subject to suit by the FTC under the Fair Debt Collection Practices Act ("FDCPA"). Even so, the *Doyle* Court stated:

> Contrary to the dissent, O.C.G.A. § 10-1-391(b) does not constitute a "legislative mandate" for consistent interpretation of the FBPA and the Federal Trade Commission Act (FTCA) *such that an attorney who violates the FTCA has also violated the [G]FBPA*. Consistent construction of these federal and state laws must take into account the differences between the statutory schemes. *Agnew v. Great Atlantic & Pacific Tea Co*., 502 S.E.2d 735 (Ga. Ct. App. 1998) (causation and injury are required elements under the FBPA, but not under the FTCA).[21] *The application of the FTCA to attorneys collecting*

---

enforcement of the GFBPA to the Georgia Attorney General. *See* Ga. L. 2015, p. 1088, § 2. *See also Financial Educ. Services, Inc. v. State ex rel. Sours*, 785 S.E.2d 544, 545 n.1 (Ga. Ct. App. 2016).
[21] The Court notes that causation and injury are certainly required elements for a *private party* suing under the GFBPA. *See Tiismann v. Linda Martin Homes Corp*., 637 S.E.2d 14, 17 (Ga. Ct. App. 2006) ("A private FBPA claim has three elements: a violation of the Act, causation, and injury."). That said, the GFBPA may be enforced through governmental and/or private action. *See Quattrocchi v. State*, 850 S.E.2d 432, 435–36 (Ga. Ct. App. 2020) (detailing the parallel enforcement scheme).  And, unlike a private action, the state enforcement scheme allows the Attorney General to seek administrative remedies (as the State does here) "whether or not any person has actually been misled," i.e., for a violation of the Act alone – absent causation or injury.

>consumer debts is by way of the FDCPA, a separate act which
>expressly addresses debt collection and applies to attorneys only
>because of the repeal of a prior exemption for them. *Heintz v.
>Jenkins*, 115 S.Ct. 1489. Moreover, Congress obviously acts in
>different governmental context than does the General Assembly. As
>already noted, if the state's legislature had intended to regulate the
>conduct of attorneys in relation to their clients *notwithstanding this
>Court's unique role with respect thereto*, one would expect to find a
>clear and specific provision like the regulation of false advertising of
>legal services in OCGA § 10-1-427.

*Id.* at 616. Thus, ultimately, the *Doyle* Court (over vociferous dissent) found that

the GFBPA did not cover certain debt collection practices by attorneys, even

though such conduct would be subject to suit by the FTC *under the FDCPA* (not

Section 5 of the FTC Act).

Defendants read this decision to support their argument that the GFBPA and

the FTC Act should not be interpreted consistently when it comes to the common

enterprise doctrine and standards for individual liability. In reading the dicta in

this way, Defendants stretch *Doyle* far beyond its holding. *Doyle*'s holding — that

certain debt collection practices by attorneys are outside the bounds of the GFBPA

— was based largely on a public policy rationale related to the Georgia Supreme

Court's exclusive authority to regulate the practice of law in the state. Moreover,

the parallel enforcement scheme at issue involved FTC's authority under the

FDCPA, not Section 5 of the FTC Act.

---

*See* O.C.G.A. § 10-1-397(b). *See also Moore-Davis Motors, Inc. v. Joyner*, 556 S.E.2d 137, 139 (Ga.
Ct. App. 2001) ("*Although the FBPA provides administrative remedies for any violation of the
Act*, a private right of action is only available to a person 'who suffers injury or damage as a result
of a violation.'") (emphasis added).

While the *Doyle* Court expressed concern about consistent interpretation of the GFBPA and the FTC Act, it did so only in the context of the particular issue there — the regulation of attorney legal work — not in the broad manner Defendants suggest. To extend *Doyle*'s dicta to support Defendants' argument that the GFBPA and FTC Act should not be interpreted consistently in the current context (involving the application of the common enterprise doctrine and standards for individual liability) would violate the plain and undisputed statutory text, as well as other Georgia Supreme Court authority. *Zeeman*, 273 S.E.2d at 913; *Henderson*, 623 S.E.2d at 468–69. Established rules of statutory construction under Georgia law provide that courts

> must presume that the General Assembly meant what it said and said what it meant. To that end, [courts] must afford the statutory text its plain and ordinary meaning, [courts] must view the statutory text in the context in which it appears, and [courts] must read the statutory text in its most natural and reasonable way . . .

*Quattrocchi v. State*, 850 S.E.2d 432, 435 (Ga. Ct. App. 2020) (quoting *Johnson v. State*, 839 S.E.2d 521 (Ga. 2020)). The plain and ordinary meaning of the relevant text is that the GFBPA shall be construed as consistent with interpretations of Section 5 of the FTC Act given in federal courts. For these reasons, *Doyle* cannot be read to prohibit the application of the FTC Act's common enterprise doctrine and standards for individual liability to the GFBPA claims. Defendants' argument against application of these doctrines fails.

To summarize: first, the plain statutory text states that the GFBPA shall "be interpreted and construed consistently with interpretations given by the [FTC] in

the federal courts" under Section 5, and that the GFBPA be "liberally construed" to promote the goal of consumer protection, *see* O.C.G.A. § 10-1-391. Second, other courts around the country have applied the FTC Act's common enterprise doctrine and standard for individual liability to their own state consumer protection statutes. For these two reasons, the Court concludes that the common enterprise doctrine and the standards for individual liability applied by federal courts to the FTC Act also apply to the GFBPA claims here.

As such, for the reasons addressed in Section III.A. of this Order, Plaintiffs have presented significant evidence that the Corporate Defendants engaged in a common enterprise through which they made false and misleading representations about the efficacy of stem cell therapy treatment. Plaintiffs have also shown that these representations constitute "unlawful acts and practices" prohibited under the GFBPA, O.C.G.A. § 10-1-393(a) & (b)(5) (outlawing "[r]epresenting that goods or services have sponsorship, *approval*, characteristics, ingredients, uses, *benefits*, or quantities that they do not have") (emphases added). Further, consistent with "the interpretations given by the [FTC] in the federal courts pursuant to Section 5(a)(1) of the [FTC Act]," *see* O.C.G.A. § 10-1-391, the individual Defendants can be held individually liable for the actions of the Corporate Defendants, for the reasons detailed in Section III.A.3 of this Order. Summary judgment is thus **GRANTED** in the State of Georgia's favor as to Count IV.

As to Count V, Plaintiffs have also provided undisputed evidence that Defendants used computers and computer networks to disseminate their deceptive stem cell therapy ads in violation of O.C.G.A. § 10-1-393.5 (prohibiting the use of a computer/computer network to "[e]ngage in any act, practice, or course of business that operates or would operate as a . . . deceit upon a person"). For example, Plaintiffs provide many emails in which the Corporate Defendants advertise to customers directly through emails, or where the individual Defendants created or approved ad content using a computer network, and more. (*See, e.g.*, Email Blast Ad, Doc. 97-16 (stating that stem cell therapy is superior to steroid injections and surgery); "Dear PBS Clients" Email, Doc. 83-11 (advertising SCIA training); SCIA Sample Email for Clinics II, Doc. 76-23; Peyroux Email, Doc. 75-9 (confirming order of 40,000 inserts for StemCell trifold); Detelich Ad Building Email, Doc. 94-16). Plaintiffs also cite to misleading advertisements on Defendants' websites. (*See, e.g.,* Superior Website, Docs. 96-24, 126-2 at ECF 21.) Summary judgment is therefore **GRANTED** in the State of Georgia's favor on Count V.

### C.   Requested Relief

#### 1.   Injunctive Relief

The FTC and the State of Georgia first request injunctive relief under the FTC Act and the GFBPA. The Peyroux Defendants do not address this request for injunctive relief at all in their response brief. Defendant Detelich, however, argues that Plaintiffs are not entitled to injunctive relief against him because there is no

risk that he will engage in similar conduct again. (Detelich Resp., Doc. 112 at 11–12.)

Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), the FTC may "seek, and after proper proof, the court may issue, a permanent injunction." It is well-settled that "permanent injunctive relief is appropriate if 'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" *USA Fin., LLC*, 415 F. App'x at 975 (citing *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980[22])). The GFBPA also authorizes a court to enter various forms of relief, including a permanent injunction, where the Attorney General has shown that a person has violated the GFBPA. O.C.G.A. § 10-1-397(b)(2).

Under the FTC Act that, where a district court concludes that the evidence "indicates a reasonable likelihood of future violations," permanent injunctive relief is appropriate. *USA Fin., LLC*, 415 F. App'x at 975 (affirming district court's grant of permanent injunction to FTC, even though it was undisputed that defendant ceased its deceptive practices in 2007 and complaint was filed in 2008, but district court determined that there was reasonable likelihood of future violations). Thus, "[i]f the FTC is able to demonstrate that there is 'some cognizable danger of recurrent violation, something more than a mere possibility,' then the FTC is entitled to injunctive relief." *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). In determining

---

[22] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

whether there is "some cognizable danger of a recurrent violation," courts consider these factors:

> the egregiousness of the defendant's actions; the isolated or recurrent nature of the actions; the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the defendant's recognition of the wrongful nature of his conduct; and the likelihood that the defendant's occupation will present opportunities for future violations. . . .

*FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1289 (M.D. Fla. 2016) (citing *FTC v. RCA Credit Servs.*, 2010 WL 2990068, at *5 (M.D. Fla. July 29, 2010) (quoting *Sec. Exch. Comm'n v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)).

Upon review of the evidence, the Court concludes that some form of injunctive relief is appropriate as to all existing Defendants. Considering the relevant factors, the evidence demonstrates that the Defendants engaged in a comprehensive campaign to develop and disseminate misleading advertisements about the efficacy and approval of stem cell therapy on a massive scale. Indeed, these advertisements were the main thrust of Defendants' businesses — and Defendants profited massively from these efforts. *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209 (where violations were "numerous and grave," permanent injunctive relief was warranted). The "degree of scienter involved" was high — Defendants Peyroux and Detelich were the force behind the whole operation and were fully immersed in the advertising campaign. Further, even though Superior and SCIA have filed for bankruptcy, Physicians Business remains operational. (PSOMF-Peyroux ¶¶ 3, 8.) And Defendants Peyroux and Detelich currently hold

interests in many other healthcare companies. (PSOMF-Peyroux, Doc. 115-1 ¶¶ 217, 218, 219, 229, 230, 234, 238, 241; PSOMF-Detelich, Doc. 117-1 ¶¶ 332, 334.) So the "likelihood that the defendant's occupation will present opportunities for future violations," is still high. *Lanier Law, LLC*, 194 F. Supp. 3d at 1289; *Windward Mktg.*, 1997 WL 33642380, at *15 (finding permanent injunction appropriate where defendants would continue to operate in telemarketing sector).

Accordingly, the Court finds that some form of permanent injunctive relief is appropriate. That said, the specific scope of the injunctive relief requires further consideration and presentation of evidence. The Court will therefore hold a hearing on the nature of the injunctive relief required as stated in the conclusion of this Order.

### 2.    Monetary Relief Under the GFBPA

Along with injunctive relief, the State of Georgia seeks monetary relief in the form of civil penalties and restitution under the GFBPA for (1) violations of § 10-1-393's prohibition on engaging in "[u]nfair or deceptive acts or practices in the conduct of consumer transactions" and (2) violations of § 10-1-393.5(b)'s prohibition on using a computer/computer network to engage in deceptive acts.

In requesting monetary relief for violations of these two sections of the GFBPA, the State relies on three statutory provisions that, together, outline the relief available under the GFBPA. These provisions are: O.C.G.A. § 10-1-397(b)(2) ("the Civil Penalty Provision"); O.C.G.A. § 10-1-393.5(d) ("Additional Computer Penalty Provision"); and O.C.G.A. § 10-1-851 ("the Unfair and Deceptive Practices

Towards the Elderly Act (UDPTEA)"). The Court outlines these relief provisions now.

First, the Civil Penalty Provision is the primary mechanism for the Attorney General to seek relief for violations of the GFBPA when the "proceedings would be in the public interest" and "*whether or not any person has actually been misled*." O.C.G.A. § 10-1-397(b) (emphasis added). This Provision authorizes the Attorney General to seek various forms of relief for violations of the GFBPA:

> (2) . . . upon a showing by the Attorney General in any superior court[23] of competent jurisdiction that a person[24] has violated or is about to violate [the GFBPA], or an order of the Attorney General, the court may enter or grant any or all of the following relief:

> (A)   A temporary restraining order or temporary or permanent injunction;

> (B)   **A civil penalty of up to a maximum of $5,000.00 per violation of this part**;

> (C)   A declaratory judgment;

> (D)   **Restitution to any person or persons adversely affected by a defendant's actions in violation of this part**;

> (E)   The appointment of a receiver, auditor, or conservator for the defendant or the defendant's assets; or

> (F)   Other relief as the court deems just and equitable.

---

[23] Although the statute authorizes the Attorney General to seek relief "in any superior court," a provision was added to the statute in 2015 clarifying that "The Attorney General is authorized to initiate or intervene as a matter of right or otherwise appear *in any federal court* or administrative agency *to implement the provisions of this article*." O.C.G.A. § 10-1-397.1 (emphasis added).
[24] The GFBPA defines "person" as a "natural person, corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity." O.C.G.A. § 10-1-392(24).

§ 10-1-397(b)(2) (emphases added). The statute does not specifically define "violation" or provide a method for assessing the specific number of violations.

Next, the Additional Computer Penalty Provision, through its reference to the Unfair and Deceptive Practices Towards the Elderly Act ("UDPTEA"), provides for additional penalties where a defendant has used a computer/computer network to engage in deceptive acts that intentionally target elderly or disabled individuals:

> Any person who intentionally targets an elder[25] or disabled person[26], as defined in Article 31 of this chapter, in violation of subsection (b) of this Code section[27] shall be subject to an additional civil penalty, as provided in Code Section 10-1-851.

O.C.G.A. § 10-1-393.5(d).

In turn, "Code Section 10-1-851," *id.*, otherwise known as UDPTEA (again the Unfair or Deceptive Practices Toward the Elderly Act), states that "[w]hen any person found to have conducted business in violation of [the GFBPA] is found to have committed said violation against elder or disabled persons," then "the court may impose an additional civil penalty not to exceed $10,000.00 for each violation" in addition to any civil penalty otherwise imposed.[28] In imposing these

---

[25] Under Article 31, an "elder person" is a person 60 years of age or older. O.C.G.A. § 10-1-850(2).
[26] A "disabled person" is an individual "who has a physical or mental impairment which substantially limits one or more of such person's major life activities." *Id.* § 10-1-850(1). The statute then provides a definition for "physical or mental impairment" that includes individuals who have "orthopedic" diseases. *Id.*
[27] Subsection (b) makes it unlawful to use a computer or computer network to engage in deceptive or fraudulent acts. O.C.G.A. § 10-1-393.5(b).
[28] *See also Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1336 (N.D. Ga. 2000) ("Under Georgia law, individuals who violate the FBPA are subject to additional civil penalties if the violation is committed against elder or disabled persons. § 10–1–851."); *Horne v. Harbour Portfolio VI, LP*, 304 F. Supp. 3d 1332, 1344 (N.D. Ga. 2018) (same).

additional civil penalties for targeting an elder or disabled person, courts "shall

consider the extent to which one or more of the following factors are present:"

(1)   Whether the defendant's conduct was in disregard of the rights of the elder or disabled person;

(2)   Whether the defendant knew or should have known that the defendant's conduct was directed to an elder person or disabled person;

(3)   Whether the elder or disabled person was more vulnerable to the defendant's conduct because of age, poor health, infirmity, impaired understanding, restricted mobility, or disability that other persons and whether the elder or disabled person actually suffered substantial physical, emotional, or economic damage resulting from defendant's conduct;

(4)   Whether the defendant's conduct caused an elder or disabled person to suffer any of the following:

(A)   Mental or emotional anguish;
(B)   Loss of or encumbrance upon a primary residence of the elder or disabled person;
(C)   Loss of or encumbrance upon the elder or disabled person's principal employment or principal source of income;
(D)   Loss of funds received under a pension or retirement plan or a government benefits program;
(E)   Loss of property set aside for retirement or for personal or family care and maintenance; or
(F)   Loss of assets essential to the health and welfare of the elder or disabled person; or

(5)   Any other factors the court deems appropriate.

O.C.G.A. § 10-1-852.

Under these relief provisions, the State of Georgia seeks the following

monetary relief from Defendants Physicians Business, Peyroux, and Detelich,

jointly and severally:  (1) a $5,000 civil penalty for each day false and misleading

representations were available on Superior's website (for at least 1330 days), for a total of $6,650,000; (2) a $10,000 civil penalty for each GFBPA violation against an elder or disabled person, including 59 online advertising campaigns, 161 brochures downloaded online, 148 seminars delivered, and 335 elderly consumer purchases of stem cell shots, for a total $7,030,000; (3) a $5,000 civil penalty for each individual consumer who purchased a stem cell shot who was not elderly, for a total of $750,000; and (4) restitution from Defendants Peyroux and Detelich for the 485 customers who purchased stem cell injections from Defendant Superior in the amount of $3,350,416 (the cost customers paid for shots, and the amount Defendants profited from selling the shots). In total, the State seeks $14,430,000 in civil penalties from all three remaining Defendants and $3,350,416 in restitution from Defendants Peyroux and Detelich. (MSJ, Doc. 73-1 at 33–34.)[29]

Defendants present a slew of arguments against the imposition of such monetary relief, including that: the civil penalties can be obtained only from a Georgia superior court; the GFBPA's civil penalty provisions are unconstitutionally vague; a lack of clarity about the proper manner for calculating civil penalties requires this Court to certify questions to the Georgia Supreme Court; and more.

Upfront, the Court notes that it cannot evaluate the amount of civil penalties or restitution at this time. The scope, nature, and amount of any monetary relief requires significantly more consideration and the presentation of comprehensive

---

[29] As a reminder, the State claims that the common enterprise generated a combined $18,403,116.14 in gross income from 2015 to 2022, and that Peyroux and Detelich jointly received at least $2,796,861.19 in profit distributions during this time.  (MSJ, Doc. 73-1 at 31.)

evidence at a hearing and likely with the aid of additional briefing. So the Court will not address any questions about the *amount* of monetary relief at this time or the appropriate way to calculate such relief. That said, the Court will address Defendants' contention that monetary relief should not be issued at all, and that questions about the statute should be certified to the Georgia Supreme Court.

### a. Civil Penalties Can be Obtained in a Federal Court

First, Defendant Detelich argues that civil penalties can be obtained only in a Georgia "superior court," not a federal court, citing O.C.G.A. § 10-1-397(b)(2) (stating that a court may issue civil penalties and restitution "upon a showing by the Attorney General in any *superior court*" that a person or entity has violated the GFBPA) (emphasis added). But in 2015, a provision was added to the statute in 2015 clarifying that "The Attorney General is authorized to initiate . . . or otherwise appear *in any federal court* or administrative agency *to implement the provisions of this article*." O.C.G.A. § 10-1-397.1 (emphasis added). Accordingly, Defendant Detelich's position is incorrect.

### b. The GFBPA's Civil Penalty Provision is Not Unconstitutionally Vague

Second, the Peyroux Defendants argue that the Civil Penalty Provision of the GFBPA is unconstitutionally vague as applied here. (Peyroux Resp., Doc. 110 at 25–29) (arguing that the statute provides "no specific method for calculating the

number of violations," "no factors for determining the size of the per violation penalty," and "no definition of the remedy of restitution").[30]

"It has long been the law in Georgia that Acts of the Legislature are not only presumed to be constitutional, but that the authority of the Courts to declare them void, will never be resorted to, except in a clear and urgent case . . ." *Bartow Cty. Bank v. Bartow Cty. Bd. of Tax Assessors*, 312 S.E.2d 102, 104 (Ga. 1984) (internal citation and quotation omitted). Statutes should be construed as constitutional "whenever possible." *Id.* This is because courts should "look diligently for the intention of the General Assembly" O.C.G.A. § 1-3-1(a), and the General Assembly is "presumed to intend all laws it enacts to be constitutional." *Bartow Cty. Bank*, 312 S.E.2d at 104.

"To withstand an attack of vagueness or indefiniteness, a civil statute must provide fair notice to those to whom the statute is directed and its provisions must enable them to determine the legislative intent." *Daniel v. Amicalola Elec. Membership Corp.*, 711 S.E.2d 709, 715 (Ga. 2011). Only where a law is "so vague that persons of common intelligence must necessarily guess at its meaning and differ as to it application" does it violate due process. *Rockdale Cty.*, 865 S.E.2d

---

[30] The Peyroux Defendants do not indicate whether they believe the Civil Penalty Provision is unconstitutionally vague under Georgia Constitution, the United States Constitution, or both. Georgia courts have addressed void-for-vagueness challenges as brought under both constitutions and have relied on United States Supreme Court decisions "interpreting the federal Constitution or Georgia decisions tracing back to such federal opinions." *See Rockdale Cty. v. U.S. Enterprises, Inc.*, 865 S.E.2d 135, 143 n.10 (Ga. 2021) (noting that the due process guaranteed by the Georgia and federal constitutions *may* be identical but that the court need not further delve into this question to decide the case). Like the Court in *Rockdale Cty.*, the Court here will "proceed in [its] analysis in reliance on the existing federal and heavily-federally-influenced Georgia precedent." *Id.*

135, 143 (Ga. 2021) (internal citation and quotation omitted); *see also Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1319 (11th Cir. 2017) (noting that a law "can be impermissibly vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"). A law may also be impermissibly vague if it "authorizes or . . . encourages arbitrary and discriminatory enforcement." *Id.*

With a vagueness challenge, "there is generally a greater tolerance of enactments with civil rather than criminal penalties because consequences of imprecision are qualitatively less severe." *Rockdale Cty.*, 865 S.E.2d at 143 (citing *Daniel*, 711 S.E.2d at 715) (cleaned up); *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) ("economic regulation is subject to a less strict vagueness test"). Finally, "the burden of proving a due process violation is on the party raising the vagueness challenge." *Rockdale Cty.*, 865 S.E.2d at 144. Where, as here, a vagueness challenge does not implicate the First Amendment, it must "be examined in the light of the facts of the case to be decided," i.e., as applied to the particular situation at hand. *Id.*

Here, Defendants had notice of what conduct violates the GFBPA because the GFBPA defines what conduct is prohibited — unfair or deceptive acts or practices in the conduct of consumer transactions, § 10-1-393. The GFBPA further provides a non-exhaustive list of examples of such unfair or deceptive acts, including: "[r]epresenting that goods or services [e.g., stem cell therapies] have . . . approval [or] . . . benefits . . . that they do not have." *Id.* § 10-1-393(b). The GFBPA

70

makes it a separate violation to use a computer/computer network to engage in such deceptive acts that operate as a "deceit upon a person." § 10-1-393.5. Thus, Defendants were clearly on notice that their conduct — representing that stem cell therapy had approval or benefits that it did not have (and using a computer/computer network to make and disseminate such representations) — was unlawful.

Further, Defendants had notice of the consequences of violating the GFBPA because the statute's Civil Penalty Provision defines the potential range of penalties that accompany noncompliance. *See* O.C.G.A. § 10-1-397(b)(2) (allowing, among other things, the Attorney General to seek civil penalties up to $5,000 per violation and restitution to any person adversely affected by a defendant's actions). Further, the Civil Penalty Provision, which allows for civil penalties of "up to $5,000 per violation" does not encourage discriminatory enforcement but rather provides the adjudicating court with discretion within set bounds, as discussed below.

The Peyroux Defendants argue that the Civil Penalty Provision is unconstitutionally vague because it does not provide a method to calculate the number of violations of the GFBPA. But language in the GFBPA, including the "per violation" language, should not be "interpreted in isolation" and instead should be construed "to give a sensible and intelligent effect to" all provisions. *Quattrocchi*, 850 S.E.2d at 435. Thus, the language allowing a court to assess "up to $5,000 per violation" must be read in the context of the GFBPA's prohibition on any "unfair

71

or deceptive act[] or practice[] in the conduct of [a] consumer transaction," O.C.G.A. § 10-1-393(a), and the prohibition on using a computer to engage "in any act, practice, or course of business" that operates as a deceit upon a person, § 10-1-393.5. Reading these provisions together suggests that each unfair or deceptive act or practice, or consumer transaction, serves as a separate violation of the statute.

Many other state consumer protection laws include similar language allowing the particular state's attorney general to recover for penalties "per violation," without explicitly defining "violation." *See, e.g.,* Ariz. Rev. Stat. § 44-1531 (providing that the Arizona AG may recover from the defendant "on behalf of the state a civil penalty of not more than ten thousand dollars per violation" of Arizona's Consumer Fraud Act); Idaho Code § 48-606 (allowing Idaho AG to recover civil penalties of "up to $5,000 per violation" of Idaho's Consumer Protection Act); Cal.Bus. & Prof. Code §§ 17206 & 17206.1 (providing for California AG to bring civil action and obtain civil penalty not to exceed $2,500 for each violation and additional civil penalty of $2,500 for each violation if acts are perpetrated against senior citizens or disabled persons).[31]

---

[31] *See also State v. Going Places Travel Corp.*, 864 N.W.2d 885, 895 (Ct. App. Wisc. 2015) (explaining that "[t]he statute does not define the term violation") (citing Wisc. Stat. § 100.171 (providing for civil penalties "not less than $100 nor more than $5000 for each violation" of Wisconsin law about required disclosures in prize notice advertisements)); Ark. Code § 4-88-113 (stating that, in proceeding brought by Arkansas Attorney General, a court may assess penalties "not to exceed" $10,000 "per violation" under Arkansas Deceptive Trade Practices Act); Wash. Rev. Code § 19.86.140 (providing for "civil penalty of not more than $7,500 for each violation" of Washington's Unfair or Deceptive Practices Act); Haw. Rev. Code § 480.3.1 (allowing for civil penalty between $500 and $10,000 for each violation); Kan. Stat. § 50-636 (allowing for civil

Courts interpreting these statutes have assessed per violation penalties based on the number of ads published, transactions completed, consumer purchases, or a mix of these measures. *See, e.g., People ex rel. Kennedy v. Beaumont Inv., Ltd.,* 3 Cal. Rptr. 3d 429, 450–51 (Cal. Ct. App. 2003), *as modified on denial of reh'g* (Sept. 9, 2003) (affirming trial court's assessment of "per violation" penalties based on number of unlawful lease transactions *and also* number of consumers affected); *State v. R.J. Reynolds Tobacco Co.,* 2013 Vt. Super. LEXIS 15, *37–39 (Vt. Super. Ct. 2013) (finding that defendant violated Vermont's consumer protection act 6776 times based on 1642 days that ads were placed on the website, 1028 direct mailings, 4100 package inserts, and 6 national magazine ads received in Vermont); *United States v. Reader's Dig. Ass'n, Inc.,* 662 F.2d 955, 959–60 (3d Cir. 1981) (upholding finding that each of 17,940,521 mailings constituted a separate violation of consent order under FTC Act); *State v. Menard, Inc.,* 358 N.W.2d 813, 815 (Wis. Ct. App. 1984) (considering "each publication of an advertisement" in each newspaper or other medium a separate violation of Wisconsin consumer protection law).

These other state consumer protection statutes have been read to provide the court with some discretion to evaluate the appropriate manner of determining

---

penalty of not more than $10,000 per violation of Kansas Consumer Protection Act); N.H. Rev. Stat. § 358-A:4 (allowing for civil penalty of up to $10,000 for each violation of New Hampshire consumer protection act); 73 Pa. Stat. § 201-8 (allowing for up to $1,000 per willful violation of Pennsylvania consumer protection statute and $3,000 per willful violation where victim is age 60 or older). While these are just some examples, numerous other states also include per violation penalties without defining "violation" in the statute.

the number of violations based on the circumstances of the case. *See, e.g., Beaumont Inv.,* 3 Cal. Rptr. 3d at 450–51 (explaining that, where statute does not define violation, "determining what qualifies as a single violation" is "up to the courts" and depends on "the circumstances of the case"); *State v. Mandatory Poster Agency, Inc.*, 398 P.3d 1271, 1280 (Wash. Ct. App. 2017) (explaining that the trial court did not abuse its discretion since state consumer protection action "vests the trial court with the power to assess a penalty for each violation"); *State ex rel. Corbin v. United Energy Corp. of Am.*, 725 P.2d 752, 756 (Ariz. Ct. App. 1986) (emphasizing importance of allowing courts flexibility in imposing civil penalties under Arizona Consumer Protection Act to "give effect to legislative intent behind the statute"). Ultimately, Defendants' argument that the GFBPA's Civil Penalty Provision is unconstitutionally vague because it does not explicitly define "violation" ignores the other provisions of the statute and conflicts with common practice in courts across the country implementing the terms of comparable state consumer protection statutes.

The Peyroux Defendants next argue that the Civil Penalty Provision is unconstitutionally vague because there are no factors to determine the size of per violation penalties. In a different but analogous context, the Eleventh Circuit rejected a similar argument that the Fair Credit Reporting Act ("FCRA") was unconstitutionally vague because it provides for a range of statutory damages[32]

---

[32] While *Harris* involved a statutory damage scheme rather than an administrative penalty scheme, the thrust of Defendants' vagueness challenge here is similar to the challenge in *Harris*.

without specifying criteria for the court or jury to assess the appropriate amount within the range. *See Harris v. Mexican Specialty Foods., Inc.*, 564 F.3d 1301, 1310–11 (11th Cir. 2009) (holding that the FCRA gives potential violations notice that they will be subject to a range of penalties per violation, thereby satisfying due process) ("In order to be unconstitutionally vague, a statute must go beyond simply granting some discretion to courts or juries to act within a range").[33]

Finally, the Peyroux Defendants argue that the Civil Penalty Provision is unconstitutionally vague because it includes no instruction on how to calculate restitution or how to determine whether an individual has been "adversely affected" by their actions. This contention lacks merit. The statute's plain text states that the Attorney General may seek and a court may grant relief in the form of "restitution to any person or persons adversely affected by a defendant's actions in violation of [the GFBPA]." § 10-1-397(b). Under well-established rules of statutory construction, courts "afford the statutory text its plain and ordinary meaning" and read statutory text "in the most natural and reasonable way, as an ordinary speaker of the English language would." *Quattrocchi*, 850 S.E.2d at 435 (explaining that "restitution" under the GFBPA is different from unliquidated damages). Assessing an earlier version of the GFBPA, the Georgia Court of Appeals characterized restitution as consisting of "the refund of the purchase price and the

---

[33] The *Harris* Court noted that statutory damage ranges exist in other statutes as well, including The Copyright Act, 17 U.S.C. § 101 (providing for statutory damage range of $750 to $30,000 per violation and $150,000 where willful), and the Communications Act of 1934, 37 U.S.C. § 151 (providing for statutory damage range of $1,000 to $10,000 per violation, and $100,000 where willful).

return to the status quo." *Colonial Lincoln-Mercury Sales, Inc. v. Molina*, 262 S.E.2d 820, 822 (Ga. Ct. App. 1979). The dictionary definition of restitution includes "a restoration of something to its rightful owner" and "a legal action serving to cause restoration of a previous state." *Restitution*, Merriam-Webster. The Cambridge Dictionary definition of "adversely affected" is "influenced or changed in a negative or harmful way." *Adversely Affected*, Cambridge Dictionary. In short, a plain reading of the statute is specific enough to provide notice to Defendants that they would have to pay money back to individuals who had been harmed by their violations of the GFBPA.[34]

In sum, Defendants have not carried their burden to overcome the presumption of constitutionality and show that the Civil Penalty Provision of the GFBPA is unconstitutionally vague because the Civil Penalty Provision put them on notice of the penalties that can be assessed against them for violating the GFBPA.

### c. The UDPTEA is Not Unconstitutionally Vague

As with their challenge to the Civil Penalty Provision, the Peyroux Defendants argue that the UDPTEA is unconstitutionally vague because it does not specifically define a "violation." § 10-1-851 ("When any person who is found to have conducted business in violation of [the GFBPA] is found to have committed said

---

[34] At the future evidentiary hearing of course, the State will be required to demonstrate that the restitution it seeks is on behalf of individuals who were "adversely affected" by Defendants' violations of the GFBPA.

violation against elder or disabled persons, in addition to any civil penalty otherwise set forth or imposed, the court may impose an additional civil penalty not to exceed $10,000 for each violation").[35] For the same reasons articulated above, this contention lacks merit because a violation is tied to each deceptive act, practice, consumer transaction, or course of business, consistent with O.C.G.A. § 10-1-393 & § 10-1-393.5.

The Peyroux Defendants next argue that their advertising did not target the elderly. This issue is subject to the Court's consideration at the evidentiary relief hearing. At the hearing, Defendants will be permitted to submit any contrary evidence that they did not target the elderly or disabled. All the same, there is no basis to find this provision unconstitutionally vague.

### d. The Court Declines to Certify Questions to the Georgia Supreme Court

Finally, Defendants ask the Court to certify questions about the application of the GFBPA to the Georgia Supreme Court. While the Peyroux Defendants do not provide specific questions that they request be certified, they say that their proffered certification questions involve how the court should apply "per violation penalties" and restitution under the Civil Penalty Provision. (Peyroux Resp., Doc. 110 at 25.) Defendant Detelich, on the other hand, proposes three specific certification questions about the GFBPA's Civil Penalty Provision: (1) How are the

---

[35] *See also Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1336 (N.D. Ga. 2000) ("Under Georgia law, individuals who violate the FBPA are subject to additional civil penalties if the violation is committed against elder or disabled persons. § 10–1–851."); *Horne v. Harbour Portfolio VI, LP*, 304 F. Supp. 3d 1332, 1344 (N.D. Ga. 2018) (same).

number of violations calculated?; (2) What factors should be considered in determining whether to assess a civil penalty and in what amount?; and (3) How is restitution determined? (Detelich Resp., Doc. 112 at 24.)

"Where there is *substantial* doubt about the correct answer to a *dispositive* question of state law," a court should certify the question to the state supreme court. *Government Employees Ins. Co. v. Glassco Inc.*, 85 F.4th 1136, 1147 (11th Cir. 2023) (emphasis added). Whether to certify a question of state law is within the court's discretion, and certification should "never be automatic or unthinking." *Escareno v. Noltina Crucible and Refractory Corp.*, 139 F.3d 1456, 1461 (11th Cir. 1998) (internal citation omitted). In evaluating whether to certify a question, courts consider "the closeness of the question," the existence of sufficient sources of state law "to allow a principled rather than conjectural conclusion," the degree to which comity is relevant, and "practical limitations of the certification process." *Id.*

After review of the record and factors for certification of appeal to the Georgia Supreme Court, the Court concludes that it would not be appropriate to grant Defendants' certification request. While there are few Georgia Supreme Court or Court of Appeals decisions explicitly interpreting the GFBPA Civil Penalty Provision, other provisions in the GFBPA and comparable provisions in other consumer protection laws provide sufficient guidance on how the GFBPA provisions at issue should be construed and implemented.[36]

---

[36] *See supra* n.31.

As noted above, questions about how the number of violations should be calculated can be answered by looking at the substantive provisions of the GFBPA prohibiting "acts or practices" in "consumer transactions," all of which can be quantified. The amount of each civil penalty is provided in the statute — up to $5,000 per violation, or $10,000 in the event a defendant has targeted an elderly or disabled person.[37] And courts are regularly tasked with determining the appropriate amount of restitution, by way of reference to relevant legal authority, dictionaries, record evidence, and other resources.[38]   Moreover, the Georgia Supreme Court has looked to decisions interpreting other state's consumer protection statutes when determining the bounds of the GFBPA. *See Henderson*, 623 S.E.2d at 97–98.  Several decisions interpret the appropriate number and amount of civil penalties under highly similar language found in other states' consumer protection statutes. These decisions provide helpful guidance for courts interpreting the GFBPA's Civil Penalty Provision. Finally, when considering

---

[37] On the question of "whether [a court should] assess a civil penalty," the State points out that, under Georgia law, while the word "may" ordinarily denotes permission and not command, "where the word as used concerns the public interest or affects the rights of third persons, [the word 'may'] shall be construed to mean 'must' or 'shall.'" O.C.G.A. § 1-3-3(10). Thus, where the Civil Penalty Provision states that a court "may" enter relief in the form of civil penalties, Georgia law suggests that the court "shall" grant such relief under the circumstances.

[38] For example, a Georgia Court of Appeals decision has characterized restitution under the GFBPA as "the refund of the purchase price and the return to the status quo." *Colonial Lincoln-Mercury Sales, Inc. v. Molina*, 262 S.E.2d 820, 822 (Ga. Ct. App. 1979). More recently, the Georgia Court of Appeals has explained that "restitution" under the Civil Penalty Provision of the GFBPA does not mean the same thing as damages and is instead equitable relief. *Quattrocchi*, 850 S.E.2d at 435. The Eleventh Circuit has explained that "restitution in equity" involves situations where a plaintiff seeks restitution or money or property belonging in good conscience to the plaintiff (or here, members of the public the State is tasked with protecting) and which can "clearly be traced to particular funds or property in the defendant's possession." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, n.45 (11th Cir. 2021) (citing Restatement (Third) of Restitution and Unjust Enrichment § 4 cmt. d).

whether to certify a question to a state supreme court, courts should consider the "practical limitations" of the process. Here, Defendants' proposed questions about the appropriate way to assess per violation penalties would likely require the Georgia Supreme Court to wade into (and evaluate) the facts and record evidence. The Georgia Supreme Court has hesitated to engage in such evidentiary evaluation on certification in the past. *See King v. King*, 888 S.E.2d 166, 170 (Ga. 2023) (declining to answer certified question where those questions sought guidance "about the scope of a fiduciary's duties under factual circumstances particular to the case" and where it appeared these "fact-bound questions" could be "answered by reference to existing Georgia law").

For all of these reasons — and in particular, the fact-intensive nature of the monetary relief issues — the Court declines to certify questions to the Georgia Supreme Court at this time.

***

For the above reasons, Defendants' arguments that the State is entitled to no monetary relief under the GFBPA lack legal support. As shown above, civil penalties and restitution may be assessed in a federal court, and the relevant relief provisions are not unconstitutionally vague. Further, the Court does not believe it necessary to certify questions to the Georgia Supreme Court at this time. Accordingly, because the State has established that Defendants violated the GFBPA, it is entitled to recover some form of monetary relief from Defendants in the form of civil penalties and restitution, though the scope of such relief is still to

be determined. The specific amount of monetary relief and the manner of calculating the civil penalties and restitution requires further consideration and an evidentiary hearing, as discussed below.

### IV.   CONCLUSION

For all these reasons, Plaintiffs' summary judgment motion [Doc. 73] is **GRANTED**. Summary judgment is **GRANTED** in the FTC's favor as to liability on Counts I–III. Summary judgment is **GRANTED** in the State of Georgia's favor as to liability on Counts IV and V.

The Court will evaluate the appropriate contours of injunctive relief (under the FTC Act and the GFBPA) and the appropriate measure and amounts of monetary relief (due to the State under the GFBPA) at a relief hearing.  At the hearing, Plaintiffs should be prepared to introduce testimony, documents, and evidence that address their request for monetary relief as well as evidence that speaks to the appropriate methodology for calculating such monetary relief. Plaintiffs are **DIRECTED** to file two proposed relief orders, one for injunctive relief and one (filed by the State) for monetary relief under the GFBPA. Plaintiffs are also **DIRECTED** to file a chart summarizing comparable penalties assessed in other cases under other states' consumer protection acts. This chart should include information about the particular defendant, the nature of the particular violation(s) and/or product, the number of violations found by the court, the amount per violation, the total penalty assessed, and the court's general rationale. Plaintiffs should also submit a notice of filing outlining and attaching any record

81

evidence supporting their specific monetary relief request calculations in this case. Defendants may file responses to Plaintiffs' proposed orders, chart, and evidentiary support of calculations.

Plaintiffs' proposed orders, chart, and evidentiary support of calculations shall be **due 21 days after the date of this Order**. Defendants may file responses, which shall be **due 21 days after they are filed**. Plaintiffs may file any replies **14 days after Defendants' responses are filed**. After the Court has received the parties' filings, it may send the parties other questions to answer, or request additional documentation, before the relief hearing. In addition, on or before **June 3, 2024**, the parties are **DIRECTED** to file notices identifying the witnesses whom they intend to call at the relief hearing.

The relief hearing is set for **10:30 a.m.** on **Monday June 17, 2024** in Courtroom 2308.

**IT IS SO ORDERED** this 11th day of March 2024.

**Honorable Amy Totenberg**
**United States District Judge**

82